UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| RICHARD KRANTZ, Derivatively On Behalf of Nominal Defendant CVS CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> THOMAS M. RYAN, DAVID B. RICKARD, THOMAS P. GERRITY, STANLEY P. GOLDSTEIN, MARIAN L. HEARD, TERRY R. LAUTENBACH, TERENCE MURRAY, SHELI Z. ROSENBERG, and WILLIAM H. JOYCE, <br><br> Defendants, <br><br> and <br><br> CVS CORPORATION, <br><br> Nominal Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

04 - 12650 REK

Civil Action No.

RECEIPT # _____
AMOUNT $ 150.00
SUMMONS ISSUED 10
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. M.P.
DATE 12/17/2004

MAGISTRATE JUDGE ____ RBC

**DERIVATIVE COMPLAINT**
and
**DEMAND FOR JURY TRIAL**

1.    Plaintiff, by his attorneys, submits this Derivative Complaint (the "Complaint") against the defendants named herein.

Nature of the Action

2.    This is a shareholder's derivative action brought for

the benefit of nominal defendant CVS Corporation ("CVS" or the "Company") against members of its Board of Directors (the "Board") and certain executive officers seeking to remedy defendants' breaches of fiduciary duties.

3.    CVS is one of the largest retail drugstore chains in the United States.  As of December 30, 2000, the Company operated 4,133 retail and specialty pharmacy drugstores and various mail-order facilities located in 31 states and the District of Columbia.  During the relevant period, CVS touted itself as the largest drug store chain in terms of number of stores operated and the largest dispenser of retail prescriptions.

4.    Beginning in 1997, CVS embarked upon a rapid expansion program, more than doubling the number of stores operated by the Company in less than two years through the acquisition of several other drugstore chains.  As a result, CVS's reported revenue grew from approximately $5.5 billion in 1996 to approximately $20.1 billion in 2000.  Additionally, CVS's reported net earnings grew from approximately $167.4 million to approximately $746 million during that same time period.

5.    During the relevant period, CVS repeatedly reported "record" financial results and touted its ongoing ability to achieve "double-digit" growth.  At all relevant times, CVS portrayed itself as a company that was extremely well-positioned

- 2 -

to take advantage of the rapidly expanding pharmacy industry. CVS also represented to the public that it was effectively handling the shortage of pharmacists in the United States and was continuing to expand the number of stores it operated, while focusing on a strategy of relocating existing pharmacies in strip malls to more profitable stand-alone locations.

6.     However, as CVS's senior officers and directors knew but did not disclose, the Company was encountering significant problems that were having a materially negative impact on its financial results and future prospects. These problems included, among other things: (a) the fact that the Company was unable to successfully offset the increased pressure on gross margins that the growing percentage of lower margin pharmacy sales were having on the Company's income and earnings; (b) that a significant number of the pharmacies CVS had acquired over the past few years were underperforming, could not be relocated, and would need to be closed; and (c) that the ongoing pharmacist shortage was having an acute impact on CVS's operations, resulting in unreasonably long waits for customers to fill prescriptions and causing stores in a number of different markets to temporarily close or reduce hours, thereby resulting in the loss of sales and further reducing income and earnings.

7.     Rather than publicly disclose these material problems,

which were eroding the Company's margins and threatening its ability to achieve forecasted growth and earnings, defendants engaged in fraudulent and undisclosed accounting practices in violation of Generally Accepted Accounting Principles ("GAAP"), which enabled the Company to artificially inflate its reported gross margin, earnings and earnings per share during the relevant period. Additionally, defendants' issued a series of materially false and misleading public statements intended to create a false impression of the Company's business and prospects throughout the relevant period, thereby rendering the Company's reported financial results complained of herein materially false and misleading.

8.   The market did not begin to learn about the significant problems that CVS was experiencing until June 27, 2001, when defendants first announced that, due to increased pressure on gross margins and the adverse impact of the pharmacist shortage, the Company's earnings per share for the second quarter and full year would be lower than they had previously projected.   In response to this negative news, the price of CVS common stock dropped precipitously frcm $44.10 per share to $36.51 per share.

9.   Further disclosure of CVS's problems was made by defendants on October 30, 2001, when they announced that the Company intended to close approximately 200 stores and incur a

- 4 -

restructuring charge of approximately $350 million.  In response to this additional negative news, the price of CVS common stock fell an additional $7.72, from $31.62 per share to $23.90 per share.

10.   The full extent of CVS's problems were not disclosed until February 5, 2002, when the Company issued a press release announcing its results for the fourth quarter of 2001 and fiscal year ended December 31, 2001.  As previously indicated, defendants announced that CVS would record a $352.5 million restructuring charge and close 229 stores as well as a mail order facility and a distribution center.  As a result of the restructuring charge, CVS announced that it had incurred a net loss for the fourth quarter of 2001 of $130 million.

## Parties

11.   Plaintiff Richard Krantz is, and was at all relevant times, a shareholder of nominal defendant CVS.

12.   Nominal defendant CVS is a Delaware corporation with its principal executive offices located at One CVS Drive, Woonsocket, Rhode Island 02895.  According to its public filings, CVS is one of the largest retail drugstore chains in the United States.

13.   Defendant Thomas M. Ryan ("Ryan") has served as President, Chief Executive Officer, and a director of CVS at all

relevant times.

14.    Defendant David B. Rickard ("Rickard") has served as Executive Vice President and Chief Financial Officer of CVS at all relevant times.

15.    Defendant Terry R. Lautenbach ("Lautenbach") has served as a director of CVS at all relevant times.

16.    Defendant Terrence Murray ("Murray") has served as a director of CVS at all relevant times.

17.    Defendant Sheli Z. Rosenberg ("Rosenberg") has served as a director of CVS at all relevant times.

18.    Defendant Thomas P. Gerrity ("Gerrity") has served as a director of CVS at all relevant times.

19.    Defendant Stanley P. Goldstein ("Goldstein") is a retired founder of CVS.  From January 1987 to April 1999, Mr. Goldstein was Chairman of the Board of the Company, and from January 1987 to May 1998, he was Chief Executive Officer of the Company.  He has served as a director of CVS at all relevant times.

20.    Defendant Marian L. Heard ("Heard") has served as a director of CVS at all relevant times.

21.    Defendant William H. Joyce ("Joyce") has served as a director of CVS at all relevant times.

- 6 -

## Jurisdiction and Venue

22. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332. This action was not brought collusively to confer jurisdiction on this Court.

23. Venue is proper in this District pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(a). Throughout the relevant period, CVS conducted significant operations in this District, including the operation of more than 300 retail drugstores.

## Duties of the Defendants

24. By reason of their positions as officers and/or directors of CVS and because of their ability to control the business and corporate affairs of CVS, the defendants owed CVS and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage CVS in a fair, just, honest, and equitable manner. The defendants were and are required to act in furtherance of the best interests of CVS and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to CVS and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its

property and assets, as well as the highest obligations of fair dealing.

25.    As officers and/or directors of a publicly held company, the defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, services, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

26.    The defendants, because of their positions of control and authority as directors and/or officers of CVS, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

27.    To discharge their duties, the officers and directors of CVS were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of CVS were required to, among other things:

> a.    exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;
>
> b.    exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state

- 8 -

> laws, rules, regulations and
> requirements;

c.   when placed on notice of illegal or
imprudent conduct committed by the
Company or its employees, exercise good
faith in taking appropriate measures to
prevent and correct such conduct; and

d.   refrain from acting upon material inside
corporate information to benefit
themselves.

15.   As alleged in detail below, from February 6, 2001
through February 5, 2002, when the defendants had knowledge of
material non-public information regarding CVS's imprudent and
illegal conduct, they breached their fiduciary duties by
permitting insiders to use material non-public information to sell
more than  130,000 shares of CVS common stock at prices higher
than they could have obtained had the market been aware of the
material non-public information, thereby reaping in excess of $6
million in illegal insider trading proceeds for their personal
gain.

16.   The defendants further breached their fiduciary duty of
good faith by knowingly causing or allowing the Company to engage
in imprudent and illegal conduct, which has caused the Company to
sustain enormous damages through, among other things, its defense
of a consolidated class action in this Court against the Company
brought under the federal securities laws (In re CVS Corporation

9

Litig., No. 01-11464 JLT).

## SUBSTANTIVE ALLEGATIONS

### CVS's Rapid Expansion of Its Business Operations

17. CVS became a stand-alone public company in 1996. At that time, it operated approximately 1,400 stores in 14 states and the District of Columbia. Since 1996, CVS aggressively expanded its Retail Pharmacy operations. Between 1996 and 2000, CVS increased the number of retail stores it operated from approximately 1,400 to over 4,100.

18. Unlike some of its competitors, CVS's rapid growth was achieved through acquisitions of other pharmacy chains. On May 29, 1997, CVS completed the acquisition of Revco D.S., Inc. ("Revco"), a pharmacy chain with approximately 2,500 drugstores. The following year, on March 31, 1998, CVS completed the acquisition of Arbor Drugs, Inc. ("Arbor Drugs"), a pharmacy chain with approximately 200 drugstores. As a result of these acquisitions, by the end of 1998, CVS operated approximately 4,122 retail pharmacies in 24 states and the District of Columbia and began touting itself as the largest chain drugstore company in the United States based on store count.

19. At all relevant times, CVS's Retail Pharmacy sales were divided between pharmacy sales and sales of general merchandise,

10

including, over-the-counter drugs, greeting cards, film and photofinishing services, beauty products and cosmetics, seasonal merchandise and convenience food (referred to by CVS as "front store" sales). Following its acquisitions of Revco and Arbor Drugs, CVS's business shifted more heavily to pharmacy sales. By 2000, pharmacy sales had increased to approximately 63% of total sales for the year, up from 43.9% in 1996.

20. As a result of the foregoing, at all relevant times, defendants knew that CVS's ability to continue to manage and grow its Retail Pharmacy business segment and to maintain and increase pharmacy sales was critical to the success of its overall operations. However, as set forth below, during the relevant period, CVS was experiencing a number of undisclosed problems that were having a materially negative impact on its Retail Pharmacy business.

## Undisclosed Adverse Facts Impacting CVS's Business and Operations During Relevant Period

### CVS's Inability to Offset Declining Gross Margins

21. During the relevant period, CVS's gross margin rate had been declining for some time and was continuing to decline, which presented a threat to CVS's operating profits and earnings.

22. The Company's explanation for the gross margin decline

11

was that, as noted above, pharmacy sales were becoming an increasingly larger percentage of CVS's total sales as compared to front store sales, and the margin on pharmacy sales was lower than the margin on front store sales. This was especially true with respect to pharmacy sales paid for by third party insurance programs, including managed care organizations. In order to reduce their prescription drug costs, these managed care organizations placed pressure on CVS to accept lower rates of reimbursement, thereby further reducing CVS's gross margin on pharmacy sales.

23. To counteract the impact that the increase in pharmacy sales was having on margin rates and achieve projected income and earnings, it was critical for CVS to improve operating efficiencies. By increasing operating efficiencies, CVS represented that it would be able to mitigate the negative impact that increased pharmacy sales were having on the Company's gross margins and operating profits.

24. Accordingly, in June 2000, in an effort to improve operating margin, CVS changed its procedures for handling in-store markdowns of damaged merchandise, store supplies, unsaleable merchandise and/or outdated merchandise. Previously, CVS stores had manually kept track of in-store markdowns and returns of

12

damaged merchandise on a weekly basis. Pursuant to the new procedure, among other things, in-store markdowns and returns were to be taken and tracked on a daily basis using an electronic RF device. According to the Company's internal policy manual issued in connection with this change, the new markdown policy would allow for "more accurate and timely [markups and markdowns] on a daily basis" and would avoid the need to take unnecessarily large write-offs of damaged merchandise at any point in time.

25. In connection with this change in procedure, on May 25, 2000, CVS management issued a memorandum to all CVS store managers, announcing that CVS would institute a new procedure for handling markdowns and returns of damaged items commencing on June 18, 2000. In describing the reasons for the change in policy for handling return of damaged merchandise, the memorandum stated the following:

### DAMAGE RETURN PROCEDURE CHANGE
### BACKGROUND

A new damage return process has been developed in conjunction with the new manual markdown application introduction on the RF Unit. The intent of this new process is to tighten controls on non-returnable and "un-billable" merchandise being sent to Damage Track.

In 1999 stores sent over $1.4 million dollars worth of non-returnable and pristine merchandise back to Damage Track (pristine being defined as perfectly good merchandise with no visible signs of the product or

13

package being damaged or outdated).

Additionally, as a company, we returned $25 million dollars more merchandise than we received credit from suppliers. This variance resulted in a company P&L write-off. If this write-off was shared evenly between all 4000 plus stores, your P&L Contribution A line would have been negatively adjusted by $6250.00.

Needless to say, we cannot afford to repeat this write-off in 2000. Therefore, the following new procedures have been developed and must be implemented IMMEDIATELY.

26. As the memorandum made clear, CVS intended to handle markdowns and returns of damaged merchandise more effectively and accurately by keeping track of this information on a daily basis. The memorandum also demonstrated the magnitude of the issue. As indicated above, in 1999, CVS returned $25 million worth of merchandise to suppliers for which it did not receive any credit. This amount does not include damaged merchandise not returnable and written off and/or merchandise damaged and sold at a marked-down price.

27. In November 2000, CVS, in direct contravention of its new markdown and damage return policy instituted a few months earlier, instructed its store managers to stop all store initiated markdowns until sometime after January 1, 2001 and to segregate and hold all merchandise that was to be written-off and/or marked

14

down in a designated section of each store's respective stockroom.

28.    Specifically, on November 20, 2000, CVS management issued a memorandum to all CVS store managers, stating that, effective immediately, "[n]o store initiated markdowns should be taken between now and January 1, 2001." The memorandum included the following additional information regarding the sudden policy turnaround:

> Further Information:
>
> What markdowns CANNOT be performed, effective immediately?
>
> --    Store level markdowns
> --    Damaged/non-returnable items
> --    Damaged/unsaleable items
>
>        NOTE:   Returnable Damages going back to the warehouse should still be processed as normal
>
> --    Cosmetic prepack markdowns
> --    Not in planogram discontinued/ Discontinued Other
> --    End of Season Down to Zero markdowns
> --    Outdated non-returnable product (i.e., Russell  Stover)
>
> How do I handle the Damaged Items that are not returnable or unsaleable?
>
> --    Hold in the designated clearance location in your stockroom.
>
> --    Visual merchandising will allocate endcaps in the January Merchandising Planner to assist with liquidating these items.

15

29. Accordingly, from November 20, 2000 through at least the end of fiscal 2000, CVS did not allow any of it's 4,100-plus stores to take markdowns or write-off damaged or otherwise unsaleable goods. As a result, each store was required to keep in storerooms thousands of dollars of damaged merchandise that should have been discounted or marked down to zero. As one former CVS store manager put it, this policy resulted in "trays and cases of unsaleable merchandise taking up space in the back of the store, in the back room."

30. CVS's sudden reversal in policy can only be explained by defendants intending or allowing its employees to avoid having to write-off tens of millions of dollars of damaged and/or discounted merchandise until sometime in 2001. Indeed, numerous CVS store managers discussed among themselves the fact that the new policy served no legitimate business purpose and was implemented in order to allow the Company to report that it had achieved its forecasted numbers for fiscal 2000.

31. Demonstrating defendants' causing or allowing this conduct is the fact that the stores were permitted to continue to process unsaleable merchandise that could be returned for a credit, while they prevented stores from processing unsaleable merchandise for which credit was not available. This unsaleable

16

merchandise should have been written off and thrown away.
However, pursuant to defendants' conduct, stores were required to
retain this merchandise, which could not be sold or returned,
through at least the end of 2000 before the write-off could be
recorded.

32.   As a result of the foregoing, defendants caused or
allowed CVS to cut off the flow of information from stores that
would allow the Company properly to account for discounted and
unsaleable merchandise, in violation of GAAP as described below in
paragraphs 107 through 124.   By doing so, CVS was able to delay
the writedown of tens of millions of dollars of inventory, thereby
artificially improving the Company's gross margin and inflating
its reported operating results for the fourth quarter and year end
2000.

33.   Moreover, according to former store managers, although
the memorandum indicates no markdowns could be taken through the
end of the year, according to former store managers, resumption of
processing markdowns did not begin until several weeks into
January 2001 and as late as February 2001.   Even after the Company
began to process markdown in 2001, pursuant to Company policy, it
took up to sixty days before marked down merchandise that could
not be sold would be marked down to zero.   Thus, the effect of

17

defendants' authority or allowing that no markdowns be taken
beginning in November 2000, was to continued to improve
artificially the Company's gross margin and operating results into
2001.

### CVS's Inability to Relocate and Need to Close Underperforming Stores

34. As described above, between 1996 and 1998, CVS acquired
approximately 2,600 stores in connection with the Revco and Arbor
Drugs acquisitions. Many of the stores acquired in these
transactions were located in undesirable strip mall locations
and/or were unprofitable. CVS's publicly touted strategy was to
relocate as many stores as possible out of strip mall locations to
larger more profitable stand-alone locations. Indeed, CVS
emphasized its relocation strategy in press releases and SEC
filings issued both before and throughout the relevant period,
noting that by relocating stores the Company was immediately able
to increase these stores' profitability.

35. However, as defendants knew or improperly failed to
know, at all relevant times, a certain percentage of its stores
located in undesirable locations would not be able to be relocated
and would need to be closed. Further, defendants knew or
improperly failed to know, that other underperforming stores could

18

not be made profitable and would also need to be closed.

36.    Indeed, since completing the Revco acquisition in 1997, the problem of underperforming stores was regularly discussed at meetings of CVS senior management regularly attended by defendant Ryan.  By 1999, CVS had developed an action plan to try and improve performance at a number of underperforming stores.  If performance could not be improved at a store, the plan was to try and sell the store or, if the store could not be sold, to schedule it for closure.

37.    In the beginning of 2001, CVS set up a cross functional task force assigned with the responsibility of determining which of its stores would need to be closed.  The task force was headed up by CVS's Treasurer, Phil Galbo.  Mr. Galbo reported directly to Douglas Sgarro, CVS's Senior Vice President - Administration and Chief Legal Officer.  Also centrally involved in this process was Larry Merlo, CVS's Executive Vice President in charge of stores.  By the first quarter of 2001, the task force had determined that approximately 200 stores would need to be closed.  Many of the stores targeted for closure were stores acquired from Revco or Arbor Drugs that were known to have been underperforming for years.  The stores scheduled for closing were identified on a list that was circulated at CVS's headquarters.  Although the list was

19

refined over time, the number of stores to be closed always remained at approximately 200.

38.  As a result of the foregoing, by the beginning of 2001, CVS's intention to close approximately 200 stores had become common knowledge internally at the Company and was the subject of discussions among CVS employees.  For example, in January 2001, a CVS District Manager disclosed to a group of store managers that CVS would be closing a number of mid-western stores sometime later in the year in connection with a restructuring plan.

39.  Rather than publicly disclosing its plans to close approximately 200 stores, however, throughout the relevant period, defendants caused or allowed CVS to emphasize misleadingly CVS's plans to open new stores in new markets and relocate stores in existing markets.

## CVS's Inability to Attract and Retain Adequate Numbers of Pharmacists to Staff its Stores

40.  At all relevant times, there was an ongoing shortage of pharmacists in the United States.  The shortage has been attributed to a number of factors, including, the growing number of prescription drugs being used to treat illnesses, the aging population and an increase from 5 years to 6 years in the number of years necessary to obtain a pharmacist degree.

20

41. Although the pharmacist shortage had some impact on the entire industry, the problem was particularly acute for CVS. This is true for several reasons. First, as alleged herein, CVS engaged in rapid expansion, resulting in a dramatic increase in the number of pharmacists the Company required to staff its stores. For example, according to a former CVS manager in CVS's construction division, at the time CVS acquired Arbor Drugs in 1998, the chain, whose operations were focused in the Detroit region, was suffering from a deficit of approximately 100 pharmacists that were needed to properly staff stores in the region. As a result, since completing the acquisition in 1998, CVS struggled to try and maintain adequate pharmacy staffing in these stores.

42. Further adding to the problem is the fact that, as described above, CVS was focused for several years on a strategy of relocating existing stores in smaller strip mall locations to larger stand-alone locations. Many of these new locations were open 24 hours, thereby further increasing CVS's need for pharmacists.

43. As early as 1997, the pharmacist shortage had been identified internally at CVS as a problem negatively impacting the Company's operations. At all relevant times, CVS's Pharmacy

21

Operations Group tried to solve the problem and was aware that their efforts were inadequate. Additionally, since 1997, CVS's Information Systems department also tried to address the adverse impact the pharmacist shortage was having on the Company and knew that the problem remained unresolved. At weekly meetings led by Howard Edels, the Company's Chief Information Officer, senior managers of the Information System department would discuss issues impacting the Company. At these meetings, the pharmacist shortage was regularly raised as a problem hindering the Company's performance. The impact of the pharmacist shortage became more acute throughout 2000. By late 2000, CVS senior management, including CVS's Chief Information Officer, internally stressed the need to improve recruitment of pharmacists in order to try and address the problem.

44. Defendants caused or allowed CVS to create the impression that it was handling the situation and, in fact, was better positioned to attract and retain pharmacists than its competitors. Indeed, CVS consistently represented that the pharmacist shortage was not impacting the Company's operations and its ability to grow.

45. For example, on October 31, 2000, Bear Stearns issued an analyst report, based on information provided by CVS, that stated:

CVS has been successful in attracting and

22

> retaining pharmacists at reasonable costs,
> despite the largest pharmacist shortage the
> U.S. has ever seen.  Beyond incenting
> pharmacists with stock options and an improved
> 401K plan, CVS is making the pharmacists' job
> more enjoyable by automating tedious, routine
> tasks with new technologies.  To this end,
> automated pill-counting technology has been
> implemented in roughly 700 stores, a number
> which we expect to increase as benefits are
> realized from improved workflow and employee
> morale.

46.  Similarly, in an article published by Chain Drug Review
on December 11, 2000,  Jim Roberts, the Vice President of CVS's
Southeast region, commented on the impact that the pharmacist
shortage was having on CVS as follows:  *"We've positioned
ourselves as the preferred place to work."*  Mr. Roberts further
stated, *"[a]s a preferred provider we are able to attract the very
best pharmacists in the marketplace and on pharmacy school
campuses where we currently recruit across the country."*

47.   The foregoing examples are representative of statements
caused or allowed by defendants during the relevant period,
designed to create the impression that the pharmacist shortage was
not having a materially adverse impact on CVS's operations.
Contrary to these representations, however, by the end of 2000, it
had become apparent internally at CVS that the Company's efforts
to recruit and retain adequate levels of pharmacist staffing were
insufficient.  During this time period, according to a former CVS

23

employee who used to work at CVS's headquarters in Rhode Island,
CVS's headquarters regularly received complaints from customers
regarding the lack of sufficient pharmacists at CVS's retail
outlets.

48.   By February 2001, the pharmacist shortage resulted in
customers experiencing unreasonably long waits to fill
prescriptions, temporary store closings and reduced store hours at
different CVS locations on a regular basis.   The pharmacist
shortage was particularly acute in certain regions of the country,
including, among others, the Detroit and Washington, D.C. regions.
However, during the relevant period the impact of the pharmacist
shortage was felt at CVS stores throughout the country.   For
example, in late 2000 and early 2001, CVS experienced a severe
shortage of pharmacists at its stores in Rhode Island.   To try and
compensate for this problem, CVS began closing pharmacies in the
region on Sundays and had the pharmacist staff alternate from
store to store.   Similarly, from February through May 2001,
temporary store closings due to lack of pharmacists transpired at
stores around the country, including stores in Connecticut, South
Carolina, North Carolina, Pennsylvania, Florida and elsewhere.

49.   Moreover, contrary to CVS's representations that it was
addressing the pharmacist shortage by establishing CVS as a

24

preferred place to work, the Company's inability to attract and retain pharmacists was actually exacerbated by the fact that it paid less than its competitors. Further, to try and compensate for the shortage, CVS required that its pharmacists work extensive amounts of unpaid overtime. Due to the severity of the shortage, some CVS pharmacists were required to work in excess of 70 hours per week to try and compensate for the lack of adequate staffing. Additionally, CVS regularly required that its pharmacists travel extensive distances to cover inadequately staffed pharmacies.

50. As a result of CVS's unfair treatment of its pharmacists, which resulted in high turnover and negatively impacted its ability to attract new pharmacists, in November 2000, a group of CVS current and former pharmacists brought a collective action against the Company alleging that its failure to pay overtime violated the Fair Labor Standards Act. Similar suits by CVS pharmacists were brought in early 2001. Defendants caused or allowed CVS not to disclose the existence of any of these lawsuits in its press releases or public filings until March 21, 2002, when CVS finally reported that the November 2000 action had been brought by pharmacists seeking recovery of unpaid overtime and liquidated damages.

51. Thus, contrary to CVS's repeated public statements that

it was better suited to handle the pharmacist shortage than most other retailers, defendants knew or improperly failed to know that the Company was unable to adequately staff its retail stores and the pharmacist shortage was having a materially negative impact on CVS's operations. In fact, the pharmacist shortage was actually having a more severe impact on CVS's operations than it was having on its competitors. For example, although one of CVS's main competitor, Walgreen, Inc., had been required to close or reduce hours at approximately 1% of its stores due to the pharmacist shortage, CVS had been required to close or reduce hours at 15% of its stores during the same period.

## False and Misleading
## Statements During the Relevant Period

52.  During the relevant period, CVS filed Forms 10-K with the SEC, signed by each defendant, which they knew or improperly failed to know, were false and misleading. The Company also filed Forms 10-Q, signed by defendant Rickard, and issued press releases which defendants knew, or improperly failed to know, were false and misleading.

53.  For example, on February 6, 2001, CVS issued a press release announcing *"record sales and earnings for the fourth quarter [of 2000] and the year ended December 30, 2000."* The

26

Company reported $5.5 billion in net sales during the fourth

quarter and fourth quarter earnings of $0.51 per share, a

purported increase of 19.6% over the same period the prior year

(after excluding results from an extra week in fiscal 1999).  For

the year, the Company reported $20.1 billion in net sales and

earnings of $1.80 per share, a purported increase of 17.7% over

the results of the prior year (after excluding a nonrecurring gain

and the extra week in 1999).

54.   In the same press release, CVS commented on the

Company's store growth as follows:

> For the year, CVS opened 158 new stores and
> relocated 230 others.  The Company entered
> three new, high growth markets in 2000 and
> prepared to enter additional new markets.
> There remain 41 of the Top 100 U.S. drugstore
> markets in which CVS currently has no
> presence, offering significant opportunity for
> future growth.  As of December 30, 2000, CVS
> operated  4,133 retail and specialty pharmacy
> stores in 31 states and the District of
> Columbia.

55.   In the February 6 press release, Defendant Ryan

commented on CVS's reported  results as follows:

> The year 2000 was another successful year for
> CVS.  We once again achieved double-digit same
> store sales grcwth, excellent expense control,
> and produced record earnings," stated Tom
> Ryan, Chairman, President and Chief Executive
> Officer.

Defendant Ryan concluded by stating:

27

> I am very pleased that we have been able to
> consistently meet or beat our goals, all while
> we continue tc invest in new stores and
> relocations, as well as in new business
> channels, which will help accelerate our
> future growth.  I believe we are better
> positioned than at any other time in the
> Company's history to capitalize on the
> significant opportunities in healthcare.

56.  Also on February 6, 2001, CVS held a conference call

with the investment community led by defendant Ryan.  During the

conference call, defendants reiterated the financial information

included in the February 6 press release.  Defendant Ryan further

commented on the Company's results as follows:

> Well, obviously I'm extremely pleased with our
> 4th quarter and our 2000 results.  In the
> quarter our sales increased 141/2% on a 52-week
> basis.  Our same-store sales increased 10.5.
> You'll see that our healthy sales growth
> translated into significant margin expansion
> which Dave [Rickard] will fully discuss later
> on.  Earnings per share in the quarter rose
> 18.6% on a comparable basis; 51 cents versus 43.

Regarding, the Company's growth strategy, defendant Ryan stated:

> Let me outline our preliminary real estate
> plan for 2001.  We'll open 150 to 170 brand
> new CVS stores.  We'll relocate 140 to 150 CVS
> stores.  We'll close an additional 60 to 70
> stores for a net new-store CVS growth of 90 to
> 100 stores for 2001.  This equates to 300-plus
> new [stores], less than we've had in the past
> but a much higher net new-store growth because
> we're closing fewer stores.

57.  Defendants knew, or improperly failed to know, that the

financial results they announced on February 6 and the statements commenting on those results set forth in paragraphs 53 through 56 above were materially false and misleading as the Company's gross margins and operating profits had been artificially inflated by CVS's failure to properly account for marked down and damaged merchandise in violation of GAAP, as described in paragraphs 107 through 124 below. As a consequence, reported earnings for the fourth quarter and year end 2000 were artificially inflated.

58.    Additionally, defendants knew, or improperly failed to know, that their comments regarding CVS's growth plans and business prospects were materially false and misleading because, as described in paragraphs 37 through 39 above, they failed to disclose the fact that CVS intended to close approximately 200 underperforming stores, as well as the fact that the Company was being adversely impacted by the ongoing pharmacist shortage.

59.    As defendants caused or allowed to occur, all of the above-described representations regarding the Company's performance for the fourth quarter and fiscal year 2000 and its business prospects were picked up and relied upon by securities analysts in issuing highly favorable reports and recommendations, which encouraged buying interest in CVS stock. For example, on February 7, 2001, Bear Stearns reiterated its "BUY RATING" on CVS

29

stock, stating that "*[t]hrough consistently improving sales growth, increased operating margins, and earnings growth, we believe the company is poised to capture a large portion of the estimated 13% in pharmacy industry growth by 2004.*"

60.    In early March, 2001, CVS issued its Annual Report to Stockholders for fiscal year 2000.  In the Annual Report, defendants repeated the same financial results for the fourth quarter of 2000 and fiscal year 2000 first announced on February 6, 2001.  Regarding the financial results, the Annual Report stated:

> The integrity of the financial statements and
> related financial information in this Annual
> Report are the responsibility of the
> management of the Company.  The financial
> statements have been prepared in conformity
> with accounting principles generally accepted
> in the United States of America and include,
> when necessary, the best estimates and
> judgments of management.  The Company
> maintains a system of internal controls
> designed to provide reasonable assurance, at
> appropriate cost, that assets are safeguarded,
> transactions are executed in accordance with
> management's authorization, and the accounting
> records provide a reliable basis for the
> preparation of the financial statements.  The
> system of internal accounting controls is
> continually reviewed by management and
> improved and modified as necessary in response
> to changing business conditions and the
> recommendations of the Company's internal
> auditors and independent auditors.

61.    Additionally, the Annual Report included a letter from

30

defendant Ryan in which he described CVS's business operations,

once again, in unconditionally glowing terms:

> The year 2000 was an exceptional year for CVS
> by any measure.  We achieved continued strong
> financial results, including record sales,
> operating profit and net earnings.

*   *   *

> This outstanding performance solidified our
> track record of meeting or beating Wall
> Street's expectations every quarter since we
> became a stand-alone public company in the
> Fall of 1996, and has translated into
> excellent returns for shareholders.

62.   The Annual Report also commented on the purported

success of CVS's expansion efforts as follows:

> Our 1997 acquisition of Revco D.S. Inc. and
> our 1998 acquisition of Arbor Drugs, Inc.
> provided us with leadership in new markets,
> earnings accretion and incremental upside
> potential.  Both companies have been fully
> integrated – from a systems, people and
> operational perspective – and are performing
> very well.

The Annual Report further described CVS's strategy for continued

store growth consisting of "1) entering new markets, 2) adding

stores within existing markets, and 3) relocating stores to more

convenient, freestanding sites."  In this regard, the Annual

Report further stated:

> Store relocations, the third leg of our real
> estate strategy, are highly productive
> investments for CVS.  When we relocate a store

31

from an inline shopping center to a
freestanding, convenient corner location, we
typically generate 25% to 35% higher front-end
sales, improved margins and a better return on
invested capital than the stores they replace.
The new sites, which are in higher-profile
locations with convenient parking, have more
appeal to consumers. Today, nearly 40% of our
stores are in freestanding locations. Our
goal over the next five to seven years is to
reach 80%. Although the number of relocations
will decrease over time, our relocation
strategy will remain an important component of
our overall growth strategy.

63. Defendants knew, or improperly failed to know, that the
financial results reported in the Annual Report and their
statements commenting on those results set forth in paragraph 60
through 62 above were materially false and misleading as the
Company's gross margins and operating profits had been
artificially inflated by defendants' failure to properly account
for marked down and damaged merchandise in violation of GAAP, as
described in paragraphs 107 through 124 below. As a consequence,
reported earnings for the fourth quarter and year end 2000 were
artificially inflated.

64. Additionally, defendants knew, or improperly failed to
know, that their comments regarding CVS's growth plans and
business prospects were materially false and misleading because
they failed to disclose the fact that CVS intended to close
approximately 200 underperforming stores, as well as the fact that

32

the Company was being adversely impacted by the ongoing pharmacist shortage, as described in 37 through 51 above.

65.   On or about February 27, 2001, CVS made available on it's website a press release announcing that Moody's Investors Service had raised the rating on CVS *"based on the company's leading market position, geographic diversity, and solid and improving debt protection measures."* The press release stated that *"CVS has become the largest drugstore chain, with stores blanketing the eastern U.S. . . . Growth has been achieved through new store openings and acquisitions.  CVS is an acquirer in this consolidating industry, buying companies such as REVCO and Arbor in the same or adjacent geographic areas."*

66.   Further amplifying the perception of itself as an organization that was successfully achieving its financial goals, on March 6, 2001, CVS issued a press release announcing that same store sales for the month of February, 2001, had increased 12.8% over the prior year period while pharmacy same store sales rose 20.1%.   In the press release, defendants caused or allowed CVS to tout itself as being *"America's #1 pharmacy dispensing more retail prescriptions in more stores than any other chain.  With annual revenues of more than $20 billion, CVS has created innovative approaches to serve the healthcare needs of all of our customers*

33

*through its more than 4,100 CVS/pharmacy stores . . .* " CVS issued
press releases announcing increased same store sales for the
months March, April and June 2001, on April 10, May 10, and June
5, 2001 respectively. Each of these press releases contained the
same glowing language quoted above.

67.   For example, on March 19, 2001, CVS filed its annual
report for fiscal year 2000 with the SEC on Form 10-K.  The Form
10-K, signed by all defendants, included the following comments
regarding CVS's business prospects:

> We believe that our pharmacy operations will
> continue to represent a critical part of our
> business and strategy due to our ability to
> attract and retain managed care customers,
> favorable industry trends and our on-going
> program of purchasing patient prescription
> files from independent pharmacies.
>
> The addition of new stores has played, and
> will continue to play a major role in our
> continued growth and success.  Our store
> development program focuses on three areas:
> entering new markets, adding stores within
> existing markets and relocating stores to more
> convenient, freestanding sites.
>
> *   *   *
>
> A key part of our store development program is
> our relocation effort.  Our relocation program
> actively seeks to relocate many of our strip
> shopping center locations to freestanding
> sites.  Because of their more convenient
> locations and larger size, relocated stores
> have typically realized significant
> improvements in customer count and revenues,
> driven largely by increased sales of higher

34

margin front store merchandise. We believe
our relocation program offers a significant
opportunity for future growth, as only 39% of
our existing stores were freestanding as of
December 30, 2000. We currently expect to
have approximately 44% of our stores in
freestanding locations by the end of fiscal
2001. Our long-term goal is to have
approximately 80% of our stores located in
freestanding sites.

68.   Defendants knew, or improperly failed to know, that the

financial results incorporated by reference in the 10-K were

materially false and misleading as the Company's gross margins and

operating profits had been artificially inflated by the Company's

failure to properly account for marked down and damaged

merchandise in violation of GAAP, as described in paragraphs 107

through 124 below. As a consequence, reported earnings for the

fourth quarter and year end 2000 were artificially inflated.

69.   Additionally, defendants knew, or improperly failed to

know, that their comments regarding CVS's growth plans and

business prospects were materially false and misleading because

they failed to disclose the fact that CVS intended to close

approximately 200 underperforming stores and the fact that the

Company was being adversely impacted by the ongoing pharmacist

shortage, as described in 37 through 51 above.

70.   The 10-K contained purported cautionary statements

regarding CVS's future operations, which were themselves

materially false and misleading. Specifically, defendants caused or allowed CVS to represent that its future results could be affected by, among other things, *"its ability to continue to secure suitable new store locations at favorable lease terms"* and *"its ability to attract, hire and retain suitable pharmacists and management personnel."* These statements were materially false and misleading in that defendants had already determined that approximately 200 stores would need to be closed because they were underperforming and could not be relocated to more desirable locations and defendants knew that CVS's operations were being adversely impacted by its inability to attract and retain adequate numbers of pharmacists to staff its stores.

71.    Also on March 19, 2001, while CVS was reaping the benefit of its purported "record" results for the fourth quarter and year end 2000, defendants issued a press release announcing that the Company had privately-placed $300 million of 5 5/8% notes due 2006 with an original issue price of $99.552 (the "Notes"). In this press release, CVS stated that, *"CVS is America's #1 pharmacy dispensing more retail prescriptions in more stores than any other chain.  With annual revenues of more than $20 billion, CVS has created innovative approaches to serve the healthcare needs of all of our customers through its more than 4,100*

36

*CVS/pharmacy stores . . . "* Subsequently, CVS filed a registration statement with the SEC which permitted purchasers of the Notes to exchange them for notes that would be freely tradeable in the market.

72. On May 2, 2001, CVS issued a press release announcing its financial results for the first quarter of 2001, the period ending March 31, 2001. The Company reported "record" net earnings of $221.7 million, or $0.54 per share, for the first quarter, up 15.9% from $191.3 million, or $0.47 per share, during the same period the prior year. Defendant Ryan commented on the results as follows:

> I am pleased with our first quarter performance, which reflects solid same store sales growth and excellent expense control, resulting in improved operating margins . . . . We also continued to make good progress on inventory management, which will be a significant driver of our future returns.

The press release also commented on CVS's store growth during the quarter as follows:

> For the quarter CVS opened 14 new stores and relocated 24 others. As of March 31, 2001, CVS operated 4,127 retail and specialty pharmacy stores in 31 states and the District of Columbia.

73. Defendants caused or allowed all of the above-described representations were picked up and relied upon by securities

37

analysts in issuing highly favorable reports and recommendations, which encouraged buying interest in CVS stock. For example, on May 3, 2001, Robinson-Humphrey, after repeating CVS's reported results, reiterated its *"BUY rating on CVS due to strong sector fundamentals and the company's recent move toward a slightly more aggressive growth strategy."*

74. On May 10, 2001, CVS held its annual meeting with securities analysts in New York City. At the conference, CVS management emphasized to analysts its internal operating initiatives to improve efficiency and drive sales, reviewed its strategies to attract and retain qualified pharmacists and discussed its plans for store growth. At the conference, CVS indicated that sales in May were "off to a good start."

75. On May 11, 2001, CVS filed its report on Form 10-Q with the SEC for the first fiscal quarter of 2001. The 10-Q was signed by defendant Rickard. In the 10-Q, CVS repeated the financial results first announced in their May 2, 2001 press release. In addition, CVS represented that:

> In the opinion of management, the accompanying consolidated financial statements include all adjustments (consisting only of normal recurring adjustments) which are necessary to present a fair statement of the Company's results of operations for the interim periods presented.

38

CVS further commented on it's results and business operations as follows:

> Our pharmacy sales growth continued to benefit from our ability to attract and retain managed care customers and favorable industry trends.

> *   *   *

> Sales also benefitted from our active relocation program which seeks to move our existing shopping center stores to larger, more convenient, freestanding locations. Historically, we have achieved significant improvements in customer count and net sales when we do this. . .. We believe that our relocation program offers a significant opportunity for future growth, as only 40% of our existing stores were freestanding as of March 31, 2001.

76. Defendants knew, or improperly failed to know, that the financial results first announced in the May 2 press release and reported in the 10-Q were materially false and misleading as the Company's gross margins and operating profits had been artificially inflated by defendants' failure to properly account for marked down and damaged merchandise in violation of GAAP, as described in paragraphs 21 through 33 above.

77. Additionally, defendants knew, or improperly failed to know, that their comments regarding CVS's growth plans and business prospects were materially false and misleading because they failed to disclose the fact that CVS intended to close

39

approximately 200 underperforming stores and that the Company was being adversely impacted by the ongoing pharmacist shortage, as described in 37 through 51 above.

78.  In addition, the 10-Q contained purported "cautionary statements" which were, in themselves, materially misleading. Specifically, CVS represented that its future operations could be affected by, among other things, *"our ability to continue to secure suitable new store locations at favorable lease terms;"* and *"our ability to attract, hire and retain suitable pharmacists and management personnel."* These statements were materially false and misleading in that defendants had already determined that approximately 200 stores would need to be closed because they were underperforming and could not be relocated to more desirable locations and that CVS's operations were being adversely impacted by its inability to attract and retain adequate numbers of pharmacists to staff its stores.

79.  The statements identified in paragraphs 40 through 51 above, which were designed to create the misleading impression that CVS was handling the pharmacist shortage better than its competitors and that the shortage was not having an adverse impact on the Company's operations.  CVS was not coping better than most retailers with the pharmacist shortage *"by making the value it*

*placed on pharmacists abundantly clear."* In fact, CVS was being collectively sued by its pharmacists based on its failure to pay overtime in violation of federal law. CVS's unfair treatment of its pharmacy personnel resulted in many pharmacists leaving the Company and negatively impacted the Company's ability to attract new pharmacists. As a result, defendants knew, or improperly failed to know, that the pharmacist shortage was having a materially negative impact on CVS's operations, resulting in increased wait time, reduced hours and temporary closings of stores on a regular basis, which in turn, reduced CVS's sales.

## The Truth Slowly Begins to Emerge

80.   On June 27, 2001, CVS surprised the market by announcing that *"as a result of current economic and business trends, it now expects earnings per share for the second quarter and full year to be lower than previously anticipated."* Defendant Ryan commented on the announcement, stating in pertinent part as follows:

> A slowing in our same store sales growth and
> increased gross margin pressure has led us to
> revise our expectations for the second quarter
> and full year," said Tom Ryan, Chairman,
> President and Chief Executive Officer.  "The
> current economic environment has impacted
> front-store sales, particularly high-margin
> seasonal and general merchandise categories.
> While our pharmacy business remains healthy
> and vibrant in the vast majority of our
> markets, there are pockets of the country
> where we are experiencing a slower growth rate

41

in pharmacy.

\*  \*  \*

Clearly, we are disappointed with these developments, and we are taking the necessary actions to reaccelerate our growth," continued Mr. Ryan. "We are focused on driving improvement through operational initiatives and tailored marketing programs. We expect that the trends we are experiencing are near terms in nature, and that we are doing the right things to get our results back on a faster growth track.

81. This announcement, however, only partially disclosed CVS's true economic condition, as defendants continued to conceal the extent of the problems at the Company. Thus, Defendant Ryan concluded the press release by stating:

In spite of these developments, we are as excited as ever about the future of CVS. We operate in a vibrant industry and remain well-positioned as the market leader to take advantage of significant growth opportunities.

82. Also on June 27, 2001, CVS held a conference call with investment analysts to discuss the announcement. During the call, Defendant Ryan stated:

Our pharmacy comps began to slow in late April and continued through May but especially the last two weeks of May and into June . . . The facts are this, we have pockets of the country where we are experiencing slower growth rate in pharmacy. *Most of these problems relate to service issues, including waiting time, reduced pharmacy department hours, or closed pharmacy departments* and out of stocks. *Most if not all of these are directly related to*

42

> *the pharmacy shortage* and I'll talk more about
> this later.

*   *   *

> Obviously, the shortage is an industry issue
> that is affecting all of us, all of our
> competitors.  But *we have had a severe*
> *shortage in four of our major markets* and
> these markets, we have, we are a significant
> leader in these markets. . . . But as a result
> we have actually had the closed doors for
> reduced department hours leading to obvious
> service issues.  We closed, reduced hours on
> closed pharmacy departments on Sunday.  We've
> shortened hours on Saturday and to be quite
> honest, we could have lived with this and I
> think our customers would understand it to a
> point.  Where we had the problem is where
> we've had to actually close some pharmacy
> departments during the weekdays.  We didn't
> have pharmacists to cover the shifts.

*   *   *

> We are still a growth company.  Although our
> growth will be lighter than normal this year,
> clearly we are affected by the prolonged slow
> down in the economy.  While we're not immune
> to down turns in the economy, we are certainly
> better positioned than most.  I am confident
> that this is just a temporary set back due to
> those reasons.

83.   Notwithstanding defendants' partial disclosure, the
statements referenced above in paragraphs 80 through 82 were each
materially false and misleading when made because they failed to
disclose and/or misrepresented the following material facts:

(a)   that the Company had engaged in improper earnings

43

management by delaying the writedown of damaged or unsaleable merchandise and that the Company's financial results had been artificially inflated as a result of this manipulation;

(b)   that the Company had recognized that it had been unable to attract and retain adequate numbers of pharmacists and that this pharmacist shortage had been negatively impacting CVS's business since the beginning of the relevant period, as described above in paragraphs 40 through 51; and

(c)   that the Company had determined that it would need to close approximately 200 stores that were underperforming and/or could not be relocated to more desirable locations, as described above in paragraphs 37 through 39.

84.   In response to the revisions of the Company's expected earnings, the price of CVS common stock dropped sharply, falling from $44.10 per share to $36.51 per share on extremely heavy trading volume.

85.   In commenting on defendants' announcements regarding the revision to expected earnings and the belated disclosure of the impact of the pharmacist shortage on CVS's operations, some analysts stated that it appeared that the Company had intentionally withheld material information from the investing public.  For example, an analyst report issued by J.P. Morgan

44

Securities Inc. stated:

> Information flow is a problem - We do not
> think that management has effectively handled
> the flow of information as recent events and
> concerns have developed. We believe that this
> has had a compounded effect on CVS' stock
> price. April and May pharmacy same store
> sales trends came in relatively soft at just
> about 14.0% (over difficult 18.0% plus prior
> year comparisons). *Management attributed soft
> trends in the pharmacy for these months to
> lower flu activity (April) and soft allergy
> trends (May) -explanations which seemed
> questionable.* Following a competitor
> downgrade on June 15, 2001, concerns about
> service levels in the pharmacy surfaced.
> Management has since acknowledged service
> problems in the pharmacy, but indicated that
> EPIC (Excellence in Pharmacy Innovation and
> Care), the company's pharmacy systems and work
> flow processes program, was operating well and
> not experiencing fundamental issues (although
> enhancements and upgrades have been required).
> Management has also since identified that the
> company has completed less file buys year-
> over-year, which has contributed to softer Rx
> same store sales. Last, CVS has revealed that
> recent soft pharmacy same store sales trends
> have been fairly isolated to 6 markets, a
> couple of which are large markets for the
> company (probably either Boston, New York,
> Philadelphia or Atlanta). *Why this
> information has come from management after the
> fact is perplexing;* however, it has clearly
> weighed on the stock price, as we wonder
> whether there is more information that needs
> to surface.

86.    An analyst report dated June 27, 2001 issued by

Prudential Securities stated:

> Although the shortage of registered
> pharmacists for the industry came as no

45

surprise, we along with other investors didn't
realize the gravity of the situation where CVS
was concerned.  Pharmacy same store sales at
CVS have been softer than anticipated over the
past couple months with May coming in at 16.1%
and April at 16.7%.  Management indicated that
this accelerated during the last two weeks of
May and into June.  The weakness originally
was attributed to weaker flu and allergy
seasons which was the case in the company's
territories.  When sales failed to rebound in
late May and June it became apparent that the
issue was a result of the severity of the
pharmacist shortage.  Due to the limited
availability of licensed pharmacists, some
stores had to decrease pharmacy hours during
peak times which led to increased waiting
periods and poorer customer service-a
revelation which wasn't apparent to investors.
As a result, some pharmacy customers switched
their prescriptions over to competitors.  Lost
business in these four problem markets should
negatively affect the top-line as well as
gross margins.

87.  Although CVS finally revealed that, contrary to their
previous representations, the pharmacist shortage was negatively
impacting CVS's operations, CVS, nevertheless, failed to disclose
the full extent of the problems it was experiencing.  CVS's
failure to disclose material adverse information, combined with
statements that CVS was still in a position to take advantage of
growth opportunities, prevented the market from discovering the
full truth and allayed analysts' fears.  For example, on June 28,
2001, based on management's representations, UBS Warburg issued an
analyst report maintaining its "Buy" rating on CVS stock, stating

46

that *"[w]hile we are disappointed with CVS's current sales performance, we believe that management is taking the necessary steps to address the pharmacist shortage problem and accelerate overall sales growth."*

88.   On July 31, 2001, CVS issued a press release announcing its financial results for the second fiscal quarter of 2001. Notwithstanding, CVS's June 27 press release lowering previously projected earnings expectations, the Company reported increased earnings and sales for the quarter, without mentioning the negative impact of the pharmacist shortage on CVS's operations. Defendant Ryan commented on the results as follows:

> "We operate in a vibrant industry with excellent long-term fundamentals.  Even in this economy we registered double digit sales growth and continued earnings growth, achieving record second quarter performance," stated Tom Ryan, Chairman, President and Chief Executive Officer.

Further, the Company also commented on store growth, stating that *"[f]or the quarter, CVS opened 16 new stores and relocated 23 others,"* without mentioning the need to close approximately 200 underperforming stores.

89.   On August 14, 2001, CVS filed its report on Form 10-Q with the SEC for the second fiscal quarter of 2001.  The 10-Q was signed by defendant Rickard.  In the 10-Q, CVS reported net sales

47

of $5.5 billion, a purported increase of 11.2% over the same
period in the prior year.  In addition, CVS represented that:

> In the opinion of management, the accompanying
> consolidated financial statements include all
> adjustments (consisting only of normal
> recurring adjustments) which are necessary to
> present a fair statement of the Company's
> results of operations for the interim periods
> presented.

*   *   *

> Sales also benefitted from our active
> relocation program which seeks to move our
> existing shipping center stores to larger,
> more convenient, freestanding locations.
> Historically, we have achieved significant
> improvements in customer count and net sales
> when we do this.. . . We believe that our
> relocation program offers a significant
> opportunity for future growth, as only 40% of
> our existing stores were freestanding as of
> June 30, 2001.

*   *   *

> Sales were negatively impacted by continuing
> pharmacy operational problems combined with
> the weakening economy.  Our pharmacy
> operational problems primarily resulted from
> the ongoing industry-wide pharmacist shortage
> caused by a number of major pharmacy schools
> transitioning their curriculum from five-year
> to six-year programs.  We believe the pharmacy
> operational issues, which included reduced
> pharmacy hours, closed pharmacy departments
> and increased customer wait times, combined
> with reduced front store sales due to the
> weakening economy, ultimately resulted in
> lower customer counts and lost sales during
> the second quarter.

48

90. The statements referenced above in paragraphs 88 and 89 were each materially false and misleading when made because they failed to disclose and/or misrepresented that the Company had engaged in improper earnings management in violation of GAAP. Moreover, although the Company belatedly acknowledged that the pharmacist shortage had negatively impacted its results for the quarter, it failed to disclose that the pharmacist shortage had been negatively impacting CVS's business since the beginning of the relevant period. Moreover, the Company continued to conceal the fact that it needed to close approximately 200 underperforming stores, while emphasizing the number of stores CVS opened during the quarter.

## The Full Truth is Revealed

91. On October 30, 2001, the Company once again shocked the market by issuing a press release announcing that CVS's financial results for the third quarter of 2001 had fallen substantially from the previous year. In this regard, the Company reported that net earnings were down 16.0% from the third quarter of 2000. In response to this negative information, defendant Ryan commented:

> We are disappointed with our results for the third quarter and committed to taking the necessary actions to improve performance and restore healthy long-term growth. With that in mind, we have completed a thorough analysis of our business and are today announcing a

49

series of actions to best position CVS for the
future.

\* \* \*

The Company's plan includes a series of sales
generation and expense reduction initiatives,
including:

--    Undertaking a store consolidation
      program, under which approximately 200
      stores will be closed during the first
      quarter of 2002

--    Closing one of CVS' ten distribution
      facilities and one of ProCare's two mail
      order facilities.

\* \* \*

In connection with certain of these actions,
the Company expects to record a pre-tax
restructuring and asset impairment charge of
approximately $350 million, of $0.56 per
diluted share, in the fourth quarter of 2001.

92.    The market reacted immediately to this additional
surprising announcement.  On October 30, 2001, the price of CVS
stock fell an additional $7.72  to $23.90 per share, a one-day
decrease of 24% and a decrease of 61% from the relevant period
high of $62.10 per share reached on March 3, 2001.

93.    On November 9, 2001, CVS filed its report on Form 10-Q
with the SEC for the third quarter of 2001. In the 10-Q,
defendants stated:

Sales were negatively impacted by operational
problems combined with the weakening economy
and increasingly competitive environment.  We

50

believe the operational issues, which
included: a pharmacist shortage resulting in
reduced pharmacy hours and closed pharmacy
departments; out-of-stock merchandise and
increased customer wait times; combined with
the weakening economy and an increasingly
competitive environments ultimately resulted
in lower customer counts and lost sales during
the third quarter. To address these issues,
we intensified our pharmacist recruiting and
retention efforts.

94. On February 5, 2002, the Company issued a press release

announcing its results for the fourth quarter of 2001 and fiscal

year ended December 31, 2001. As previously indicated, defendants

announced that CVS would record a $352.5 million restructuring

charge and close 229 stores as well as a mail order facility and a

distribution center. As a result of the restructuring charge, CVS

announced that it had incurred a net loss for the fourth quarter

of 2001 of $130 million.

95. As set forth above, during the relevant period,

defendants issued or allowed to be issued materially false and

misleading statements regarding the Company which misled the

investing public. The market for CVS common stock was open, well-

developed and efficient at all relevant times. As a result of

these materially false and misleading statements and failures to

disclose, CVS common stock traded at artificially inflated prices

during the relevant period. The artificial inflation continued

until the time CVS fully revealed the deteriorated nature of its business and these admissions were communicated to, and/or digested by, the securities markets. Persons who purchased or otherwise acquired CVS common stock relying upon the integrity of the market price of CVS common stock and market information relating to CVS, and were been damaged thereby and have brought numerous lawsuits, now consolidated into one suit, which has cost the Company millions of dollars to defend and which may cost the Company tens of millions more in settlement and for further litigation costs, all to the harm of the Company. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by the Company.

## The Company's Incentive Bonus Structure

96. Defendants Ryan and Rickard and other senior CVS executives were motivated to engage in the improper scheme alleged herein by their ability to obtain extraordinarily generous bonus compensation tied to meeting certain predetermined financial objectives. Specifically, the bonus structure was based on pre-established objectives for CVS' consolidated earnings before taxes ("EBIT") and return on net assets ("RONA").

52

97.    In 2000, as result of the Company's reported financial numbers, defendant Ryan received a bonus of $1.6 million, which was *164% of his base salary* of $975,000.00 for the year.  Further, in 2000, defendant Rickard received a bonus of $592,102, which was *more than 100% of his base salary* of $590,000 for the year.  As alleged herein, the bonuses received by the defendants were based on financial numbers that were manipulated and were therefore false and misleading.  But for defendants' conduct alleged herein, Ryan and Rickard would not have been able to receive the substantial bonuses they received in 2000.  As a result of the other defendants' failure to exercise properly their fiduciary duties, they caused or allowed these excessive bonuses, totaling many millions of dollars, to be improperly paid, thereby harming CVS.

## Insider Sales

98.    Defendant Ryan was also motivated to artificially inflate the price of CVS common stock through his misrepresentations and omissions in order to engage in insider sales and realize substantial profits.  During the relevant period, defendant Ryan sold CVS stock despite adverse information about CVS business which he knew but had not been disclosed to the public.

53

99. Specifically, on May 22 and 23, 2001, while the Company's common stock was artificially inflated as a result of defendants' false and misleading representations of the Company's financial performance, Defendant Ryan exercised his CVS stock options and sold a total of 95,040 shares of CVS common stock for total proceeds of approximately $3.54 million.

100. These stock sales by Defendant Ryan constituted 27% of the CVS stock he actually owned or acquired by exercise of stock options during the relevant period. Defendant Ryan sold 27% of the stock he owned or acquired because he knew the stock was artificially inflated and would decline sharply in price when the true facts, which defendants were concealing, became public.

101. Defendant Ryan's stock sales were also unusual in their timing. These stock sales occurred during the time period when CVS was supposedly enjoying a period of exceptional business success. As a result, if these exceptionally favorable present conditions and future prospects actually existed, CVS stock should have been poised for continued advancement. Nevertheless, defendant Ryan unloaded 95,040 shares of CVS stock- 27% of his holdings - for $3.54 million in illegal trading proceeds during a time of supposedly exceptional business growth. Defendant Ryan did this because he knew CVS's statements about the current strong

54

condition and success of CVS's business, as well as its strong future prospects, were false and misleading and were concealing the serious negative conditions in CVS business detailed herein. Indeed, defendant Ryan made the insider sales alleged above during the time when, as he later admitted, the Company was being negatively impacted by the pharmacist shortage, contrary to CVS's statements that they were well-suited to handle the shortage and it was not having any impact on the Company's operations.

102. Moreover, during the relevant period defendants failed to prevent other Company insiders from selling shares of CVS common stock at artificially inflated prices. For example, on March 5, 2001, Douglas Sgarro CVS's Vice President, sold 42,407 shares of CVS common stock at between $60.00 and $60.50 per share for total proceeds of $2,546,926.00.

103. The insider selling by defendant Ryan, as well as the insider selling of other Company executives were a waste of CVS's assets.

## Private Placement of 5 5/8% Notes

104. On March 19, 2001, the Company announced in a press release that it had privately-placed $300 million of 5 5/8 notes due 2006 with an original issue price of $99.552 (the "2006 Notes"). The private placement closed on March 22, 2001. The

55

Company used the proceeds of the sale of the 2006 Notes to repay outstanding short-term debt.

105. At the time of the private placement, the 2006 Notes were not registered under the Securities Act of 1933 and could not be sold absent registration or an applicable exemption from registration requirements.

106. The sale of the $300 million worth of 2006 notes was successfully caused or allowed by defendants herein on more favorable terms than CVS would have received if the true financial picture of the Company had been revealed to the public. CVS was able to use the inflated financial numbers to attract buyers to the 2006 Notes since the public was feeling confident about the continued financial success of the Company. Lawsuits resulting from such fraudulent sale have harmed the Company.

## CVS's False and Misleading Financial Statements

107. At all relevant times during the relevant period, CVS represented that its financial statements were prepared in accordance with GAAP. GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. As set forth in Financial Accounting Standards Board ("FASB") Statement of Concepts ("Concepts Statement") No. 1, one

of the fundamental objectives of financial reporting is that it provide accurate and useful information concerning an entity. Concepts Statement No. 1 provides, in pertinent part,

> Financial statements are a central feature of financial reporting. They are the principal means of communicating accounting information to those outside an enterprise.... Financial reporting should provide information that is useful to present and potential investors and creditors and others in making rational investment, credit, and similar decisions.

108. By signing Forms 10-K and 10-Q during the relevant period, defendants represented that CVS's financial statements during the relevant period were prepared in accordance with GAAP. Such representations were materially false and misleading because defendants knew, or improperly failed to know, that the Company issued financial statements that provided false and misleading information about the value of and its policy of accounting for inventories. These misrepresentations materially mislead investors about CVS's gross profits, gross margins and profitability during the relevant period.[1]

109. Regulation S-X [17 C.F.R. § 210.4-01(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

---

[1]    Gross profit is defined as the excess of sales over cost of goods sold and is referred to as gross margin when expressed as a percentage of sales.

57

110. CVS's financial statements for the year ended December 31, 2000 were included in its Annual Report to Shareholders which was incorporated by reference in CVS's 2000 Form 10-K filed with SEC on or about March 19, 2001. Such financial statements disclosed that inventories are stated at "the lower of cost or market using the first in, first out method.

111. GAAP, in Chapter 4 of Accounting Research Bulletin ("ARB") No. 43, provides:

> A major objective of accounting for inventories is the proper determination of income through the process of matching appropriate costs against revenues...
>
> The primary basis for accounting for inventories is cost.... A departure from the cost basis of pricing inventories *is required* when the utility of goods is longer as great as its cost. Where there is evidence that the utility of goods, in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss in the current period. This is generally accomplished by stating such goods at the lower level commonly designated as *market*. [First Emphasis Added.]

112. In addition, GAAP, as noted in Accounting Principles Board ("APB") Opinion No. 28, inventory losses from market declines should not be deferred and are costs which are associated with revenue that should be reported as part of the cost of goods

58

sold.

113. Defendants caused or allowed CVS to violate GAAP by improperly accounting for inventory and the cost of goods sold. As noted above, CVS's gross margin rate had been in continual decline for some time due to the fact that lower margin pharmacy sales were becoming an increasingly larger percentage of CVS's total sales. This was especially true with respect to pharmacy sales paid for by third party insurance programs.

114. In order to mitigate the negative impact that the increase in pharmacy sales was having on gross margins, CVS improperly failed to account for its inventories in accordance with GAAP and its publicly disclosed policy of accounting for inventories at the lower of cost or market value. In so doing, CVS delayed recording a charge against its cost of goods sold resulting from an impairment in the value of its inventory, which materially inflated its reported gross margins and earnings during the year ended December 31, 2000.

115. As noted above, on May 25, 2000, defendants caused or allowed CVS management to issue a memorandum to all CVS store managers, announcing that CVS would implement new procedures to account for in-store markdowns of damaged merchandise, store supplies, unsaleable merchandise and/or outdated merchandise.

Pursuant to the new procedures, in-store markdowns and returns were to be tracked and recorded on a daily basis using an electronic RF device. According to the Company's internal policy manual the change in the markdown policy would allow for "more accurate and timely [markups and markdowns] on a daily basis" and would reduce the risk of having to record any unnecessarily large write-offs for damaged, unsaleable or outdated merchandise at any point in time.

116. In November 2000, however, CVS, in direct contravention of its newly implemented  markdown and damage return policy, required all CVS store managers to stop store initiated markdowns until after January 1, 2001. Accordingly, from November 20, 2000 through at least the end of fiscal 2000, defendants caused or allowed 4,100 plus stores not to take markdowns or return damaged, unsaleable or outdated goods. This initiative caused one former CVS store manager to state that his store had "trays and cases of unsaleable merchandise taking up space in the back of the store, in the back room."

117. As a result of defendants' improper conduct, CVS knowingly suspended receipt of information from its stores necessary to allow it to properly account for impaired merchandise inventory.  In so doing, defendants caused or allowed CVS to delay

60

the write down of tens of millions of dollars of inventory, thereby artificially inflating the Company's gross margins and operating results.

118. By delaying the write-off of discounted and/or unsaleable merchandise, defendants caused or allowed CVS to improve reported margins at a time when it was critical for them to do so. CVS's sales growth of 11% from 1999 to 2000 was almost entirely attributable to lower margin pharmacy sales. Nonetheless, CVS's reported gross margins as a percentage of total revenue remained constant at approximately 26% in both years. Since CVS's sales growth in 2000 was almost entirely attributable to lower margin pharmacy sales, CVS's overall gross margin would be expected to decline unless defendants caused or allowed the Company to compensate for the increased pressure on margins in some other way. Defendants caused or allowed management to direct all stores managers to cease recording bone-fide markdowns until after fiscal 2000, thereby allowing CVS to artificially inflate reported gross margins in fiscal 2000.

119. Accordingly, the representations during the relevant period concerning CVS's gross profits, gross margins and earnings were materially false and misleading as they improperly failed to account for the impairment in the value of its inventories, which

61

defendants knew, or recklessly ignored.  This failure violated GAAP and was in direct contravention of CVS's publicly disclosed policy of accounting for inventories at the lower of cost or market value.

120.  In addition to the violations of GAAP noted above, CVS's December 31, 2000 financial statements also violated, at least, the following additional provisions of GAAP:

(a)  The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶ 58-59);

(b)  The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶ 79);

(c)  The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶ 95, 97).

(d)   The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, ¶ 34);

(e)   concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶ 50); and

(f)   the concept that information about an enterprise gains greatly in usefulness if it can be compared with similar information ... about the same enterprise for some other period or some other point in time.  (Concepts Statement No. 2, ¶ 111).

121. In failing to file financial statements with the SEC which conformed to the requirements of GAAP, defendants caused or allowed CVS to disseminate CVS financial statements that were presumptively misleading and inaccurate.  Accordingly, defendants materially misled the investing public during the relevant period, thereby inflating the price of CVS common stock, by allowing or

63

causing CVS to publicly issue false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.

122. In addition, Item 7 of Form 10-K, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), require the issuer to furnish information pursuant to Item 303 of Regulation S-K [17 C.F.R. 229.303]. In discussing results of operations, Item 303 of Regulation S-K requires the registrant to:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

The instructions to paragraph 303(a) further state:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results.

123. The SEC, in its May 18, 1989 Interpretive Release No. 34-26831, has indicated that SEC registrants are required to employ the following two-step analysis in determining when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303 of Regulation S-K:

> A disclosure duty exists where a trend,

64

demand, commitment, event or uncertainty is
both presently known to management and is
reasonably likely to have a material effect on
the Registrant's results of operations.

124. Nonetheless, CVS's Form 10-K and Form 10-Q issued during
the relevant period, and signed by defendants, failed to disclose
the information necessary for a proper understanding and
evaluation of the Company's inventories and operating results.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

125. Plaintiff brings this action derivatively in the right
and for the benefit of CVS to redress injuries suffered as a
result of the breaches of fiduciary duty by the defendants.

126. Plaintiff will adequately and fairly represent the
interests of CVS and its shareholders in enforcing and prosecuting
its rights.

127. As a result of the facts set forth herein, plaintiff has
not made any demand on the CVS Board of Directors to institute
this action against the defendants.  Such demand would be a futile
and useless act because the Board is incapable of making an
independent and disinterested decision to institute and vigorously
prosecute this action for at least the following reasons:

> A.   A majority of the members of the Board
>      knowingly caused or allowed the Company
>      to engage in the imprudent and illegal
>      conduct described herein, which could not
>      have been an exercise of good faith

65

business judgment;

B.  A majority of the members of the Board exhibited a sustained and systematic failure to fulfill their fiduciary duties and therefore face a substantial likelihood of being held liable for their breaches of fiduciary duties. Accordingly, the Board is legally incapable of independently and disinterestedly considering a demand to institute and vigorously prosecute this action.

C.  Defendants Ryan and Rickard are directly interested in the insider trading transactions challenged herein, from which they each received millions or hundreds of thousands of dollars in illicit personal financial benefits. Accordingly, defendants Ryan and Rickard are legally incapable of independently and disinterestedly considering a demand to institute and vigorously prosecute this action

COUNT I

AGAINST ALL DEFENDANTS FOR  BREACH
OF FIDUCIARY DUTIES FOR INSIDER SELLING
AND MISAPPROPRIATION OF INFORMATION

128. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

129. At the time of each of the stock sales set forth herein, each defendant knew, but did not disclose publicly, that CVS had engaged in the imprudent and illegal conduct described herein. Each defendant made or allowed each of the aforementioned stock

66

sales on the basis of this material non-public information.

130. The information described in the preceding paragraph was proprietary, non-public information concerning CVS.

131. At the time of their stock sales, each defendant knew that when CVS's imprudent and illegal conduct was publicly disclosed, the price of the Company's common stock would dramatically decrease. The defendants' sales or allowance of sale of CVS common stock based on their knowledge of this material non-public information was a breach of their fiduciary duties of loyalty and good faith.

132. Since the use of the Company's proprietary information for their own gain or allowance of co-defendants' gain constitutes a breach of the defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits any defendants obtained or permitted thereby.

## COUNT II

### AGAINST DEFENDANTS RYAN AND RICKARD FOR UNJUST ENRICHMENT

133. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

134. As a result of their wrongdoing alleged herein, defendants Ryan and Rickard were unjustly enriched by their

receipt of proceeds from their improper sales of CVS stock.

135. As a result of their wrongdoing alleged herein, defendants Ryan and Rickard were further unjustly enriched by their receipt of the cash bonuses alleged herein.

136. It would be unconscionable and contrary to fundamental principles of equity for Ryan and Rickard to retain the foregoing unjust benefits they received as a result of their wrongdoing. Accordingly, the Court should order Ryan and Rickard to disgorge their unjustly obtained benefits.

## COUNT III

### AGAINST ALL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY OF GOOD FAITH

137. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

138. As alleged herein, each defendant had a fiduciary duty to, *inter alia*, exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and, when placed on notice of illegal or imprudent conduct committed by the Company or its employees, exercise good faith in taking appropriate measures to prevent and correct such conduct.

68

139.    Each defendant breached his fiduciary duty of good faith by knowingly causing or allowing the Company to engage in the imprudent and illegal conduct described herein, and, when placed on notice of the wrongdoing, failing to make a good faith effort to prevent or correct it.

140.    As a direct and proximate result of defendants' foregoing breaches of fiduciary duty, the Company has sustained damages, including, but not limited to, costs and expenses in connection with internal and external investigations of and litigation regarding the Company's imprudent and illegal conduct.

## Requests for Relief

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties;

B.    Imposition of a constructive trust in favor of the Company for the amount of profits each of the defendants received from their sales of CVS common stock alleged herein;

C.    Entry of an Order compelling each of the defendants to disgorge to the Company the unjust benefits they received as a result of their wrongdoing;

D.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the
      Court deems just and proper.


## JURY DEMAND

Plaintiff demands a trial by jury.


Dated: December 17, 2004                    Respectfully submitted,

                                   **PERKINS SMITH & COHEN LLP,**

                              By:  _____
                                   Susan E. Stenger
                                   BBO #555552
                                   One Beacon Street, 30th Fl.
                                   Boston, MA 02108-3106
                                   Tel:  617-854-4000
                                   Fax:  617-854-4040

                                   **WECHSLER HARWOOD LLP**
                                   Robert I. Harwood
                                   Samuel K. Rosen
                                   488 Madison Avenue
                                   New York, NY 10022
                                   Tel:  212-935-7400
                                   Fax:  212-753-3630

—

**VERIFICATION**

STATE OF NEW YORK    )
                     ss:
COUNTY OF NEW YORK   )


        I, Richard Krantz, declare under penalty of perjury as follows:

        1.   I am the plaintiff in the above-captioned matter.

        2.   I have read the foregoing Derivative Complaint and hereby verify that the contents thereof are true and correct to my own knowledge, except as to matters therein stated to be alleged on information and belief, which matters I believe to be true.

Dated: December 14, 2004


                                                                     _____
                                                              Richard Krantz

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS–44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Richard Krantz, Derivatively On Behalf of Nominal Defendant CVS Corporation

## DEFENDANTS

Thomas M. Ryan, David B. Rickard, Thomas P. Gerrity, Stanley P. Goldstein, Marian L. Heard, Terry R. Lautenbach, Terence Murray, Sheli Z. Rosenberg, and William J. Joyce

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **New York**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT **Suffolk**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Susan E. Stenger
Perkins Smith & Cohen LLP
One Beacon Street, 30th Floor
Boston, MA  02108
617-854-4000

ATTORNEYS (IF KNOWN)

Unknown

04 - 12650 REK

## II. BASIS OF JURISDICTION   (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)   AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT   (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 110 Insurance | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 140 Negotiable Instrument | | | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☒ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 890 Other Statutory Actions |
| ☐ 240 Torts to Land | | ☐ 535 Death Penalty | | | |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS — Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

28 USC sec. 1332.  Shareholders derivative suit for breaches of fiduciary duty.

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $
Well over $1,000,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ YES   ☐ NO

## VIII. RELATED CASE(S) (See instructions):
IF ANY

JUDGE _____   DOCKET NUMBER _____

DATE
December 17, 2004

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY)_____

   Richard Krantz v. Thomas M. Ryan, et al._____

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL

   COVER SHEET.  (SEE LOCAL RULE 40.1(A)(1)).

   ____  I.     160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

   ____  II.    195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,      *Also complete AO 120 or AO 121
                740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.         for patent, trademark or copyright cases

   _X_   III.   110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                380, 385, 450, 891.

   ____  IV.    220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
                690, 810, 861-865, 870, 871, 875, 900.

   ____  V.     150, 152, 153.

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)). IF MORE THAN ONE PRIOR RELATED CASE
   HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

       None._____

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS
   COURT?
                                                          YES          (NO)

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE
   PUBLIC INTEREST?   (SEE 28 USC §2403)
                                                          YES          (NO)

   IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?
                                                          YES          (NO)

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE
   28 USC §2284?
                                                          YES          (NO)

7. DO ALL OF THE PARTIES IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE
   COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE
   SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).
                                                          YES          (NO)

       A.   IF YES, IN WHICH DIVISION DO ALL OF THE NON-GOVERNMENTAL PARTIES RESIDE?

            (EASTERN DIVISION)          CENTRAL DIVISION              WESTERN DIVISION

       B.   IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING
            GOVERNMENTAL AGENCIES, RESIDING IN MASSACHUSETTS RESIDE?

            EASTERN DIVISION            CENTRAL DIVISION              WESTERN DIVISION

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME  Susan E. Stenger_____

ADDRESS  Perkins Smith & Cohen LLP, One Beacon St., 30th Floor, Boston, MA  02108

TELEPHONE NO.  617-854-4000_____

(Cover sheet local.wpd - 11/27/00)