UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RICHARD KRANTZ, Derivatively On Behalf
of Nominal Defendant CVS Corporation,

              Plaintiff,

        - against -

THOMAS M. RYAN, DAVID B. RICKARD,
THOMAS P. GERRITY, STANLEY P.
GOLDSTEIN, MARIAN L. HEARD, TERRY
R. LAUTENBACH, TERENCE MURRAY,
SHELI Z. ROSENBERG, and WILLIAM H.
JOYCE,

              Defendants,

          and

CVS CORPORATION,

           Nominal Defendant.

04-12650-REK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF MASSACHUSETTS    )
                              )SS.
COUNTY OF SUFFOLK         )

MICHAEL S. GARDENER, being first duly sworn upon oath, deposes and states:

1.    I am an attorney duly licensed to practice in the Commonwealth of Massachusetts and one of the attorneys representing Defendant CVS Corp., Thomas M. Ryan and David B. Rickard (collectively, "Defendants") in the above-entitled matter. I file this affidavit in support of Defendants' Motion to Redesignate Action as a Related Case.

2.      Attached hereto as Exhibit A is a true and correct copy of the complaint filed in the Securities Action under the caption <u>In re:  CVS Corp. Sec. Litig.</u>, C.A. No. 01-11464-JLT.

3.      Attached hereto as Exhibit B is a true and correct blackline comparison of the complaint filed in the Securities Action, <u>In re:  CVS Corp. Sec. Litig.</u>, C.A. No. 01-11464-JLT, against the complaint filed in the instant action.

4.      Attached hereto as Exhibit C is a true and correct copy of Defendants' Motion to Redesignate the Derivative Action as a Related Case and to Consolidate, and accompanying memorandum of law, filed with Judge Tauro in <u>In re:  CVS Corp. Sec. Litig.</u>, C.A. No. 01-11464-JLT.

Michael S. Gardener

Sworn to before me this
11th day of FEB , 2005



Notary Public

AIMEE RICE
Notary Public
Commonwealth of Massachusetts
My Commission Expires January 6, 2009

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE CVS CORPORATION
SECURITIES LITIGATION

:
:
: **C.A. No. 01-11464 JLT**

## CONSOLIDATED AND AMENDED
## CLASS ACTION COMPLAINT

Lead Plaintiffs, by their attorneys, allege the following based upon knowledge, with

respect to their own acts, and upon other facts obtained through an investigation made by and

through their attorneys, including a review of the public filings of CVS Corporation ("CVS" or

the "Company") with the United States Securities and Exchange Commission (the "SEC"),

published reports, news articles, analyst reports, other publications, and interviews of former

CVS employees. Based on the substantial facts already uncovered, and alleged herein, Lead

Plaintiffs believe that additional substantial evidentiary support will exist for the allegations after

a reasonable opportunity for discovery. Many of the facts supporting the allegations contained

herein are known only to defendants and are within their exclusive control.

## NATURE OF THE ACTION

1.     This is a securities fraud class action brought on behalf of persons and entities,

other than defendants and certain related parties who purchased the common stock of defendant

CVS between February 6, 2001, and October 30, 2001 (the "Class Period), seeking to pursue

remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). The Complaint

alleges a fraudulent scheme and deceptive course of business that injured purchasers of CVS

common stock throughout the Class Period.

2.      CVS is one of the largest retail drugstore chains in the United States. As of
December 30, 2000, the Company operated 4,133 retail and specialty pharmacy drugstores and
various mail-order facilities located in 31 states and the District of Columbia. During the Class
Period, CVS touted itself as the largest drug store chain in terms of number of stores operated
and the largest dispenser of retail prescriptions.

3.      Beginning in 1997, CVS embarked upon a rapid expansion program, more than
doubling the number of stores operated by the Company in less than two years through the
acquisition of several other drugstore chains. As a result, CVS's reported revenue grew from
approximately $5.5 billion in 1996 to approximately $20.1 billion in 2000. Additionally, CVS's
reported net earnings grew from approximately $167.4 million to approximately $746.0 million
during that same time period.

4.      During the Class Period, CVS repeatedly reported "record" financial results and
touted its ongoing ability to achieve "double-digit" growth. At all relevant times, CVS portrayed
itself as a company that was extremely well-positioned to take advantage of the rapidly
expanding pharmacy industry. CVS also represented to the public that it was effectively
handling the shortage of pharmacists in the United States and was continuing to expand the
number of stores it operated, while focusing on a strategy of relocating existing pharmacies in
strip malls to more profitable stand-alone locations.

5.      However, as CVS's senior officers and directors knew but did not disclose, the
Company was encountering significant problems that were having a materially negative impact
on its financial results and future prospects. These problems included, among other things: (a)
the fact that the Company was unable to successfully offset the increased pressure on gross
margins that the growing percentage of lower margin pharmacy sales were having on the

- 2 -

Company's income and earnings; (b) that a significant number of the pharmacies CVS had acquired over the past few years were underperforming, could not be relocated, and would need to be closed; and (c) that the ongoing pharmacist shortage was having an acute impact on CVS's operations, resulting in unreasonably long waits for customers to fill prescriptions and causing stores in a number of different markets to temporarily close or reduce hours, thereby resulting in the loss of sales and further reducing income and earnings.

6.    Rather than publicly disclose these material problems, which were eroding the Company's margins and threatening its ability to achieve forecasted growth and earnings, defendants engaged in fraudulent and undisclosed accounting practices in violation of Generally Accepted Accounting Principles ("GAAP"), which enabled the Company to artificially inflate its reported gross margin, earnings and earnings per share during the Class Period. Additionally, defendants' issued a series of materially false and misleading public statements intended to create a false impression of the Company's business and prospects throughout the Class Period, thereby rendering the Company's reported financial results complained of herein materially false and misleading.

7.    The market did not begin to learn about the significant problems that CVS was experiencing until June 27, 2001, when defendants first announced that, due to increased pressure on gross margins and the adverse impact of the pharmacist shortage, the Company's earnings per share for the second quarter and full year would be lower than they had previously projected. In response to this negative news, the price of CVS common stock dropped precipitously from $44.10 per share to $36.51 per share -- a single day decline of $7.59 per share and a 41% decline from the stock's inflated Class Period high of $62.10, reached less than four months earlier on March 8, 2001.

8.    However, the full extent of CVS's problems remained concealed by defendants until October 30, 2001, when they announced that the Company intended to close approximately 200 stores and incur a restructuring charge of approximately $350 million. In response to this additional negative news, the price of CVS common stock fell an additional $7.72, from $31.62 per share to $23.90 per share -- representing an additional one day decline of over 24% and a total decline of over 61% from the stock's inflated Class Period high.

## JURISDICTION AND VENUE

9.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated by the SEC, 17 C.F.R. § 240.10b-5.

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Throughout the Class Period, CVS conducted significant operations in this District, including the operation of more than 300 retail drugstores.

12.    In connection with the acts, conduct and other wrongs alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of national securities exchanges, including the New York Stock Exchange.

## THE PARTIES

13.    Lead Plaintiffs, Plumbers & Pipefitters National Pension Fund and Welch & Forbes, purchased CVS common stock during the Class Period, and have suffered substantial damages as a result of the wrongful acts of defendants as alleged herein.

- 4 -

14.    Defendant CVS is a Delaware corporation with its principal executive offices located at One CVS Drive, Woonsocket, Rhode Island 02895.

a. During the Class Period, CVS's operations were grouped into four business segments:

(1) Retail Pharmacy, which operated retail drugstores throughout the country selling prescription drugs and a variety of general merchandise;

(2) Pharmacy Benefit Management ("PBM"), which provided prescription benefit management services to managed care organizations;

(3) Specialty Pharmacy, which operated mail order facilities and retail pharmacies under the name CVS ProCare for patients requiring complex and expensive drug therapies for long-term health conditions; and

(4) Internet Pharmacy, which operated a mail order facility and online retail pharmacy operating under the name CVS.com.

b.    Sometime after the Class Period, CVS changed its reporting structure by incorporating its Internet Pharmacy segment into its Retail Pharmacy segment and incorporating its Specialty Pharmacy segment into its PBM segment.

c.    During the Class Period, CVS' Retail Pharmacy segment was by far its largest, representing approximately 97% of its consolidated net sales and operating profit in fiscal 2000 and 96% of its consolidated net sales and operating profit in fiscal 2001.

d.    As of March 9, 2001, CVS had 392,925,516 shares of common stock outstanding.

- 5 -

15.     Defendant Tom Ryan served as Chairman, President and Chief Executive Officer of the Company at all relevant times.

16.     Defendant David B. Rickard served as Executive Vice President and Chief Financial Officer of the Company at all relevant times.

17.     Defendants Ryan and Rickard are sometimes referred to herein collectively as the "Individual Defendants."

18.     As set forth in detail below, because of their senior executive positions within the Company, the Individual Defendants had access to the adverse undisclosed information about CVS's financial results and performance and knew that these adverse facts and omissions rendered the representations made by and about CVS and the financial statements issued by the Company materially false and misleading at all relevant times.

19.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false and misleading information conveyed in the Company's press releases and filings with the SEC are the collective actions of the Individual Defendants. Each of these senior officers of CVS, as set forth below in detail, by virtue of his high-level position with CVS, was directly involved in the day-to-day operations of the Company at the highest level and was privy to the adverse undisclosed information set forth herein and knew of or recklessly disregarded the material falsity of the Company's public statements during the Class Period. These individuals were each involved in the drafting and reviewing of the false and misleading statements identified herein and were aware or recklessly disregarded that false and misleading statements were being issued regarding the Company and either approved, condoned or facilitated these statements, in violation of federal securities laws.

- 6 -

## CLASS ACTION ALLEGATIONS

20.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of all persons or entities who purchased the common stock of CVS between February 6, 2001 and October 30, 2001, inclusive (the "Class Period"). Excluded from the Class are defendants, all of the officers, directors and partners thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any of the foregoing have or had a controlling interest.

21.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members can only be determined by appropriate discovery, plaintiff believes that Class members number at least in the thousands and that they are geographically dispersed. As of March 9, 2001, the Company had 392,925,516 shares of common stock outstanding. Throughout the Class Period, CVS common stock was actively traded on the New York Stock Exchange. Record owners and other members of the Class may be identified from records maintained by CVS or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

22.    Lead Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein and sustained damages in connection therewith.

23.    Lead Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel who are experienced and competent in class action and

- 7 -

securities litigation. Lead Plaintiffs have no interests that are contrary to or in conflict with the members of the Class they seek to represent.

24.    Common questions of law and fact exist as to all Class members and predominate over any questions that may affect only individual members. Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    Whether statements made by defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations and financial statements of CVS and whether defendants breached any duty to convey material facts or to correct material facts previously disseminated;

(c)    Whether defendants participated in and pursued the fraudulent scheme or course of business complained of;

(d)    Whether defendants acted willfully, with knowledge or recklessly, in omitting and/or misrepresenting material facts;

(e)    Whether the market price of CVS common stock was artificially inflated during the Class Period due to the material misrepresentations and omissions complained of herein; and

(f)    Whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

25.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Further, as the damages suffered by individual members of the Class may be relatively small, the expense and

- 8 -

burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### CVS's Rapid Expansion of Its Business Operations

26.    CVS became a stand-alone public company in 1996. At that time, it operated approximately 1,400 stores in 14 states and the District of Columbia. Since 1996, CVS has aggressively expanded its Retail Pharmacy operations. Indeed, between 1996 and 2000, CVS increased the number of retail stores it operated from approximately 1,400 to over 4,100.

27.    Unlike some of its competitors, CVS's rapid growth has been achieved through acquisitions of other pharmacy chains. On May 29, 1997, CVS completed the acquisition of Revco D.S., Inc. ("Revco"), a pharmacy chain with approximately 2,500 drugstores. The following year, on March 31, 1998, CVS completed the acquisition of Arbor Drugs, Inc. ("Arbor Drugs"), a pharmacy chain with approximately 200 drugstores. As a result of these acquisitions, by the end of 1998, CVS operated approximately 4,122 retail pharmacies in 24 states and the District of Columbia and began touting itself as the largest chain drugstore company in the United States based on store count.

28.    CVS's Retail Pharmacy sales are divided between pharmacy sales and sales of general merchandise, including, over-the-counter drugs, greeting cards, film and photofinishing services, beauty products and cosmetics, seasonal merchandise and convenience food (referred to by CVS as "front store" sales). Following its acquisitions of Revco and Arbor Drugs, CVS's business has shifted more heavily to pharmacy sales. By 2000, pharmacy sales had increased to represent approximately 63% of total sales for the year, up from 43.9% in 1996.

29.    As a result of the foregoing, at all relevant times, defendants knew that CVS's ability to continue to manage and grow its Retail Pharmacy business segment and to maintain and increase pharmacy sales was critical to the success of its overall operations. However, as set forth below, by the beginning of the Class Period, CVS was experiencing a number of undisclosed problems that were having a materially negative impact on its Retail Pharmacy business.

### Undisclosed Adverse Facts Impacting CVS's Business and Operations During the Class Period

#### CVS's Inability to Offset Declining Gross Margins

30.    By the beginning of the Class Period, CVS's gross margin rate had been declining for some time and was continuing to decline, which presented a threat to CVS's operating profits and earnings.

31.    The Company's explanation for the gross margin decline was that, as noted above, pharmacy sales were becoming an increasingly larger percentage of CVS's total sales as compared to front store sales, and the margin on pharmacy sales is lower than the margin on front store sales. This is especially true with respect to pharmacy sales paid for by third party insurance programs, including managed care organizations. In order to reduce their prescription drug costs, these managed care organizations have placed pressure on CVS to accept lower rates of reimbursement, thereby further reducing CVS's gross margin on pharmacy sales.

32.    In order to counteract the impact that the increase in pharmacy sales was having on margin rates and achieve projected income and earnings, it was critical for CVS to improve operating efficiencies. By increasing operating efficiencies, CVS represented that it would be

- 10 -

able to mitigate the negative impact that increased pharmacy sales were having on the Company's gross margins and operating profits.

33.     Accordingly, in June 2000, in an effort to improve operating margin, CVS changed its procedures for handling in-store markdowns of damaged merchandise, store supplies, unsaleable merchandise and/or outdated merchandise. Previously, CVS stores had manually kept track of in-store markdowns and returns of damaged merchandise on a weekly basis. Pursuant to the new procedure, among other things, in-store markdowns and returns were to be taken and tracked on a daily basis using an electronic RF device. According to the Company's internal policy manual issued in connection with this change, the new markdown policy would allow for "more accurate and timely [markups and markdowns] on a daily basis" and would avoid the need to take unnecessarily large write-offs of damaged merchandise at any point in time.

34.     In connection with this change in procedure, on May 25, 2000, CVS management issued a memorandum to all CVS store managers, announcing that CVS would institute a new procedure for handling markdowns and returns of damaged items commencing on June 18, 2000. In describing the reasons for the change in policy for handling return of damaged merchandise, the memorandum stated the following:

## DAMAGE RETURN PROCEDURE CHANGE

BACKGROUND
A new damage return process has been developed in conjunction with the new manual markdown application introduction on the RF Unit. The intent of this new process is to tighten controls on non-returnable and "un-billable" merchandise being sent to Damage Track.

> In 1999 stores sent over $1.4 million dollars worth of non-returnable and pristine merchandise back to Damage Track (pristine being defined as perfectly good merchandise with no visible signs of the product or package being damaged or outdated).

> Additionally, as a company, we returned $25 million dollars more merchandise than we received credit from suppliers. This variance resulted in a company P&L write-off. If this write-off was shared evenly between all 4000 plus stores, your P&L Contribution A line would have been negatively adjusted by $6250.00.

Needless to say, we cannot afford to repeat this write-off in 2000. Therefore, the following new procedures have been developed and must be implemented IMMEDIATELY.

35.    As the memorandum makes clear, CVS intended to more effectively and accurately handle markdowns and returns of damaged merchandise by keeping track of this information on a daily basis. The memorandum also demonstrates the magnitude of the issue. As indicated above, in 1999, CVS returned $25 million worth of merchandise to suppliers for which it did not receive any credit. This amount does not include damaged merchandise that was not returnable and was written off and/or merchandise that was damaged and sold at a marked down price.

36.    In November 2000, CVS, in direct contravention of its new markdown and damage return policy instituted a few months earlier, instructed its store managers to stop all store initiated markdowns until sometime after January 1, 2001 and to segregate and hold all merchandise that was to be written-off and/or marked down in a designated section of each store's respective stockroom.

37.    Specifically, on November 20, 2000, CVS management issued a memorandum to all CVS store managers, stating that, effective immediately, "[n]o store initiated markdowns should be taken between now and January 1, 2001." The memorandum included the following additional information regarding the sudden policy turnaround:

Further Information:
What markdowns CANNOT be performed, effective immediately?
-- Store level markdowns
  -- Damaged / non-returnable items

- 12 -

-- Damaged / unsaleable items
   NOTE: Returnable Damages going back to the warehouse should still be
   processed as normal
-- Cosmetic prepack markdowns
-- Not in planogram discontinued / Discontinued Other
-- End of Season Down to Zero markdowns
-- Outdated non-returnable product (i.e., Russell Stover)

How do I handle the Damaged Items that are not returnable or unsaleable?
-- Hold in the designated clearance location in your stockroom.
-- Visual merchandising will allocate endcaps in the January Merchandising Planner to
   assist with liquidating these items.

38.    Accordingly, from November 20, 2000 through at least the end of fiscal 2000,

defendants did not allow any of CVS's 4,100-plus stores to take markdowns or write-off

damaged or otherwise unsaleable goods. As a result, each store was required to keep thousands

of dollars of damaged merchandise in storerooms that should have been discounted or marked

down to zero. As one former CVS store manager put it, this policy resulted in "trays and cases of

unsaleable merchandise taking up space in the back of the store, in the back room."

39.    Defendants sudden reversal in policy can only be explained by their intent to

avoid having to write-off tens of millions of dollars of damaged and/or discounted merchandise

until sometime in 2001. Indeed, numerous CVS store managers discussed among themselves

the fact that the new policy served no legitimate business purpose and was implemented in order

to allow the Company to report that it had achieved its forecasted numbers for fiscal 2000,

thereby allowing CVS executives to reap substantial bonuses.

40.    Demonstrating defendants intent in this regard is the fact that they allowed stores

to continue to process unsaleable merchandise that could be returned for a credit, while they

prevented stores from processing unsaleable merchandise for which credit was not available.

This unsaleable merchandise should have been written off and thrown away. However, pursuant

- 13 -

to defendants' instructions, stores were required to retain this merchandise, which could not be sold or returned, through at least the end of 2000 before the write-off could be recorded.

41.    As a result of the foregoing, CVS knowingly cut off the flow of information from stores that would allow the Company to properly account for discounted and unsaleable merchandise, in violation of GAAP as described below in paragraphs 127 through 144. By doing so, defendants were able to delay the writedown of tens of millions of dollars of inventory, thereby artificially improving the Company's gross margin and inflating its reported operating results for the fourth quarter and year end 2000.

42.    Moreover, although the memorandum indicates that no markdowns could be taken through the end of the year, according to former store managers, resumption of processing markdowns did not begin to take place until several weeks into January 2001 and as late as February 2001. Even after markdowns began to be processed in 2001, pursuant to Company policy, it took up to sixty days before potentially saleable marked down merchandise that could not be sold would be marked down to zero. Thus, the effect of defendants' directive that no markdowns be taken beginning in November 2000, continued to artificially improve the Company's gross margin and operating results into 2001.

### CVS's Inability to Relocate and Need to Close Underperforming Stores

43.    As described above, between 1996 and 1998, CVS acquired approximately 2,600 stores in connection with the Revco and Arbor Drugs acquisitions. Many of the stores acquired in these transactions were located in undesirable strip mall locations and/or were unprofitable. CVS's publicly touted strategy was to relocate as many stores as possible out of strip mall locations to larger more profitable stand-alone locations. Indeed, CVS emphasized its relocation strategy in press releases and SEC filings issued both before and throughout the Class Period,

- 14 -

noting that by relocating stores the Company was immediately able to increase these stores' profitability.

44.    However, as defendants knew, at all relevant times, a certain percentage of its stores that were located in undesirable locations would not be able to be relocated and would need to be closed. Further, defendants knew that other stores that were underperforming could not be made profitable and would also need to be closed.

45.    Indeed, since completing the Revco acquisition in 1997, the problem of underperforming stores was regularly discussed at meetings of CVS senior management. By 1999, CVS had developed an action plan to try and improve performance at a number of underperforming stores. If performance could not be improved at a store, defendants' plan was to try and sell the store or, if the store could not be sold, to schedule it for closure.

46.    In the beginning of 2001, CVS set up a cross functional task force assigned with the responsibility of determining which of its stores would need to be closed. The task force was headed up by CVS's Treasurer, Phil Galbo. Mr. Galbo reported directly to Douglas Sgarro, CVS's Senior Vice President - Administration and Chief Legal Officer. Also centrally involved in this process was Larry Merlo, CVS's Executive Vice President in charge of stores. By the first quarter of 2001, the task force had determined that approximately 200 stores would need to be closed. Many of the stores targeted for closure were stores acquired from Revco or Arbor Drugs that were known to have been underperforming for years. The stores scheduled for closing were identified on a list that was circulated at CVS's headquarters. Although the list was refined over time, the number of stores to be closed always remained at approximately 200.

47.    As a result of the foregoing, by the beginning of 2001, CVS's intention to close approximately 200 stores had become common knowledge internally at the Company and was

- 15 -

the subject of discussions among CVS employees. For example, in January 2001, a CVS District Manager disclosed to a group of store managers that CVS would be closing a number of mid-western stores sometime later in the year in connection with a restructuring plan.

48.     Rather than publicly disclosing its plans to close approximately 200 stores, however, throughout the Class Period, defendants misleadingly emphasized CVS's plans to open new stores in new markets and relocate stores in existing markets.

### CVS's Inability to Attract and Retain
### Adequate Numbers of Pharmacists to Staff its Stores

49.     For the past several years, there has been an ongoing shortage of pharmacists in the United States. The shortage has been attributed to a number of factors, including, the growing number of prescription drugs being used to treat illnesses, the aging population and an increase of the number of years necessary to obtain a pharmacist degree from 5 years to 6 years.

50.     Although the pharmacist shortage has had some impact on the entire industry, the problem has been particularly acute for CVS. This is true for several reasons. First, as alleged herein, CVS has engaged in rapid expansion, resulting in a dramatic increase in the number of pharmacists the Company required to staff its stores. For example, according to a former CVS manager in CVS's construction division, at the time CVS acquired Arbor Drugs in 1998, the chain, whose operations were focused in the Detroit region, was suffering from a deficit of approximately 100 pharmacists that were needed to properly staff stores in the region. Unknown to the investing public, since completing the acquisition in 1998, CVS has struggled to try and maintain adequate pharmacy staffing in these stores.

51.     Further adding to the problem is the fact that, as described above, CVS has focused for the past several years on a strategy of relocating existing stores in smaller strip mall

- 16 -

locations to larger stand-alone locations. Many of these new locations are open 24 hours, thereby further increasing the need for pharmacists at CVS.

52.    As early as 1997, the pharmacist shortage had been identified internally at CVS as a problem that was negatively impacting the Company's operations. From 1997 through 2000, and continuing throughout the Class Period, CVS's Pharmacy Operations Group was involved in trying to solve the problem and was aware that their efforts were inadequate. Additionally, since 1997, CVS's Information Systems department was also involved in trying to address the adverse impact that the pharmacist shortage was having on the Company and knew that the problem remained unresolved. At weekly meetings led by Howard Edels, the Company's Chief Information Officer, senior managers of the Information System department would discuss issues impacting the Company. At these meetings, the pharmacist shortage was regularly raised as a problem hindering the Company's performance. The impact of the pharmacist shortage became more acute throughout 2000. By late 2000, CVS senior management, including CVS's Chief Information Officer, internally stressed the need to improve recruitment of pharmacists in order to try and address the problem.

53.    Rather than disclosing the extent of the impact that the pharmacist shortage was having on CVS, defendants chose to create the impression that CVS was handling the situation and, in fact, was better positioned to attract and retain pharmacists than its competitors. Indeed, CVS consistently represented that the pharmacist shortage was not impacting the Company's operations and its ability to grow.

54.    For example, on October 31, 2000, Bear Stearns issued an analyst report, based on information provided by CVS, which stated the following:

- 17 -

CVS has been successful in attracting and retaining pharmacists at reasonable costs, despite the largest pharmacist shortage the U.S. has ever seen. Beyond incenting pharmacists with stock options and an improved 401K plan, CVS is making the pharmacists' job more enjoyable by automating tedious, routine tasks with new technologies. To this end, automated pill-counting technology has been implemented in roughly 700 stores, a number which we expect to increase as benefits are realized from improved workflow and employee morale.

55.     Similarly, in an article published by Chain Drug Review on December 11, 2000, Jim Roberts, the Vice President of CVS's Southeast region, commented on the impact that the pharmacist shortage was having on CVS as follows: "We've positioned ourselves as the preferred place to work." Mr. Roberts further stated, "[a]s a preferred provider we are able to attract the very best pharmacists in the marketplace and on pharmacy school campuses where we currently recruit across the country."

56.     The foregoing examples are representative of statements made by defendants, both before and during the Class Period, designed to create the impression that the pharmacist shortage was not having a materially adverse impact on CVS's operations. Contrary to these representations, however, by the end of 2000, it had become apparent internally at CVS that the Company's efforts to recruit and retain adequate levels of pharmacist staffing were insufficient. During this time period, according to a former CVS employee who used to work at CVS's headquarters in Rhode Island, CVS's headquarters regularly received complaints from customers regarding the lack of sufficient pharmacists at CVS's retail outlets.

57.     By February 2001, the pharmacist shortage resulted in customers experiencing unreasonably long waits to fill prescriptions, temporary store closings and reduced store hours at different CVS locations on a regular basis. The pharmacist shortage was particularly acute in certain regions of the country, including, among others, the Detroit and Washington, D.C. regions. However, the impact of the pharmacist shortage during the Class Period was felt at CVS

stores throughout the country. For example, in late 2000 and early 2001, CVS experienced a severe shortage of pharmacists at its stores in Rhode Island. To try and compensate for this problem, CVS began closing pharmacies in the region on Sundays and had the pharmacist staff alternate from store to store. Similarly, from February through May 2001, temporary store closings due to lack of pharmacists transpired at stores around the country, including stores in Connecticut, South Carolina, North Carolina, Pennsylvania, Florida and elsewhere. Defendants did not disclose any of the problems they were having as a result of the pharmacist shortage.

58.    Moreover, contrary to defendants' representations that it was addressing the pharmacist shortage by establishing CVS as a preferred place to work, the Company's inability to attract and retain pharmacists was actually exacerbated by the fact that it paid less than its competitors. Further, to try and compensate for the shortage, CVS required that its pharmacists work extensive amounts of unpaid overtime. Due to the severity of the shortage, some CVS pharmacists were required to work in excess of 70 hours per week to try and compensate for the lack of adequate staffing. Additionally, CVS regularly required that its pharmacists travel extensive distances to cover pharmacies that were inadequately staffed.

59.    As a result of CVS's unfair treatment of its pharmacists, which resulted in high turnover and negatively impacted its ability to attract new pharmacists, in November 2000, a group of CVS current and former pharmacists brought a collective action against the Company alleging that its failure to pay overtime violated the Fair Labor Standards Act. Similar suits by CVS pharmacists were brought in early 2001. Defendants did not disclose the existence of any of these lawsuits in its press releases or public filings until March 21, 2002, when it finally reported that the November 2000 action had been brought by pharmacists seeking recovery of unpaid overtime and liquidated damages.

60.    Thus, contrary to defendants' repeated public statements that CVS was better suited to handle the pharmacist shortage than most other retailers, defendants knew that they were unable to adequately staff its retail stores and the pharmacist shortage was having a materially negative impact on CVS's operations. In fact, the pharmacist shortage was actually having a more severe impact on CVS's operations than it was having on its competitors. For example, although one of CVS's main competitor, Walgreen, Inc., had been required to close or reduce hours at approximately 1% of its stores due to the pharmacist shortage, CVS had been required to close or reduce hours at 15% of its stores during the same period.

### False and Misleading
### Statements During the Class Period

61.    On February 6, 2001, the first day of the Class Period, CVS issued a press release announcing "record sales and earnings for the fourth quarter [of 2000] and the year ended December 30, 2000." The Company reported $5.5 billion in net sales during the fourth quarter and fourth quarter earnings of $0.51 per share, a purported increase of 19.6% over the same period the prior year (after excluding results from an extra week in fiscal 1999). For the year, the Company reported $20.1 billion in net sales and earnings of $1.80 per share, a purported increase of 17.7% over the results of the prior year (after excluding a nonrecurring gain and the extra week in 1999).

62.    In the same press release, CVS commented on the Company's store growth as follows:

> For the year, CVS opened 158 new stores and relocated 230 others. The Company entered three new, high growth markets in 2000 and prepared to enter additional new markets. There remain 41 of the Top 100 U.S. drugstore markets in which CVS currently has no presence, offering significant opportunity for future growth. As of December 30, 2000, CVS operated 4,133 retail and specialty pharmacy stores in 31 states and the District of Columbia.

- 20 -

63.    In the February 6 press release, Defendant Ryan commented on CVS's reported

results as follows:

> "The year 2000 was another successful year for CVS. We once again achieved
> double-digit same store sales growth, excellent expense control, and produced
> record earnings," stated Tom Ryan, Chairman, President and Chief Executive
> Officer.

Defendant Ryan concluded by stating:

> I am very pleased that we have been able to consistently meet or beat our goals. all while
> we continue to invest in new stores and relocations, as well as in new business channels,
> which will help accelerate our future growth. I believe we are better positioned than at
> any other time in the Company's history to capitalize on the significant opportunities in
> healthcare.

64.    Also on February 6, 2001, CVS held a conference call with the investment

community led by defendant Ryan. During the conference call, defendants reiterated the

financial information included in the February 6 press release. Defendant Ryan further

commented on the Company's results as follows:

> Well, obviously I'm extremely pleased with our 4th quarter and our 2000 results. In the
> quarter our sales increased 141/2% on a 52-week basis. Our same-store sales increased
> 10.5. You'll see that our healthy sales growth translated into significant margin expansion
> which Dave [Rickard] will fully discuss later on. Earnings per share in the quarter rose
> 18.6% on a comparable basis; 51 cents versus 43.

Regarding, the Company's growth strategy, defendant Ryan stated:

> Let me outline our preliminary real estate plan for 2001. We'll open 150 to 170 brand
> new CVS stores. We'll relocate 140 to 150 CVS stores. We'll close an additional 60 to
> 70 stores for a net new-store CVS growth of 90 to 100 stores for 2001. This equates to
> 300-plus new [stores], less than we've had in the past but a much higher net new-store
> growth because we're closing fewer stores.

65.    Defendants knew, or recklessly disregarded, that the financial results they

announced on February 6 and the statements commenting on those results set forth in paragraph

61 through 64 above were materially false and misleading as the Company's gross margins and

operating profits had been artificially inflated by defendants' failure to properly account for marked down and damaged merchandise in violation of GAAP, as described in paragraphs 33 through 42 above.  As a consequence, reported earnings for the fourth quarter and year end 2000 were artificially inflated.

66.     Additionally, defendants knew, or recklessly disregarded, that their comments regarding CVS's growth plans and business prospects were materially false and misleading because, as described in paragraphs 43 through 60 above, they failed to disclose the fact that CVS intended to close approximately 200 underperforming stores, as well as the fact that the Company was being adversely impacted by the ongoing pharmacist shortage.

67.     As defendants intended and anticipated, all of the above-described representations regarding the Company's performance for the fourth quarter and fiscal year 2000 and its business prospects were picked up and relied upon by securities analysts in issuing highly favorable reports and recommendations, which encouraged buying interest in CVS stock.  For example, on February 7, 2001, Bear Stearns reiterated its "BUY RATING" on CVS stock, stating that "[t]hrough consistently improving sales growth, increased operating margins, and earnings growth, we believe the company is poised to capture a large portion of the estimated 13% in pharmacy industry growth by 2004."

68.     In early March, 2001, CVS issued its Annual Report to Stockholders for fiscal year 2000.  In the Annual Report, defendants repeated the same financial results for the fourth quarter of 2000 and fiscal year 2000 first announced on February 6, 2001.  Regarding the financial results, the Annual Report contained a statement signed by the Individual Defendants stating:

- 22 -

The integrity and objectivity of the financial statements and related financial information in this Annual Report are the responsibility of the management of the Company. The financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America and include, when necessary, the best estimates and judgments of management.

The Company maintains a system of internal controls designed to provide reasonable assurance, at appropriate cost, that assets are safeguarded, transactions are executed in accordance with management's authorization, and the accounting records provide a reliable basis for the preparation of the financial statements. The system of internal accounting controls is continually reviewed by management and improved and modified as necessary in response to changing business conditions and the recommendations of the Company's internal auditors and independent auditors.

69.    Additionally, the Annual Report included a letter from defendant Ryan in which

he described CVS's business operations, once again, in unconditionally glowing terms:

The year 2000 was an exceptional year for CVS by any measure. We achieved continued strong financial results, including record sales, operating profit and net earnings.

\* \* \* \* \*

This outstanding performance solidified our track record of meeting or beating Wall Street's expectations every quarter since we became a stand-alone public company in the Fall of 1996, and has translated into excellent returns for shareholders.

70.    The Annual Report also commented on the purported success of CVS's expansion

efforts as follows:

Our 1997 acquisition of Revco D.S. Inc. and our 1998 acquisition of Arbor Drugs, Inc. provided us with leadership in new markets, earnings accretion and incremental upside potential. Both companies have been fully integrated – from a systems, people and operational perspective – and are performing very well.

The Annual Report further described CVS's strategy for continued store growth consisting of "1)

entering new markets, 2) adding stores within existing markets, and 3) relocating stores to more

convenient, freestanding sites." In this regard, the Annual Report further stated:

Store relocations, the third leg of our real estate strategy, are highly productive investments for CVS. When we relocate a store from an inline shopping center to a freestanding, convenient corner location, we typically generate 25% to 35% higher front-

- 23 -

end sales, improved margins and a better return on invested capital than the stores they replace. The new sites, which are in higher-profile locations with convenient parking, have more appeal to consumers. Today, nearly 40% of our stores are in freestanding locations. Our goal over the next five to seven years is to reach 80%. Although the number of relocations will decrease over time, our relocation strategy will remain an important component of our overall growth strategy.

71.    Defendants knew, or recklessly disregarded, that the financial results reported in the Annual Report and their statements commenting on those results set forth in paragraph 68 through 70 above were materially false and misleading as the Company's gross margins and operating profits had been artificially inflated by defendants' failure to properly account for marked down and damaged merchandise in violation of GAAP, as described in paragraphs 33 through 42 above. As a consequence, reported earnings for the fourth quarter and year end 2000 were artificially inflated.

72.    Additionally, defendants knew, or recklessly disregarded, that their comments regarding CVS's growth plans and business prospects were materially false and misleading because they failed to disclose the fact that CVS intended to close approximately 200 underperforming stores, as well as the fact that the Company was being adversely impacted by the ongoing pharmacist shortage, as described in 43 through 60 above.

73.    On or about February 27, 2001, defendants made available on CVS's website a press release announcing that Moody's Investors Service had raised the rating on CVS "based on the company's leading market position, geographic diversity, and solid and improving debt protection measures." The press release stated that "CVS has become the largest drugstore chain, with stores blanketing the eastern U.S. . . . Growth has been achieved through new store openings and acquisitions. CVS is an acquirer in this consolidating industry, buying companies such as REVCO and Arbor in the same or adjacent geographic areas."

74.     Further amplifying the perception of itself as an organization that was successfully achieving its financial goals, on March 6, 2001, CVS issued a press release announcing that "same store sales for the four weeks ended February 24, 2001 increased 12.8% over the prior year period while pharmacy same store sales rose 20.1%." In the press release, defendants touted CVS as being "America's #1 pharmacy dispensing more retail prescriptions in more stores than any other chain. With annual revenues of more than $20 billion, CVS has created innovative approaches to serve the healthcare needs of all of our customers through its more than 4,100 CVS/pharmacy stores . . . " Defendants issued press releases announcing increased same store sales for the months March, April and June 2001, on April 10, May 10, and June 5, 2001 respectively. Each of these press releases contained the same glowing language quoted above.

75.     On March 19, 2001, CVS filed its annual report for fiscal year 2000 with the SEC on Form 10-K. The Form 10-K was signed by, among others, defendants Ryan and Rickard. In the 10-K, defendants incorporated by reference the purported "record" results reported in CVS's Annual Statement to Shareholders and first announced in defendants' February 6 press release.

76.     Additionally, the 10-K included the following comments regarding CVS's business prospects:

> We believe that our pharmacy operations will continue to represent a critical part of our business and strategy due to our ability to attract and retain managed care customers, favorable industry trends and our on-going program of purchasing patient prescription files from independent pharmacies.

> \* \* \* \* \*

> The addition of new stores has played, and will continue to play a major role in our continued growth and success. Our store development program focuses on three areas: entering new markets, adding stores within existing markets and relocating stores to more convenient, freestanding sites. During fiscal 2000, we opened 388 new stores, which included 35 CVS ProCare stores and 230 relocations. During the last three years we opened over 1,200 new and relocated stores, or over a quarter of our existing store base.

We expect to open approximately 300 new stores during fiscal 2001 about half of which are expected to be relocations.

\* \* \* \* \*

A key part of our store development program is our relocation effort. Our relocation program actively seeks to relocate many of our strip shopping center locations to freestanding sites. Because of their more convenient locations and larger size, relocated stores have typically realized significant improvements in customer count and revenues, driven largely by increased sales of higher margin front store merchandise. We believe our relocation program offers a significant opportunity for future growth, as only 39% of our existing stores were freestanding as of December 30, 2000. We currently expect to have approximately 44% of our stores in freestanding locations by the end of fiscal 2001. Our long-term goal is to have approximately 80% of our stores located in freestanding sites.

77.    Defendants knew, or recklessly disregarded, that the financial results incorporated

by reference in the 10-K were materially false and misleading as the Company's gross margins

and operating profits had been artificially inflated by defendants' failure to properly account for

marked down and damaged merchandise in violation of GAAP, as described in paragraphs 33

through 42 above. As a consequence, reported earnings for the fourth quarter and year end 2000

were artificially inflated.

78.    Additionally, defendants knew, or recklessly disregarded, that their comments

regarding CVS's growth plans and business prospects were materially false and misleading

because they failed to disclose the fact that CVS intended to close approximately 200

underperforming stores and the fact that the Company was being adversely impacted by the

ongoing pharmacist shortage, as described in 43 through 60 above.

79.    The 10-K contained purported cautionary statements regarding CVS's future

operations, which were themselves materially false and misleading. Specifically, defendants

represented that its future results could be affected by, among other things, "our ability to

continue to secure suitable new store locations at favorable lease terms" and "our ability to

attract, hire and retain suitable pharmacists and management personnel." These statements were

materially false and misleading in that defendants had already determined that approximately 200

stores would need to be closed because they were underperforming and could not be relocated to

more desirable locations and defendants knew that CVS's operations were being adversely

impacted by its inability to attract and retain adequate numbers of pharmacists to staff its stores.

80.    Also on March 19, 2001, while CVS was reaping the benefit of its purported

"record" results for the fourth quarter and year end 2000, defendants issued a press release

announcing that the Company had privately-placed $300 million of 5 5/8% notes due 2006 with

an original issue price of $99.552 (the "Notes"). In this press release, defendants stated that,

"CVS is America's #1 pharmacy dispensing more retail prescriptions in more stores than any

other chain. With annual revenues of more than $20 billion, CVS has created innovative

approaches to serve the healthcare needs of all of our customers through its more than 4,100

CVS/pharmacy stores . . . " Subsequently, CVS filed a registration statement with the SEC

which permitted purchasers of the Notes to exchange them for notes that would be freely

tradeable in the market.

81.    On May 2, 2001, CVS issued a press release announcing its financial results for

the first quarter of 2001, the period ending March 31, 2001. The Company reported "record" net

earnings of $221.7 million, or $0.54 per share, for the first quarter, up 15.9% from $191.3, or

$0.47 per share, during the same period the prior year. Defendant Ryan commented on the

results as follows:

> I am very pleased with our first quarter performance, which reflects solid same
> store sales growth and excellent expense control, resulting in improved operating
> margins . . .. We also continued to make good progress on inventory management,
> which will be a significant driver of our future returns.

The press release also commented on CVS's store growth during the quarter as follows:

> For the quarter CVS opened 14 new stores and relocated 24 others. As of March 31, 2001, CVS operated 4,127 retail and specialty pharmacy stores in 31 states and the District of Columbia.

82.     As defendants intended and anticipated, all of the above-described representations were picked up and relied upon by securities analysts in issuing highly favorable reports and recommendations, which encouraged buying interest in CVS stock. For example, on May 3, 2001, Robinson-Humphrey, after repeating CVS's reported results, reiterated its "BUY rating on CVS due to strong sector fundamentals and the company's recent move toward a slightly more aggressive growth strategy."

83.     On May 10, 2001, CVS held its annual meeting with securities analysts in New York City. At the conference, CVS management emphasized to analysts its internal operating initiatives to improve efficiency and drive sales, reviewed its strategies to attract and retain qualified pharmacists and discussed its plans for store growth. At the conference, CVS indicated that sales in May were "off to a good start."

84.     On May 11, 2001, CVS filed its report on Form 10-Q with the SEC for the first fiscal quarter of 2001. The 10-Q was signed by defendant Rickard. In the 10-Q, defendants repeated the financial results first announced in their May 2, 2001 press release. In addition, CVS represented that:

> In the opinion of management, the accompanying consolidated condensed financial statements include all adjustments (consisting only of normal recurring adjustments) which are necessary to present a fair statement of the Company's results of operations for the interim periods presented.

Defendants further commented on CVS's results and business operations as follows:

> Our pharmacy sales growth continued to benefit from our ability to attract and retain managed care customers and favorable industry trends.

* * * * *

Sales also benefitted from our active relocation program which seeks to move our existing shopping center stores to larger, more convenient, freestanding locations. Historically, we have achieved significant improvements in customer count and net sales when we do this. . .. We believe that our relocation program offers a significant opportunity for future growth, as only 40% of our existing stores were freestanding as of March 31, 2001.

85.    Defendants knew, or recklessly disregarded, that the financial results first

announced in the May 2 press release and reported in the 10-Q were materially false and

misleading as the Company's gross margins and operating profits had been artificially inflated by

defendants' failure to properly account for marked down and damaged merchandise in violation

of GAAP, as described in paragraphs 33 through 42 above.

86.    Additionally, defendants knew, or recklessly disregarded, that their comments

regarding CVS's growth plans and business prospects were materially false and misleading

because they failed to disclose the fact that CVS intended to close approximately 200

underperforming stores and that the Company was being adversely impacted by the ongoing

pharmacist shortage, as described in 43 through 60 above.

87.    In addition, the 10-Q contained purported "cautionary statements" which were, in

themselves, materially misleading. Specifically, CVS represented that its future operations could

be affected by, among other things, "our ability to continue to secure suitable new store locations

at favorable lease terms;" and "our ability to attract, hire and retain suitable pharmacists and

management personnel." These statements were materially false and misleading in that

defendants had already determined that approximately 200 stores would need to be closed

because they were underperforming and could not be relocated to more desirable locations and

that CVS's operations were being adversely impacted by its inability to attract and retain

adequate numbers of pharmacists to staff its stores.

- 29 -

88.    On May 14, 2001, Jim Smith, CVS's senior vice president of health services was quoted in an article published by Racher Press Inc. as follows: "By making the value it places on pharmacists abundantly clear, CVS Corp. is coping better with the nationwide pharmacist shortage than most retailers."

89.    Similarly, on May 11, 2001, J.P. Morgan issued an analyst report, based on information provided by CVS at its May 10 meeting with securities analysts, which stated the following: "CVS addressed its strategies to attract and retain quality pharmacists and technicians. CVS offers stock options to pharmacists, who can also participate in 401K and employee stock programs. The company discussed Excellence in Pharmacy Innovation and Care (EPIC), its program which focuses on workflow processes in the pharmacy, automation (for pill counting), as well as labor productivity, in terms of the cost benefits of shifting work from the pharmacist to the technician. 60% of the company's new pharmacy staff are hired away from competitors, while 40% from colleges."

90.    The statements identified in paragraphs 88 and 89 above, which were designed to create the impression that CVS was handling the pharmacist shortage better than its competitors and that the shortage was not having an adverse impact on the Company's operations were materially false and misleading for the reasons set forth in paragraphs 49 through 60 above. Indeed, in communications with analysts, defendants' acknowledged that growth of pharmacy sales in April and May, 2001 was lower than the previous year. However, defendants falsely represented that this softening in sales was attributable to weak flu and allergy seasons. Contrary to these representations, as defendants were later forced to admit, the softening of sales was actually attributable to CVS's lack of adequate pharmacists to staff its stores.

91.    Moreover, contrary to defendants' representations, CVS was not coping better than most retailers with the pharmacist shortage "by making the value it placed on pharmacists abundantly clear." In fact, CVS was being collectively sued by its pharmacists based on its failure to pay overtime in violation of federal law. CVS's unfair treatment of its pharmacy personnel resulted in many pharmacists leaving the Company and negatively impacted the Company's ability to attract new pharmacists. As a result, defendants knew, or recklessly disregarded, that the pharmacist shortage was having a materially negative impact on CVS's operations, resulting in increased wait time, reduced hours and temporary closings of stores on a regular basis, which in turn, reduced CVS's sales.

### The Truth Slowly Begins to Emerge

92.    On June 27, 2001, CVS surprised the market by announcing that "as a result of current economic and business trends, it now expects earnings per share for the second quarter and full year to be lower than previously anticipated." Defendant Ryan commented on the announcement, stating in pertinent part as follows:

> "A slowing in our same store sales growth and increased gross margin pressure has led us to revise our expectations for the second quarter and full year," said Tom Ryan, Chairman, President and Chief Executive Officer. "The current economic environment has impacted front-store sales, particularly high-margin seasonal and general merchandise categories. While our pharmacy business remains healthy and vibrant in the vast majority of our markets, there are pockets of the country where we are experiencing a slower growth rate in pharmacy.
>
> "Clearly, we are disappointed with these developments, and we are taking the necessary actions to reaccelerate our growth," continued Mr. Ryan. "We are focused on driving improvement through operational initiatives and tailored marketing programs. We expect that the trends we are experiencing are near term in nature, and that we are doing the right things to get our results back on a faster growth track."

93.    This announcement, however, only partially disclosed CVS's true economic

condition, as defendants continued to conceal the extent of the problems at the Company. Thus,

Defendant Ryan concluded the press release by stating:

> In spite of these developments, we are as excited as ever about the future of CVS. We
> operate in a vibrant industry and remain well-positioned as the market leader to take
> advantage of significant growth opportunities.

94.    Also on June 27, 2001, defendants held a conference call with investment analysts

to discuss the announcement. During the call, defendant Ryan stated:

> Our pharmacy comps began to slow in late April and continued through May but
> especially the last two weeks of May and into June . . . The facts are this, we have
> pockets of the country where we are experiencing slower growth rate in pharmacy. *Most
> of these problems relate to service issues, including waiting time, reduced pharmacy
> department hours, or closed pharmacy departments* and out of stocks. *Most if not all of
> these are directly related to the pharmacy shortage* and I'll talk more about this later.

* * * *

> Obviously, the shortage is an industry issue that is affecting all of us, all of our
> competitors. But *we have had a severe shortage in four of our major markets* and these
> markets, we have, we are a significant leader in these markets. . . . Markets are
> Washington, Metro Washington, D.C., Hartford, Connecticut, Detroit and Cleveland and
> obviously we have some other isolated areas. But as a result we have actually had the
> closed doors for reduced department hours leading to obvious service issues. We closed,
> reduced hours on closed pharmacy departments on Sunday. We've shortened hours on
> Saturday and to be quite honest, we could have lived with this and I think our customers
> would understand it to a point. Where we had the problem is where we've had to actually
> close some pharmacy departments during the weekdays. We didn't have pharmacists to
> cover the shifts.

* * * *

> We are still a growth company. Although our growth will be lighter than normal this
> year, clearly we are affected by the prolonged slow down in the economy. While we're
> not immune to down turns in the economy, we are certainly better positioned than most. I
> am confident that this is just a temporary set back due to those reasons I mentioned and
> that our trends will improve.

- 32 -

95.     Notwithstanding defendants' partial disclosure, the statements referenced above in paragraphs 92 through 94 were each materially false and misleading when made because they failed to disclose and/or misrepresented the following material facts:

(a)     that the Company had engaged in improper earnings management by delaying the writedown of damaged or unsaleable merchandise and that the Company's financial results had been artificially inflated as a result of this manipulation, as described above in paragraphs 32 through 42;

(b)     that the Company had determined that it would need to close approximately 200 stores that were underperforming and/or could not be relocated to more desirable locations, as described above in paragraphs 43 through 48; and

(c)     that the Company had recognized that it had been unable to attract and retain adequate numbers of pharmacists and that this pharmacist shortage had been negatively impacting CVS's business since the beginning of the Class Period, as described above in paragraphs 49 through 60.

96.     In response to defendants' revisions of the Company's expected earnings, the price of CVS common stock dropped sharply, falling from $44.10 per share to $36.51 per share on extremely heavy trading volume.

97.     In commenting on defendants' announcements regarding the revision to expected earnings and the belated disclosure of the impact of the pharmacist shortage on CVS's operations, some analysts stated that it appeared that the Company had intentionally withheld material information from the investing public. For example, an analyst report issued by J.P. Morgan Securities Inc. stated:

Information flow is a problem - We do not think that management has effectively handled the flow of information as recent events and concerns have developed. We believe that this has had a compounded effect on CVS' stock price. April and May pharmacy same store sales trends came in relatively soft at just about 14.0% (over difficult 18.0% plus prior year comparisons). *Management attributed soft trends in the pharmacy for these months to lower flu activity (April) and soft allergy trends (May) -explanations which seemed questionable.* Following a competitor downgrade on June 15, 2001, concerns about service levels in the pharmacy surfaced. Management has since acknowledged service problems in the pharmacy, but indicated that EPIC (Excellence in Pharmacy Innovation and Care), the company's pharmacy systems and work flow processes program, was operating well and not experiencing fundamental issues (although enhancements and upgrades have been required). Management has since identified that the company has completed less file buys year-over-year, which has contributed to softer Rx same store sales. Last, CVS has revealed that recent soft pharmacy same store sales trends have been fairly isolated to 6 markets, a couple of which are large markets for the company (probably either Boston, New York, Philadelphia or Atlanta). *Why this information has come from management after the fact is perplexing*; however, it has clearly weighed on the stock price, as we wonder whether there is more information that needs to surface.

98.    An analyst report dated June 27, 2001 issued by Prudential Securities stated:

Although the shortage of registered pharmacists for the industry came as no surprise, we along with other investors didn't realize the gravity of the situation where CVS was concerned. Pharmacy same store sales at CVS have been softer than anticipated over the past couple months with May coming in at 16.1% and April at 16.7%. Management indicated that this accelerated during the last two weeks of May and into June. The weakness originally was attributed to weaker flu and allergy seasons which was the case in the company's territories. When sales failed to rebound in late May and June it became apparent that the issue was a result of the severity of the pharmacist shortage. Due to the limited availability of licensed pharmacists, some stores had to decrease pharmacy hours during peak times which led to increased waiting periods and poorer customer service-a revelation which wasn't apparent to investors. As a result, some pharmacy customers switched their prescriptions over to competitors. Lost business in these four problem markets should negatively affect the top-line as well as gross margins.

99.    Although defendants finally revealed that, contrary to their previous

representations, the pharmacist shortage was negatively impacting CVS's operations, they,

nevertheless, failed to disclose the full extent of the problems that CVS was experiencing.

Defendants' failure to disclose material adverse information, combined with their statements that

CVS was still in a position to take advantage of growth opportunities, prevented the market from

discovering the full truth and allayed analysts' fears. For example, on June 28, 2001, based on management's representations, UBS Warburg issued an analyst report maintaining its "Buy" rating on CVS stock, stating that "[w]hile we are disappointed with CVS' current sales performance, we believe that management is taking the necessary steps to address the pharmacist shortage problem and accelerate overall sales growth."

100.    On July 31, 2001, CVS issued a press release announcing its financial results for the second fiscal quarter of 2001. Notwithstanding, CVS's June 27 press release lowering previously projected earnings expectations, defendants reported that the Company had increased earnings and sales for the quarter, without mentioning the negative impact of the pharmacist shortage on CVS's operations. Defendant Ryan  commented on the results as follows:

> "We operate in a vibrant industry with excellent long-term fundamentals. Even in this economy we registered double digit sales growth and continued earnings growth, achieving record second quarter performance," stated Tom Ryan, Chairman, President and Chief Executive Officer.

Further, defendants also commented on the Company's store growth, stating that "[f]or the quarter, CVS opened 16 new stores and relocated 23 others," without mentioning the need to close approximately 200 underperforming stores.

101.    On August 14, 2001, CVS filed its report on Form 10-Q with the SEC for the second fiscal quarter of 2001. The 10-Q was signed by defendant Rickard. In the 10-Q, defendants reported net sales of $5.5 billion, a purported increase of 11.2% over the same period in the prior year. In addition, CVS represented that:

> In the opinion of management, the accompanying consolidated condensed financial statements include all adjustments (consisting only of normal recurring adjustments) which are necessary to present a fair statement of the Company's results of operations for the interim periods presented.

Defendants further commented on CVS's results and business operations as follows:

- 35 -

> Sales also benefitted from our active relocation program which seeks to move our existing shipping center stores to larger, more convenient, freestanding locations. Historically, we have achieved significant improvements in customer count and net sales when we do this.. . . We believe that our relocation program offers a significant opportunity for future growth, as only 40% of our existing stores were freestanding as of June 30, 2001.

Defendants also acknowledged that:

> Sales were negatively impacted by continuing pharmacy operational problems combined with the weakening economy. Our pharmacy operational problems primarily resulted from the ongoing industry-wide pharmacist shortage caused by a number of major pharmacy schools transitioning their curriculum from five-year to six-year programs. We believe the pharmacy operational issues, which included reduced pharmacy hours, closed pharmacy departments and increased customer wait times, combined with reduced front store sales due to the weakening economy, ultimately resulted in lower customer counts and lost sales during the second quarter.

102.    The statements referenced above in paragraphs 100 and 101 were each materially false and misleading when made because they failed to disclose and/or misrepresented that the Company had engaged in improper earnings management in violation of GAAP. Moreover, although defendants belatedly acknowledged that the pharmacist shortage had negatively impacted its results for the quarter, they failed to disclose that the pharmacist shortage had been negatively impacting CVS's business since the beginning of the Class Period. Moreover, defendants continued to conceal the fact that the Company had determined that it would need to close approximately 200 underperforming stores, while emphasizing the number of stores CVS opened during the quarter.

**The Full Truth is Revealed**

103.    On October 30, 2001, the last day of the Class Period, defendants once again shocked the market by issuing a press release announcing that CVS's financial results for the third quarter of 2001 had fallen substantially from the previous year. In this regard, defendants

- 36 -

reported that net earnings were down 16.0% from the third quarter of 2000. In response to this

negative information, defendant Ryan commented:

> We are disappointed with our results for the third quarter and committed to taking the
> necessary actions to improve performance and restore healthy long-term growth. With
> that in mind, we have completed a thorough analysis of our business and are today
> announcing a series of actions to best position CVS for the future.

* * * * *

> The Company's plan includes a series of sales generation and expense reduction
> initiatives, including:
>
> -- Undertaking a store consolidation program, under which approximately 200
> stores will be closed during the first quarter of 2002
>
> -- Closing one of CVS' ten distribution facilities and one of ProCare's two mail
> order facilities.

* * * * *

> In connection with certain of these actions, the Company expects to record a pre-
> tax restructuring and asset impairment charge of approximately $350 million, or $0.56
> per diluted share, in the fourth quarter of 2001.

104.    The market reacted immediately to this additional surprising announcement. On

October 30, 2001, the price of CVS stock fell an additional $7.72 to $23.90 per share, a one-day

decrease of 24% and a decrease of 61% from the Class Period high of $62.10 per share reached

on March 3, 2001.

105.    As set forth above, throughout the Class Period, defendants issued materially false

and misleading statements regarding the Company which misled the investing public. The

market for CVS common stock was open, well-developed and efficient at all relevant times. As

a result of these materially false and misleading statements and failures to disclose, CVS

common stock traded at artificially inflated prices during the Class Period. The artificial

inflation continued until the time CVS fully revealed the deteriorated nature of its business and

- 37 -

these admissions were communicated to, and/or digested by, the securities markets. Lead

Plaintiffs and other members of the Class purchased or otherwise acquired CVS common stock

relying upon the integrity of the market price of CVS common stock and market information

relating to CVS, and have been damaged thereby. At all relevant times, the material

misrepresentations and omissions particularized in this Complaint directly or proximately caused

or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and other

members of the Class.

### Post Class Period Events

106.    On November 9, 2001, CVS filed its report on Form 10-Q with the SEC for the

third quarter of 2001. In the 10-Q, defendants stated:

> Sales were negatively impacted by operational problems combined with the weakening
> economy and increasingly competitive environment. We believe the operational issues,
> which included: a pharmacist shortage resulting in reduced pharmacy hours and closed
> pharmacy departments; out-of-stock merchandise and increased customer wait times;
> combined with the weakening economy and an increasingly competitive environments
> ultimately resulted in lower customer counts and lost sales during the third quarter. To
> address these issues, we intensified our pharmacist recruiting and retention efforts.

The 10-Q also reiterated defendants' plan to close approximately 200 stores and record a

restructuring charge of approximately $350 million.

107.    On February 5, 2002, defendants issued a press release announcing CVS's results

for the fourth quarter of 2001 and fiscal year ended December 31, 2001. As previously indicated,

defendants announced that CVS would record a $352.5 million restructuring charge and close

229 stores as well as a mail order facility and a distribution center. As a result of the

restructuring charge, CVS announced that it had incurred a net loss for the fourth quarter of 2001

of $130 million.

## ADDITIONAL SCIENTER ALLEGATIONS

108.    As alleged herein, defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements, issued or disseminated by or in the name of the Company, as set forth herein, were materially false and misleading when made. Defendants knew, or recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public and they knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding CVS and its business practices, their control over and/or receipt of CVS's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning CVS were active and culpable participants in the fraudulent scheme alleged herein.

109.    Thus, throughout the Class Period, defendants had actual knowledge of, or recklessly disregarded, CVS's improper accounting activities and the adverse impact that the pharmacist shortage was having on CVS's operations, as well as the need to close approximately 200 underperforming stores. Nevertheless, defendants issued the materially false and misleading statements identified above, which were contradicted by internal evidence, which was known or should have been known by defendants during the Class Period.

110.    Defendants knowledge or reckless disregard of the false and misleading nature of the Company's financial statements is demonstrated by the fact that, as alleged herein, CVS issued a memorandum to all store managers in November 2000 directing them to cease recording markdowns through at least the end of 2000, thereby preventing defendants from receiving

information that was necessary to allow for the proper accounting of impaired merchandise inventory.

111. Additionally, the pharmacist shortage and its impact on the Company was the subject of intense scrutiny at CVS. As alleged herein since 1997, CVS senior executives and departments, including the Pharmacy Operations Group and the Information Systems department had been involved in efforts to address the adverse impact that the pharmacy shortage was having on the Company. As a result, at all relevant times, defendants knew or recklessly disregarded that their failure to disclose the negative impact that the pharmacy shortage was having caused their public statements to be materially false and misleading. Indeed, at least one analyst commented that defendants had delayed disclosing adverse information regarding the effect of the pharmacist shortage on CVS's operations.

112. The need to close underperforming stores was also a subject of intense scrutiny at CVS. As alleged herein, in early 2001, CVS put together a cross functional task assigned with the responsibility of determining which of its stores would need to be closed. Morever, the process of closing stores requires significant planing. According to a former CVS field technician with responsibility for closing stores, store closings are known at least six months to a year before they take place. Thus, at all relevant times, defendants knew or recklessly disregarded that their failure to disclose the need to close approximately 200 underperforming stores rendered their public statements materially false and misleading.

113. Defendants' scienter is further evidenced by (i) the bonus structure of the Company, which further motivated the Individual Defendants to issue fraudulent statements; (ii) the insider selling of defendant Ryan and other CVS insiders; and (iii) the sale of $300 million of

- 40 -

notes on terms more favorable than CVS would have received had it disclosed the truth about its business.

### The Company's Incentive Bonus Structure

114.    The Individual Defendants and other senior CVS executives were motivated to engage in the fraudulent scheme alleged herein by their ability to obtain extraordinarily generous bonus compensation tied to meeting certain predetermined financial objectives. Specifically, the bonus structure was based on pre-established objectives for CVS' consolidated earnings before taxes ("EBIT") and return on net assets ("RONA").

115.    In 2000, as result of the Company's reported financial numbers, defendant Ryan received a bonus of $1.6 million, which was *164% of his base salary* of $975,000.00 for the year. Further, in 2000, defendant Rickard received a bonus of $592,102, which was *more than 100% of his base salary* of $590,000 for the year. As alleged herein, the bonuses received by the Individual Defendants were based on financial numbers that were manipulated and were therefore false and misleading. But for defendants' fraudulent conduct alleged herein, they would not have been able to receive the substantial bonuses they received in 2000.

116.    In order to receive a large bonus in 2001, the Individual Defendants were also motivated to commit fraud by continuing to manipulate the Company's financial numbers to meet the EBIT and RONA pre-established objectives. However, only after the scheme to defraud unraveled, were the Individual Defendants not able to obtain the objectives, and therefore, were not awarded incentive bonuses for 2001.

### Insider Sales

117.    Defendant Ryan was also motivated to artificially inflate the price of CVS common stock through his misrepresentations and omissions in order to engage in insider sales

- 41 -

and realize substantial profits. During the Class Period, defendant Ryan sold CVS stock despite adverse information about CVS business which he knew but had not been disclosed to the public.

118.    Specifically, on May 22 and 23, 2001, while the Company's common stock was artificially inflated as a result of defendants' false and misleading representations of the Company's financial performance, defendant Ryan exercised his CVS stock options and sold a total of 95,040 shares of CVS common stock for total proceeds of approximately $3.54 million.

119.    These stock sales by defendant Ryan constituted 27% of the CVS stock he actually owned or acquired by exercise of stock options during the Class Period. Defendant Ryan sold 27% of the stock he owned or acquired because he knew the stock was artificially inflated and would decline sharply in price when the true facts, which defendants were concealing, became public.

120.    Defendant Ryan's stock sales were also unusual in their timing. These stock sales occurred during the time period when CVS was supposedly enjoying a period of exceptional business success and was achieving strong revenue, net income and EPS growth. As a result, if these exceptionally favorable present conditions and future prospects actually existed, CVS stock should have been poised for continued advancement. Nevertheless, defendant Ryan unloaded 95,040 shares of CVS stock- 27% of his holdings - for $3.54 million in illegal trading proceeds during a time of supposedly exceptional business growth. Defendant Ryan did this because he knew that defendants' statements about the current strong condition and success of CVS's business, as well as its strong future prospects, were false and misleading and were concealing the serious negative conditions in CVS business detailed herein. Indeed, defendant Ryan made the insider sales alleged above during the time when, as defendants later admitted, the Company was being negatively impacted by the pharmacist shortage, contrary to defendants' statements

- 42 -

that they were well-suited to handle the shortage and it was not having any impact on the Company's operations.

121.    Moreover, during Class Period, Company insiders in addition to defendant Ryan, sold shares of CVS common stock at artificially inflated prices. For example, on March 5, 2001, Douglas Sgarro CVS's Vice President, sold 42,407 shares of CVS common stock at between $60.00 and $60.50 per share for total proceeds of $2,546,926.00.

122.    The insider selling by defendant Ryan, as well as the insider selling of other Company executives is strong evidence of scienter on the part of defendants.

### Private Placement of 5 5/8% Notes

123.    On March 19, 2001, the Company announced in a press release that it had privately-placed $300 million of 5 5/8 notes due 2006 with an original issue price of $99.552 (the "2006 Notes"). The private placement closed on March 22, 2001. The Company used the proceeds of the sale of the 2006 Notes to repay outstanding short-term debt.

124.    At the time of the private placement, the 2006 Notes were not registered under the Securities Act and could not be sold absent registration or an applicable exemption from registration requirements.

125.    The sale of the $300 million worth of 2006 notes was successfully accomplished on more favorable terms than CVS would have received if the true financial picture of the Company had been revealed to the public. CVS was able to use the inflated financial numbers to attract buyers to the 2006 Notes since the public was feeling confident about the continued financial success of the Company.

126.    Therefore, a motive for the Company to commit the fraud alleged herein was the ability of the Company to successfully sell the 2006 notes which was accomplished using the false and misleading representations and omissions in the financial statements.

## CVS's False and Misleading Financial Statements

127.    At all relevant times during the Class Period, CVS represented that its financial statements were prepared in accordance with GAAP.  GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  As set forth in Financial Accounting Standards Board ("FASB") Statement of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and useful information concerning an entity.  Concepts Statement No. 1 provides, in pertinent part,

> Financial statements are a central feature of financial reporting.  They are the principal means of communicating accounting information to those outside an enterprise....  Financial reporting should provide information that is useful to present and potential investors and creditors and others in making rational investment, credit, and similar decisions.

128.    The representations that CVS's financial statements during the Class Period were prepared in accordance with GAAP were materially false and misleading because defendants knew, or recklessly ignored, that the Company issued financial statements which provided false and misleading information about the value of and its policy of accounting for inventories. In so doing, CVS understated its cost of goods sold and overstated the value of its inventories. These misrepresentations materially mislead investors about CVS's gross profits, gross margins and profitability during the Class Period.[1]

---

[1]       Gross profit is defined as the excess of sales over cost of goods sold and is referred to as gross margin when expressed as a percentage of sales.

- 44 -

129.    Regulation S-X [17 C.F.R. § 210.4-01(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

130.    CVS's financial statements for the year ended December 31, 2000 were included in its Annual Report to Shareholders which was incorporated by reference in CVS's 2000 Form 10-K filed with SEC on or about March 19, 2001. Such financial statements disclosed that inventories are stated at "the lower of cost or market using the first in, first out method."

131.    GAAP, in Chapter 4 of Accounting Research Bulletin ("ARB") No. 43, provides:

A major objective of accounting for inventories is the proper determination of income through the process of matching appropriate costs against revenues...

The primary basis for accounting for inventories is cost.... A departure from the cost basis of pricing inventories *is required* when the utility of goods is longer as great as its cost. Where there is evidence that the utility of goods, in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss in the current period. This is generally accomplished by stating such goods at the lower level commonly designated as *market*. [First Emphasis Added]

132.    In addition, GAAP, as noted in Accounting Principles Board ("APB") Opinion No. 28, inventory losses from market declines should not be deferred and are costs which are associated with revenue that should be reported as part of the cost of goods sold.

133.    CVS violated GAAP by improperly accounting for inventory and the cost of goods sold. As noted above, CVS's gross margin rate had been in continual decline for some time due to the fact that lower margin pharmacy sales were becoming an increasingly larger percentage of CVS's total sales. This was especially true with respect to pharmacy sales paid for by third party insurance programs.

- 45 -

134.    In order to mitigate the negative impact that the increase in pharmacy sales were having on gross margins, CVS improperly failed to account for its inventories in accordance with GAAP and its publicly disclosed policy of accounting for inventories at the lower of cost or market value. In so doing, CVS delayed recording a charge against its cost of goods sold resulting from an impairment in the value of its inventory, which materially inflated its reported gross margins and earnings during the year ended December 31, 2000.

135.    As noted above, *on May 25, 2000, CVS management issued a memorandum to all CVS store managers, announcing that CVS would implement new procedures to account for in-store markdowns of damaged merchandise, store supplies, unsaleable merchandise and/or outdated merchandise.* Pursuant to the new procedures, in-store markdowns and returns were to be tracked and recorded on a daily basis using an electronic RF device. According to the Company's internal policy manual the change in the markdown policy would allow for "more accurate and timely [markups and markdowns] on a daily basis" and would reduce the risk of having to record any unnecessarily large write-offs for damaged, unsaleable or outdated merchandise at any point in time.

136.    *In November 2000, however, CVS, in direct contravention of its newly implemented markdown and damage return policy, required all CVS store managers to stop store initiated markdowns until after January 1, 2001.* Accordingly, from November 20, 2000 through at least the end of fiscal 2000, defendants did not allow any of its 4,100 plus stores to take markdowns or return damaged, unsaleable or outdated goods. This initiative caused one former CVS store manager to lament that his store had "trays and cases of unsaleable merchandise taking up space in the back of the store, in the back room."

137.    As a result of the foregoing, CVS knowingly suspended receipt of information from its stores that was necessary to allow it to properly account for impaired merchandise inventory. In so doing, defendants caused CVS to delay the write down of tens of millions of dollars of inventory, thereby artificially inflating the Company's gross margins and operating results during the Class Period.

138.    By delaying the write-off of discounted and/or unsaleable merchandise, defendants were able to improve reported margins at a time when it was critical for them to do so. CVS's sales growth of 11% from 1999 to 2000 was almost entirely attributable to lower margin pharmacy sales. Nonetheless, CVS's reported gross margins as a percentage of total revenue remained constant at approximately 26% in both years. Since CVS's sales growth in 2000 was almost entirely attributable to lower margin pharmacy sales, CVS's overall gross margin would be expected to decline unless defendants compensated for the increased pressure on margins in some other way. As a result of defendants' directive to all stores managers to cease recording bone-fide markdowns until after fiscal 2000, CVS was able to artificially inflate reported gross margins in fiscal 2000.

139.    Accordingly, the representations during the Class Period concerning CVS's gross profits, gross margins and earnings were materially false and misleading as they improperly failed to account for the impairment in the value of its inventories, which defendants knew, or recklessly ignored. This failure violated GAAP and was in direct contravention of CVS's publicly disclosed policy of accounting for inventories at the lower of cost or market value.

140.    In addition to the violations of GAAP noted above, CVS's December 31, 2000 financial statements also violated, at least, the following additional provisions of GAAP:

      a.      The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶ 58-59);

      b.      The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶ 79);

      c.      The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶ 95, 97).

      d.      The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, ¶ 34);

      e.      The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶ 50); and

      f.      The concept that information about an enterprise gains greatly in usefulness if it can be compared with similar information ... about the same enterprise for some other period or some other point in time. (Concepts Statement No. 2, ¶ 111).

141.    In failing to file financial statements with the SEC which conformed to the requirements of GAAP, defendants disseminated financial statements of CVS which were presumptively misleading and inaccurate. Accordingly, defendants materially misled the investing public during the Class Period, thereby inflating the price of CVS common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.

142.    In addition, Item 7 of Form 10-K, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), require the issuer to furnish information pursuant to Item 303 of Regulation S-K [17 C.F.R. 229.303]. In discussing results of operations, Item 303 of Regulation S-K requires the registrant to:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

The instructions to paragraph 303(a) further state:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results.

143.    The SEC, in its May 18, 1989 Interpretive Release No. 34-26831, has indicated that SEC registrants are required to employ the following two-step analysis in determining when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303 of Regulation S-K:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and is reasonably likely to have a material effect on the Registrant's results of operations.

- 49 -

144.    Nonetheless, CVS's Form 10-K and Forms 10-Q issued during the Class Period failed to disclose the information necessary for a proper understanding and evaluation of the Company's inventories and operating results.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET DOCTRINE

145.    Lead Plaintiffs rely, in part, on the presumption of reliance established by the fraud-on-the-market doctrine.

146.    At all relevant times, the market for CVS common stock was an efficient market for the following reasons, among others:

(a)    CVS common stock met the requirements for listing, and was listed and actively traded, on the New York Stock Exchange ("NYSE"), a highly efficient market;

(b)    As a regulated issuer, CVS filed periodic public reports with the SEC and the NYSE that contained material misrepresentations and/or omitted material facts during the Class Period, as alleged herein, causing the price of CVS stock to trade at artificially inflated prices;

(c)    The trading volume of CVS common stock was substantial during the Class Period, indicating that there was a liquid market for CVS stock during the Class Period;

(d)    CVS stock was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace. In writing their reports, analysts reflected information provided by defendants;

- 50 -

(e)    CVS regularly issued press releases which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

147.    As a result, the market for CVS securities promptly digested current information with respect to CVS from all publicly-available sources and reflected such information in CVS's stock price.

148.    The foregoing facts clearly indicate the existence of an efficient market for the trading of CVS securities and, consequently, the applicability of the fraud-on-the-market presumption of reliance. Accordingly, Lead Plaintiffs and all purchasers of CVS common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies with respect to the misstatements and omissions alleged herein.

## NO STATUTORY SAFE HARBOR

149.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the statements referred to historical or existing conditions. The specific statements pleaded herein were not identified as "forward-looking statements" when made. Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected." To the extent that there are any forward-looking statements pleaded herein, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those forward-looking statements because, at the time each of those forward-looking statements was made, the

- 51 -

speaker knew that the forward-looking statement was false and/or the forward-looking statement

was authorized and/or approved by an executive officer of CVS who knew that those statements

were false when made.

## COUNT I

### For Violations Of Section 10(b) Of The
### Exchange Act And Rule 10b-5 Promulgated
### Thereunder Against All Defendants

150.    Lead Plaintiffs repeat and reallege the allegations set forth above as though fully

set forth herein. This claim is asserted against all defendants.

151.    During the Class Period, defendants, and each of them, carried out a plan, scheme

and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive

the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii)

artificially inflate and maintain the market price of CVS common stock; and (iii) cause Lead

Plaintiffs and other members of the Class to purchase CVS stock at artificially inflated prices. In

furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them,

took the actions set forth herein.

152.    Defendants, either individually or as a group: (a) employed devices, schemes, and

artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material

facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a

course of business which operated as a fraud and deceit upon the purchasers of the Company's

common stock in an effort to maintain artificially high market prices for CVS common stock in

violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued as

primary participants in the wrongful and illegal conduct charged herein and the Individual Defendants are also sued herein as controlling person of CVS, as alleged below.

153.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

154.    Defendants, individually and as a group, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of CVS as specified herein.

155.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of CVS's value and · performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about CVS and its business, operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more

particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of CVS securities during the Class Period.

156.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, customer relationships and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

157.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing CVS's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock. As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain

such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

158.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of CVS's common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of CVS's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired CVS common stock during the Class Period at artificially inflated high prices and were damaged thereby.

159.    At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of CVS, which were not disclosed by defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their CVS securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

160.    By virtue of the foregoing, defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

161.    As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act Against the Individual Defendants

162.    Lead Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein. This claim is asserted against the Individual Defendants.

163.    The Individual Defendants were and acted as controlling persons of CVS within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level position with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance and undisclosed problems, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

164.    In addition, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

- 56 -

165.    As set forth above, defendant CVS violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of CVS, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs, on their own behalf and on behalf of the Class, pray for judgment as follows:

(i)    Determining that this action is a proper class action and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(ii)    Awarding compensatory damages in favor of Lead Plaintiffs and the members of the Class against all defendants, jointly and/or severally, for all damages sustained as a result of defendants' securities law violations, in an amount to be proven at trial, together with interest thereon;

(iii)    Awarding Lead Plaintiffs and the members of the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(iv)    Awarding such other and further relief as this Court may deem just and proper

## JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED: April 8, 2002

MOULTON & GANS, P.C.

By: _____
　　Nancy Freeman Gans, BBO #184540
133 Federal Street, 12th Floor
Boston, MA 02110
(617) 369-7979

**MILBERG WEISS BERSHAD
　HYNES & LERACH LLP**
Deborah Clark-Weintraub
Charles S. Hellman
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

**SCHIFFRIN & BARROWAY, LLP**
Stuart L. Berman
Michael K. Yarnoff
Three Bala Plaza East
Suite 400
Bala Cynwyd, Pennsylvania 19004
(610) 667-7706

**Co-Lead Counsel for Lead Plaintiffs**

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document was
served upon the attorney of record for each party
by mail (by hand) on _4/8/02_

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ———————————————— x | |
| RICHARD KRANTZ, Derivatively On Behalf of Nominal Defendant CVS CORPORATION, | ) ) ) |
| | ) |
| Plaintiff, | ) ) |
| | ) |
| v. | ) ) |
| | ) |
| THOMAS M. RYAN, DAVID B. RICKARD, THOMAS P. GERRITY, STANLEY P. GOLDSTEIN, MARIAN L. HEARD, TERRY R. LAUTENBACH, TERENCE MURRAY, SHELI Z. ROSENBERG, and WILLIAM H. JOYCE, | ) ) ) ) ) ) Civil Action No. 04-12650-REK ) ) ) Magistrate Judge  RBC |
| Defendants, | ) ) |
| | ) |
| and | ) ) |
| | ) |
| CVS CORPORATION, | ) ) |
| | ) |
| Nominal Defendant. | ) ) |
| | ) |
| ———————————————— x | |

## |DERIVATIVE COMPLAINT
### and
### DEMAND FOR JURY TRIAL

1.    |Plaintiff, by his attorneys, submits this Derivative Complaint (the "Complaint") against the defendants named herein.

|Nature of the Action|

2.    |This is a shareholder's derivative action brought for the benefit of nominal defendant CVS Corporation ("CVS" or the "Company") against members of its

Board of Directors (the "Board") and certain executive officers seeking to remedy defendants' breaches of fiduciary duties.|

3.    |CVS is one of the largest retail drugstore chains in the United States. As of December 30, 2000, the Company operated 4,133 retail and specialty pharmacy drugstores and various mail-order facilities located in 31 states and the District of Columbia. During the relevant period, CVS touted itself as the largest drug store chain in terms of number of stores operated and the largest dispenser of retail prescriptions.|

4.    |Beginning in 1997, CVS embarked upon a rapid expansion program, more than doubling the number of stores operated by the Company in less than two years through the acquisition of several other drugstore chains. As a result, CVS's reported revenue grew from approximately $5.5 billion in 1996 to approximately $20.1 billion in 2000. Additionally, CVS's reported net earnings grew from approximately $167.4 million to approximately $746 million during that same time period.|

5.    |During the relevant period, CVS repeatedly reported "record" financial results and touted its ongoing ability to achieve "double-digit" growth. At all relevant times, CVS portrayed itself as a company that was extremely well-positioned to take advantage of the rapidly expanding pharmacy industry. CVS also represented to the public that it was effectively handling the shortage of pharmacists in the United States and was continuing to expand the number of stores it operated, while focusing on a strategy of relocating existing pharmacies in strip malls to more profitable stand-alone locations.|

2

6.    |However, as CVS's senior officers and directors knew but did not disclose, the Company was encountering significant problems that were having a materially negative impact on its financial results and future prospects. These problems included, among other things: (a) the fact that the Company was unable to successfully offset the increased pressure on gross margins that the growing percentage of lower margin pharmacy sales were having on the Company's income and earnings; (b) that a significant number of the pharmacies CVS had acquired over the past few years were underperforming, could not be relocated, and would need to be closed; and (c) that the ongoing pharmacist shortage was having an acute impact on CVS's operations, resulting in unreasonably long waits for customers to fill prescriptions and causing stores in a number of different markets to temporarily close or reduce hours, thereby resulting in the loss of sales and further reducing income and earnings.|

7.    |Rather than publicly disclose these material problems, which were eroding the Company's margins and threatening its ability to achieve forecasted growth and earnings, defendants engaged in fraudulent and undisclosed accounting practices in violation of Generally Accepted Accounting Principles ("GAAP"), which enabled the Company to artificially inflate its reported gross margin, earnings and earnings per share during the relevant period. Additionally, defendants' issued a series of materially false and misleading public statements intended to create a false impression of the Company's business and prospects throughout the relevant period, thereby rendering the Company's reported financial results complained of herein materially false and misleading.|

3

8.      |The market did not begin to learn about the significant problems that CVS was experiencing until June 27, 2001, when defendants first announced that, due to increased pressure on gross margins and the adverse impact of the pharmacist shortage, the Company's earnings per share for the second quarter and full year would be lower than they had previously projected. In response to this negative news, the price of CVS common stock dropped precipitously from $44.10 per share to $36.51 per share.|

9.      |Further disclosure of CVS's problems was made by defendants on October 30, 2001, when they announced that the Company intended to close approximately 200 stores and incur a restructuring charge of approximately $350 million. In response to this additional negative news, the price of CVS common stock fell an additional $7.72, from $31.62 per share to $23.90 per share.|

10.     |The full extent of CVS's problems were not disclosed until February 5, 2002, when the Company issued a press release announcing its results for the fourth quarter of 2001 and fiscal year ended December 31, 2001. As previously indicated, defendants announced that CVS would record a $352.5 million restructuring charge and close 229 stores as well as a mail order facility and a distribution center. As a result. of the restructuring charge, CVS announced that it had incurred a net loss for the fourth quarter of 2001 of $130 million.

## |Parties|

11.     |Plaintiff Richard Krantz is, and was at all relevant times, a shareholder of nominal defendant CVS.|

4

12.     Nominal defendant CVS is a Delaware corporation with its principal executive offices located at One CVS Drive, Woonsocket, Rhode Island 02895. According to its public filings, CVS is one of the largest retail drugstore chains in the United States.

13.     Defendant Thomas M. Ryan ("Ryan") has served as President, Chief Executive Officer, and a director of CVS at all relevant times.

14.     Defendant David B. Rickard ("Rickard") has served as Executive Vice President and Chief Financial Officer of CVS at all relevant times.

15.     Defendant Terry R. Lautenbach ("Lautenbach") has served as a director of CVS at all relevant times.

16.     Defendant Terrence Murray ("Murray") has served as a director of CVS at all relevant times.

17.     Defendant Sheli Z. Rosenberg ("Rosenberg") has served as a director of CVS at all relevant times.

18.     Defendant Thomas P. Gerrity ("Gerrity") has served as a director of CVS at all relevant times.

19.     Defendant Stanley P. Goldstein ("Goldstein") is a retired founder of CVS. From January 1987 to April 1999, Mr. Goldstein was Chairman of the Board of the Company, and from January 1987 to May 1998, he was Chief Executive Officer of the Company. He has served as a director of CVS at all relevant times.

20.     Defendant Marian L. Heard ("Heard") has served as a director of CVS at all relevant times.

5

21.    |Defendant William H. Joyce ("Joyce") has served as a director of CVS at all relevant times.

## |Jurisdiction and Venue|

22.    |This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332. This action was not brought collusively to confer jurisdiction on this court.|

23.    Venue is proper in this District pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(a). Throughout the relevant period, CVS conducted significant operations in this District, including the operation of more than 300 retail drugstores.

## |Duties of the Defendants|

24.    |By reason of their positions as officers and/or directors of CVS and because of their ability to control the business and corporate affairs of CVS, the defendants owed CVS and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage CVS in a fair, just, honest, and equitable manner. The defendants were and are required to act in furtherance of the best interests of CVS and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to CVS and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of air dealing.|

25.    |As officers and/or directors of a publicly held company, the defendants had a duty to promptly disseminate accurate and truthful information with regard to the

Company's operations, performance, services, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.|

26.    |The defendants, because of their positions of control and authority as directors and/or officers of CVS, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.|

27.    |To discharge their duties, the officers and directors of CVS were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of CVS were required to, among other things:

|a.    exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

|b.    exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements;

|c.    when placed on notice of illegal or imprudent conduct committed by the Company or its employees, exercise good faith in taking appropriate measures to prevent and correct such conduct; and

|d    refrain from acting upon material inside corporate information to benefit themselves.

|15.    As alleged in detail below, from February 6, 2001 through February 5, 2002, when the defendants had knowledge of material non-public information regarding CVS's imprudent and illegal conduct, they breached their fiduciary duties by permitting insiders to use material non-public information to sell more than 130,000 shares of CVS

common stock at prices higher than they could have obtained had the market been aware of the material non-public information, thereby reaping in excess of $6 million in illegal insider trading proceeds for their personal gain.

|16.    The defendants further breached their fiduciary duty of good faith by knowingly causing or allowing the Company to engage in imprudent and illegal conduct, which has caused the Company to sustain enormous damages through, among other things, its defense of a consolidated class action in this Court against the Company brought under the federal securities laws (In re CVS Corporation Litig., No. 01-11464 JLT).

## SUBSTANTIVE ALLEGATIONS|

### CVS's Rapid Expansion of Its Business Operations

26.|17. CVS became a stand-alone public company in 1996. At that time, it operated approximately 1,400 stores in 14 states and the District of Columbia. Since 1996, CVS has aggressively expanded its Retail Pharmacy operations. Indeed, between|Between 1996 and 2000, CVS increased the number of retail stores it operated from approximately 1,400 to over 4,100.

27.|18. Unlike some of its competitors, CVS's rapid growth has been|was achieved through acquisitions of other pharmacy chains. On May 29, 1997, CVS completed the acquisition of Revco D.S., Inc|inc. ("Revco"), a pharmacy chain with approximately 2,500 drugstores. The following year, on March 31, 1998, CVS completed the acquisition of Arbor Drugs, Inc. ("Arbor Drugs"), a pharmacy chain with approximately 200 drugstores. As a result of these acquisitions, by the end of 1998, CVS

8

operated approximately 4,122 retail pharmacies in 24 states and the District of Columbia and began touting itself as the largest chain drugstore company in the United States based on store count.

28.-|19. At all relevant times, CVS's Retail Pharmacy sales are|were divided between pharmacy sales and sales of general merchandise, including, over-the-counter drugs, greeting cards, film and photofinishing services, beauty products and cosmetics, seasonal merchandise and convenience food (referred to by CVS as "front store" sales). Following its acquisitions of Revco and Arbor Drugs, CVS's business has shifted more heavily to pharmacy sales. By 2000, pharmacy sales had increased to represent approximately 63% of total sales for the year, up from 43.9|93.9`% in 1996.

29.|20. As a result of the foregoing, at all relevant times, defendants knew that CVS's ability to continue to manage and grow its Retail Pharmacy business segment and to maintain and increase pharmacy sales was critical to the success of its overall operations. However, as set forth below, by the beginning of the Class Period|during the relevant period, CVS was experiencing a number of undisclosed problems that were having a materially negative impact on its Retail Pharmacy business.

Undisclosed Adverse Facts Impacting CVS's
Business |
and Operations During the Class|Relevant Period|

CVS's Inability to Offset Declining Gross Margins

30.    By the beginning of the Class Period|21.    During the relevant period, CVS's gross margin rate had been declining for some time and was continuing to decline, which presented a threat to CVS's operating profits and earnings.

31.|22. The Company's explanation for the gross margin decline was that, as noted above, pharmacy sales were becoming an increasingly larger percentage of CVS's total sales as compared to front store sales, and the margin on pharmacy sales is|was lower than the margin on front store sales. This is|was especially true with respect to pharmacy sales paid for by third party insurance programs, including managed care organizations. In order to reduce their prescription drug costs, these managed care organizations have placed pressure on CVS to accept lower rates of reimbursement, thereby further reducing CVS's gross margin on pharmacy sales.

32.    In order to|23. To counteract the impact that the increase in pharmacy sales was having on margin rates and achieve projected income and earnings, it was critical for CVS to improve operating efficiencies. By increasing operating efficiencies, CVS represented that it would be able to mitigate the negative impact that increased pharmacy sales were having on the Company's gross margins and operating profits.

33.|24. Accordingly, in June 2000, in an effort to improve operating margin, CVS changed its procedures for handling in-store markdowns of damaged merchandise, store supplies, unsaleable merchandise and/or outdated merchandise. Previously, CVS stores had manually kept track of in-store markdowns and returns of damaged merchandise on a weekly basis. Pursuant to the new procedure, among other things, in-store markdowns and returns were to be taken and tracked on a daily basis using an electronic RF device. According to|to the Company's internal policy manual issued in connection with this change, the new markdown policy would allow for "more accurate and timely [markups

10

and markdowns] on a daily basis" and would avoid the need to take unnecessarily large

write-offs of damaged merchandise at any point in time.

34.|25. In connection with this change in procedure, on May 25, 2000, CVS

management issued a memorandum to all CVS store managers, announcing that CVS

would institute a new procedure for handling markdowns and returns of damaged items

commencing on June 18, 2000. In describing the reasons for the change in policy for

handling return of damaged merchandise, the memorandum stated the following:

> DAMAGE RETURN PROCEDURE CHANGE|
> BACKGROUND
>
> A new damage return process has been developed in
> conjunction with the new manual markdown application
> introduction on the RF Unit. The intent of this new process
> is to tighten controls on non-returnable and "un-billable"
> merchandise being sent to Damage Track.
>
> In 1999 stores sent over $1.4 million dollars worth of non-
> returnable and pristine merchandise back to Damage Track
> (pristine being defined as perfectly good merchandise with
> no visible signs of the product or package being damaged
> or outdated).
>
> Additionally, as a company, we returned $25 million
> dollars more merchandise than we received credit from
> suppliers. This variance resulted in a company P&L write-
> off. If this write-off was shared evenly between all 4000
> plus stores, your P&L Contribution A line would have been
> negatively adjusted by $6250.00.
>
> Needless to say, we cannot afford to repeat this write-off in
> 2000. Therefore, the following new procedures have been
> developed and must be implemented IMMEDIATELY.

35.|26. As the memorandum makes|made clear, CVS intended to more effectively

and accurately handle markdowns and returns of damaged merchandise |more effectively

any accurately by keeping track of this information|. on a daily basis. The memorandum

11

also ~~demonstrates~~|demonstrated the magnitude of the issue.  As indicated above, in 1999, CVS returned $25 million worth of merchandise to suppliers for which ~~it~~ did not receive any credit. This amount does not include damaged merchandise ~~that was~~ not|- returnable and ~~was~~ written off and/or merchandise ~~that was~~ damaged and sold at a marked |-down price.

~~36.~~|27. In November 2000, CVS, in direct contravention of its new markdown and damage return policy instituted a few months earlier, instructed its store managers to stop all store initiated markdowns until sometime after January 1, 2001 and to segregate and hold all merchandise that was to be written-off and/or marked down in a designated section of each store's respective stockroom.

~~37.~~|28. Specifically, on November 20, 2000, CVS management issued a memorandum to all CVS store managers, stating that, effective immediately, "[n]o store initiated markdowns should be taken between now and January 1, 2001." The memorandum included the following additional information regarding the sudden policy turnaround:

> Further Information:
>
> What markdowns CANNOT be performed, effective immediately?
>
> —     Store level markdowns— |
> — Damaged/non-returnable items— |
> — Damaged/unsaleable items
>
> > NOTE:  Returnable Damages going back to the warehouse should still be processed as normal
>
> —     Cosmetic prepack markdowns|
> —     Not in planogram discontinued/ Discontinued Other
>
> |

12

— End of Season Down to Zero markdowns— |
—Outdated non-returnable product |
(i.e., Russell Stover)

How do I handle the Damaged Items that are not returnable or unsaleable?

— Hold in the designated clearance location in your stockroom|.

— Visual merchandising will allocate endcaps in the January Merchandising Planner to assist with liquidating these items.

38.|29. Accordingly, from November 20, 2000 through at least the end of fiscal 2000, defendants|CVS did not allow any of CVS's|its 4,100-plus stores to take markdowns or write-off damaged or otherwise unsaleable goods. As a result, each store was required to keep |in storerooms thousands of dollars of damaged merchandise in storerooms that should have been discounted or marked down to zero. As one former CVS store manager put it, this policy resulted in "trays and cases of unsaleable merchandise taking up space in the back of the store, in the back room."

39. — Defendants|30.         CVS's sudden reversal in policy can only be explained by their intent|key defendants intending or allowing its employees to avoid having to write-off tens of millions of dollars of damaged and/or discounted merchandise until sometime M|in 2001. Indeed, numerous CVS store managers discussed among themselves the fact that the new policy served no legitimate business purpose and was implemented in order to allow the Company to report that it had achieved its forecasted numbers for fiscal 2000, thereby allowing CVS executives to reap substantial bonuses.|2000.

40.|31. Demonstrating defendants intent in|' causing or allowing this regard|conduct is the fact that they allowed|the stores| were permitted to continue to process unsaleable merchandise that could be returned for a credit, while they prevented stores from processing unsaleable merchandise for which credit was not available. This unsaleable merchandise should have been written off and thrown away. However, pursuant to defendants' instructions|conduct, stores were required to retain this merchandise, which could not be sold or returned, through at least the end of 2000 before the write-off could be recorded.

41.|32. As a result of the foregoing, CVS knowingly|defendants caused or allowed CVS to cut off the flow of information from stores that would allow the Company to properly |to account for discounted and unsaleable merchandise, in violation of GAAP as described below in paragraphs 127|107 through 144.|124. By doing so, defendants were|CVS was able to delay the writedown of tens of millions of dollars of inventory, thereby artificially improving the Company's gross margin and inflating its reported operating results for the fourth quarter and year end 2000.

42.|33. Moreover, |according to former store managers, although the memorandum indicates that no markdowns could be taken through the end of the year, according to former store managers, resumption of processing markdowns did not begin to take place until several weeks into January 2001 and as late as February 2001. Even after markdowns|the Company began to be processed|process markdown in 2001, pursuant to Company policy, it took up to sixty days before potentially saleable marked down merchandise that could not be sold would be marked down to zero. Thus, the

14

effect|affect of defendants' directive|authority or allowing that no markdowns be taken

beginning in November 2000, |was to continued to |improve artificially improve the

Company's gross margin and operating results into 2001.

CVS's Inability to Relocate and Need to Close |
Underperforming Stores

43.|34. As described above, between 1996 and 1998, CVS acquired

approximately 2,600 stores in connection with the Revco and Arbor Drugs acquisitions.

Many of the stores acquired in these transactions were located in undesirable strip mall

locations and/or were unprofitable. CVS's publicly touted strategy was to relocate as

many stores as possible out of strip mall locations to larger more profitable stand-alone

locations. Indeed, CVS emphasized its relocation strategy in press releases and SEC

filings issued both before and throughout the Class Period|relevant period, noting that by

relocating stores the Company was immediately able to increase these stores'

profitability.

44.|35. However, as defendants knew| or improperly failed to know, at all relevant

times, a certain percentage of its stores that were located in undesirable locations would

not be able to be relocated and would need to be closed. Further, defendants knew |or

improperly failed to know, that other stores that were underperforming| stores could not

be made profitable and would also need to be closed.

45.|36. Indeed, since completing the Revco acquisition in 1997, the problem of

underperforming stores was regularly discussed at meetings of CVS senior management|

regularly attended by defendant Ryan. By 1999, CVS had developed an action plan to try

and improve performance at a number of underperforming stores. If|The performance

15

could not be improved at a store, ~~defendants'~~|the plan was to try and sell the store or, if the store could not be sold, to schedule it for closure.

46.|37. In the beginning of 2001, CVS set up a cross functional task force assigned with the responsibility of determining which of its stores would need to be closed. The task force was headed up by CVS's Treasurer, Phil Galbo. Mr. Galbo reported directly to Douglas Sgarro, CVS's Senior Vice President - Administration and Chief Legal Officer. Also centrally involved in this process was Larry ~~Merlo~~|Merle, ~~CVS~~|CVS's Executive Vice President in charge of stores. By the first quarter of 2001, the task force had determined that approximately 200 stores would need to be closed. Many of the stores targeted for closure were stores acquired from Revco or Arbor Drugs that were known to have been underperforming for years. The stores scheduled for closing were identified on a list that was circulated at CVS's headquarters. Although the list was refined over time, the number of stores to be closed always remained at approximately 200.

47.|38. As a result of the foregoing, by the beginning of 2001, CVS's intention to close approximately 200 stores had become common knowledge internally at the Company and was the subject of discussions among CVS employees. For example, in January 2001, a CVS District Manager disclosed to a group of store managers that CVS would be closing a number of mid-western stores sometime later in the year in connection with a restructuring plan.

48.|39. Rather than publicly disclosing its plans to close approximately 200 stores, however, throughout the ~~Class Period~~|relevant period, defendants |caused or allowed

16

CVS to emphasize misleadingly ~~emphasized~~ CVS's plans to open new stores in new markets and relocate stores ~~in~~|it existing markets.

### CVS's Inability to Attract and Retain
### Adequate Numbers of Pharmacists to Staff its Stores

~~49.     For the past several years~~|40.  At all relevant. times, there ~~has been~~|was an ongoing shortage of pharmacists in the United States. The shortage has been attributed to a number of factors, including, the growing number of prescription drugs being used to treat illnesses, the aging population and an increase ~~of~~|from 5 years to 6 years in the number of years necessary to obtain a pharmacist degree ~~from 5 years to 6 years~~.

~~50.~~|41.  Although the pharmacist shortage ~~has~~ had some impact on the entire industry, the problem ~~has been~~|was particularly acute for CVS. This is true for several reasons ~~:~~|. First, as alleged herein, CVS ~~has~~ engaged in rapid expansion, resulting in a dramatic increase in the number of pharmacists the Company required to staff its stores. For example, according to a former CVS manager in CVS's construction division, at the time CVS acquired Arbor Drugs in 1998, the chain, whose operations were focused in the Detroit region, was suffering from a deficit of approximately 100 pharmacists that were needed to properly staff stores in the region. ~~Unknown to the investing public~~|As a result, since completing the acquisition in 1998, CVS ~~has~~ struggled to try and maintain adequate pharmacy staffing in these stores.

~~51.~~|42. Further adding to the problem is the fact that, as described above, CVS ~~has~~|was focused for ~~the past~~ several years on a strategy of relocating existing stores in smaller strip mall locations to larger stand-alone locations. Many of these new locations

are|were open 24 hours, thereby further increasing the|CVS's need for pharmacists-at CVS.

52.|43. As early as 1997, the pharmacist shortage had been identified internally at CVS as a problem that was negatively impacting the Company's operations. From 1997 through 2000, and continuing throughout the Class Period|At all relevant times, CVS's Pharmacy Operations Group was involved in trying|tried to solve the problem and was aware that their efforts were inadequate. Additionally, since 1997, CVS's Information Systems department was also involved in trying|tried to address the adverse impact-that the pharmacist shortage was having on the Company and knew that the problem remained unresolved. At weekly meetings led by Howard Edels, the Company's Chief Information Officer, senior managers of the Information System department would discuss issues impacting the Company. At these meetings, the pharmacist shortage was regularly raised as a problem hindering the Company's performance. The impact of the pharmacist shortage became more acute throughout 2000. By late 2000, CVS senior management, including CVS's Chief Information Officer, internally stressed the need to improve recruitment of pharmacists in order to try and address the problem.

53.    Rather than disclosing the extent of the impact that the pharmacist shortage was having on CVS, defendants chose|44.  Defendants caused or allowed CVS to create the impression that CVS|it was handling the situation and, in fact, was better positioned to attract and retain pharmacists than its competitors. Indeed, CVS consistently represented that the pharmacist shortage was not impacting the Company's operations and its ability to grow.

54. 45. For example, on October 31, 2000, Bear Stearns|Stearns issued an analyst report, based on information provided by CVS, which|that stated the following:

> CVS has been successful in attracting and retaining pharmacists at reasonable costs, despite the largest pharmacist shortage the U.S. has ever seen. Beyond incenting pharmacists with stock options and an improved 401K plan, CVS is making the pharmacists' job more enjoyable by automating tedious, routine tasks with new technologies. To this end, automated pill-counting technology has been implemented in roughly 700 stores, a number which we expect to increase as benefits are realized from improved workflow and employee morale.

55. 46. Similarly, in an article published by Chain Drug Review on December 11, 2000, Jim Roberts, the Vice President of CVS's Southeast region, commented on the impact that the pharmacist shortage was having on CVS as follows: *"We've positioned ourselves as the preferred place to work."* Mr. Roberts further stated, *"[a]s a preferred provider we are able to attract the very best pharmacists in the marketplace and on pharmacy school campuses where we currently recruit across the country."*

56. 47. The foregoing examples are representative of statements made|caused or allowed by defendants, both before and during the Class Period|relevant period, designed to create the impression that the pharmacist shortage was not having a materially adverse impact on CVS's operations. Contrary to these representations.|, however, by the end of 2000, it had become apparent internally at CVS that the Company's efforts to recruit and retain adequate levels of pharmacist staffing were insufficient. During this time period, according to a former CVS employee who used to work at CVS's headquarters in Rhode Island, CVS's headquarters regularly received complaints from customers regarding the lack of sufficient pharmacists at CVS's retail outlets.

57. 48. By February 2001, the pharmacist shortage resulted in customers experiencing unreasonably long waits to fill prescriptions, temporary store closings and reduced store hours at different CVS locations on a regular basis. The pharmacist shortage was particularly acute in certain regions of the country, including, among others, the Detroit and Washington, D.C. regions. However, |during the relevant period the impact of the pharmacist shortage during the Class Period was felt at CVS stores throughout the country. For example, in late 2000 and early 2001, CVS experienced a severe shortage of pharmacists at its stores in Rhode Island. To try and compensate for this problem, CVS began closing pharmacies in the region on Sundays and had the pharmacist staff alternate from store to store. Similarly, from February through May 2001, temporary store closings due to lack of pharmacists transpired at stores around the country, including stores in Connecticut, South Carolina, North Carolina, Pennsylvania, Florida and elsewhere. Defendants did not disclose any of the problems they were having as a result of the pharmacist shortage.

58. 49. Moreover, contrary to defendants' |CVS's representations that it was addressing the pharmacist shortage by establishing CVS as a preferred place to work, the Company's inability to attract and retain pharmacists was actually exacerbated by the fact that it paid less than its competitors. Further, to try and compensate for the shortage, CVS required that its pharmacists work extensive amounts of unpaid overtime. Due to the severity of the shortage, some CVS pharmacists were required to work in excess of 70 hours per week to try and compensate for the lack of adequate staffing. Additionally,

CVS regularly required that its pharmacists travel extensive distances to cover

~~pharmacies that were~~ inadequately staffed| pharmacies.

~~59.~~|50. As a result of CVS's unfair treatment of its pharmacists, which resulted in

high turnover and negatively impacted its ability to attract new pharmacists, in November

2000, a group of CVS current and former pharmacists brought a collective action against

the Company alleging that its failure to pay overtime violated the Fair Labor Standards

Act. Similar suits by CVS pharmacists were brought in early 2001. Defendants

~~did~~|caused or allowed CVS not |to disclose the existence of any of these lawsuits in its

press releases or public filings until March 21, 2002, when ~~it~~|CVS finally reported that

the November 2000 action had been brought by pharmacists seeking recovery of unpaid

overtime and liquidated damages.

~~60.~~|51. Thus, contrary to ~~defendants'~~|CVS's repeated public statements that

~~CVS~~|it was better suited to handle the pharmacist shortage than most other retailers,

defendants knew ~~that they were~~|or improperly failed to know that the Company was

unable to adequately staff its retail stores and the pharmacist shortage was having a

materially negative impact on CVS's operations. In fact, the pharmacist shortage was

actually having a more severe impact on CVS's operations than it was having on its

competitors. For example, although one of CVS's main ~~competitor~~|competitors,

Walgreen, Inc., had been required to close or reduce hours at approximately 1% of its

stores due to the pharmacist shortage, CVS had been required to close or reduce hours at

15% of its stores during the same period.

### False and Misleading
### Statements During the ~~Class~~|Relevant Period

|52.    During the relevant period, CVS filed Forms 10-K with the SEC, signed by each defendant, which they knew or improperly failed to know, were false and misleading. The Company also filed Forms 10-Q, signed by defendant Rickard, and issued press releases which defendants knew, or improperly failed to know, were false and misleading.

~~61.    On~~|53. For example, on February 6, 2001, ~~the first day of the Class Period,~~ CVS issued a press release announcing *"record sales and earnings for the fourth quarter [of 2000] and the year ended December 30, 2000."* The Company reported $5.5 billion in net sales during the fourth quarter and fourth quarter earnings of $0.51 per share, a purported increase of 19.6% over the same period the prior year (after excluding results from an extra week in fiscal 1999). For the year, the Company reported $20.1 billion in net|, sales and earnings of $1.80 per share, a purported increase of 17.7%|, over the results of the prior year (after excluding a nonrecurring gain and the extra week in 1999).

~~62.~~|54. In the same press release, CVS commented on the Company's store growth as follows:

> For the ~~year~~|near, CVS opened 158 new stores and
> relocated 230 others. The Company entered three new, high
> growth markets in 2000 and prepared to enter additional
> new markets. There remain 41 of the Top 100 U.S.
> drugstore markets in which CVS currently has no presence,
> offering significant opportunity for future growth. As of
> December 30, 2000, CVS operated ~~4,133~~|41,133 retail and
> specialty pharmacy stores in 31 states and the District of
> Columbia.

22

63.|55. In the February 6 press release, Defendant Ryan commented on CVS's

reported results as follows:

> "The year 2000 was another successful year for CVS. We
> once again achieved double-digit same store sales growth,
> excellent expense control, and produced record earnings,"
> stated Tom|, Ryan, Chairman, President and Chief
> Executive Officer.

Defendant Ryan concluded by stating:

> I am very pleased that we have been able to consistently
> meet or beat our goals, all while we continue to invest in
> new stores and relocations, as well as in new business
> channels, which will help accelerate our future growth. I
> believe we are better positioned than at any other time in
> the Company's history to capitalize on the significant
> opportunities in healthcare.

64.|56. Also on February 6, 2001, CVS held a conference call with the investment

community led by defendant Ryan. During the conference call, defendants reiterated the

financial information included in the February 6 press release. Defendant Ryan further

commented on the Company's results as follows:

> Well, obviously I'm extremely pleased with our 4th quarter
> and our 2000 results. In the quarter our sales increased
> 14|14 1/2% on a 52-week basis. Our same-store sales
> increased 10.5. You'll see that our healthy sales growth
> translated into significant margin expansion which Dave
> [Rickard]|) will fully discuss later on. Earnings per share in
> the quarter rose 18.6% on a comparable basis; 51 cents
> versus 43.

Regarding, the Company's growth strategy, defendant Ryan stated:

> Let me outline our preliminary real estate plan for 2001.
> We'll open 150 to 170 brand new CVS stores. We'll
> relocate 140 to 150 CVS stores. We'll close an additional
> 60 to 70 stores for a net new-store CVS growth of 90 to
> 100 stores for 2001. This equates to 300-plus new [stores],

23

less than we've had in the past but a much higher net new-store growth because we're closing fewer stores.

65.|57. Defendants knew, or ~~recklessly disregarded~~|improperly failed to know, that the financial results they announced on February 6 and the statements commenting on those results set forth in ~~paragraph 61~~|paragraphs 53 through 64|56 above were materially false and misleading as the Company's gross margins and operating profits had been artificially inflated by ~~defendants'~~|CVS's failure to properly account for marked down and damaged merchandise in violation of GAAP, as described in paragraphs 33|107 through 42 above|129 below. As a consequence, reported earnings for the fourth quarter and year end 2000 were artificially inflated.

66.|58. Additionally, defendants knew, or ~~recklessly disregarded~~|improperly failed to know, that their comments regarding ~~CVS~~|CVS's growth plans and business prospects were materially false and misleading because, as described in paragraphs 43|37 through 60|39 above, they failed to disclose the fact that CVS intended to close approximately 200 underperforming stores, as well as the fact that the Company was being adversely impacted by the ongoing pharmacist shortage.

67.|59. As defendants ~~intended and anticipated~~|caused or allowed to occur, all of the above-described representations regarding the Company's performance for the fourth quarter and fiscal|. year 2000 and its business prospects were picked up and relied upon by securities analysts in issuing highly favorable reports and recommendations, which encouraged buying interest in CVS stock. For example, on February 7, 2001, Bear ~~Stearns~~|Stearns reiterated its "BUY RATING" on CVS stock, stating that *"[t]hrough consistently improving sales growth, increased operating margins, and earnings growth,*

24

*we believe the company is poised to capture a large portion of the estimated 13% in*

*pharmacy industry growth by 2004."*

68.|60. In early March, 2001, CVS issued its Annual Report to Stockholders for

fiscal year 2000. In the Annual Report, defendants repeated the same financial results for

the fourth quarter of 2000 and fiscal year 2000 first announced on February 6, 2001.

Regarding the financial results, the Annual Report ~~contained a statement signed by the~~

~~Individual Defendants stating~~|stated:

> The integrity ~~and objectivity~~ of the financial statements and
> related financial information in this Annual Report are the
> responsibility of the management of the Company. The
> financial statements have been prepared in conformity with
> accounting principles generally accepted in the United
> States of America and include, when necessary, the best
> estimates and judgments of management. The Company
> maintains a system of internal controls designed to provide
> reasonable assurance, at appropriate cost, that assets are
> safeguarded, transactions are executed in accordance with
> management's authorization, and the accounting records
> provide a reliable basis for the preparation of the financial
> statements. ~~The~~|the system of internal accounting controls
> is continually reviewed by management and improved and
> modified as necessary in response to changing business
> conditions and the recommendations of the Company's
> internal auditors and independent auditors.

69.|61. Additionally, the Annual Report included a letter from defendant Ryan in

which he described CVS's business operations, once again, in unconditionally glowing

terms:

> The year 2000 was an exceptional year for CVS by any
> measure. We achieved continued strong financial results,
> including record sales, operating profit and net earnings.

*            *  *  *        *

25

This outstanding performance solidified our track record of meeting or beating Wall Street's expectations every quarter since we became a stand-alone public company in the Fall of 1996, and has translated into excellent returns for shareholders.

70.|62. The Annual Report also commented on the purported success of CV S|CVS's expansion efforts as follows:

Our 1997 acquisition of Revco D.S. Inc. and our 1998 acquisition of Arbor Drugs, Inc. provided us with leadership in new markets, earnings accretion and incremental upside potential. Both companies have been fully integrated –|– from a systems, people and operational perspective –|– and are performing very well.

The Annual Report further described CVS's strategy for continued store growth consisting of *"1) entering new markets, 2) adding stores within existing markets, and 3) relocating stores to more convenient, freestanding sites."* In this regard, the Annual Report further stated:

Store relocations, the third leg of our real estate strategy, are highly productive investments for CVS. When we relocate a store from an inline shopping center to a freestanding, convenient corner location, we typically generate 25% to 35% higher front-end sales, improved margins and a better return on invested capital than the stores they replace. The new sites, which are in higher-profile locations with convenient parking, have more appeal to consumers. Today, nearly 40% of our stores are in freestanding locations. Our goal over the next five to seven years is to reach 80%. Although the number of relocations will|wild decrease over time, our relocation strategy will remain an important component of our overall growth strategy.

71.|63. Defendants knew, or recklessly disregarded|improperly failed to know, that the financial results reported in the Annual Report and their statements commenting on those results set forth in paragraph 68|60 through 70|62 above were materially false

26

and misleading as the Company's gross margins and operating profits had been artificially inflated by defendants' failure to properly account for marked down and damaged merchandise in violation of GAAP, as described in paragraphs 33|107 through 42 above|124 below. As a consequence, reported earnings for the fourth quarter and year end 2000 were artificially inflated.

72.|64. Additionally, defendants knew, or recklessly disregarded|improper failed to know, that their comments regarding CVS's growth plans and business prospects were materially false and misleading because they failed to disclose the fact that CVS intended to close approximately 200 underperforming stores, as well as the fact that the Company was being adversely impacted by the ongoing pharmacist shortage, as described in 43|37 through 60|51 above.

73.|65. On or about February 27, 2001, defendants|CVS made available on CVS's|its website a press release announcing that Moody's Investors Service had raised the rating on CVS *"based on the company's leading market position, geographic diversity, and solid and improving debt protection measures."* The press release stated that *"CVS has become the largest drugstore chain, with stores blanketing the eastern U.S. . . . Growth has been achieved through new store openings and acquisitions. CVS is an acquirer in this consolidating industry, buying companies such as REVCO and Arbor in the same or adjacent geographic areas."*

74.|66. Further amplifying the perception of itself as an organization that was successfully achieving its financial goals, on March 6, 2001, CVS issued a press release announcing that "same store sales for the four weeks ended|month of February 24, 2001|,

2001, had increased 12.8% over the prior year period while pharmacy same store sales

rose 20.1%.²² In the press release, defendants ~~touted~~|caused or allowed CVS| to tout itself

as being *"America's #1 pharmacy dispensing more retail prescriptions in more stores*

*than any other chain. With annual revenues of more than $20 billion, CVS has created*

*innovative approaches to* ~~serve~~/*servo the healthcare needs of all of our customers*

*through its more than 4,100 CVS/pharmacy stores . .- ."* ~~Defendants~~/ CVS issued press

releases announcing increased same store sales for the months March, April and June

2001, on April 10, May 10, and June 5, 2001 respectively.  Each of these press releases

contained the same glowing language quoted above.

    ~~75.——On~~|67. For example, on March 19, 2001, CVS filed its annual report for

fiscal year 2000 with the SEC on Form 10-K.  The Form 10-K ~~was signed by, among~~

~~others, defendants Ryan and Rickard. In the l0-K, defendants incorporated by reference~~

~~the purported "record" results reported in CVS's Annual Statement to Shareholders and~~

~~first announced in defendants' February 6 press release.76. Additionally, the 10-K~~|,

signed by all defendants, included the following comments regarding CVS's business

prospects:

> We believe that our pharmacy operations will continue to
> represent a critical part of our business and strategy due to
> our ability to attract and retain managed care customers,
> favorable industry trends and our on-going program of
> purchasing patient prescription files from independent
> pharmacies.
>
>                    *  *  *  *  *
>
> The addition of new stores has played, and will continue to
> play a major role in our continued growth and success. Our
> store development program focuses on three areas: entering

28

new markets, adding stores within existing markets and
relocating stores to more convenient, freestanding sites.
~~During fiscal 2000, we opened 388 new stores, which
included 35 CVS ProCare stores and 230 relocations.
During the last three years we opened over 1,200 new and
relocated stores, or over a quarter of our existing store base.~~

~~We expect to open approximately 300 new stores during fiscal 2001 about half of
which are expected to be relocations.~~

*     * * *     *

A key part of our store development program is our
relocation effort. Our relocation program actively seeks to
relocate many of our strip shopping center locations to
~~freestanding~~|Freestanding sites. Because of their more
convenient locations and larger size, relocated stores have
typically realized significant improvements in customer
count and revenues, driven largely by increased sales of
higher margin front store merchandise. We believe our
relocation program offers a significant opportunity for
future growth, as only 39% of our existing stores were
freestanding as of December 30, 2000. We currently
expect|: to have approximately 44% of our stores in
freestanding locations by the end of fiscal 2001. Our long-
term goal is to have approximately 80% of our stores
located in freestanding sites.

~~77.~~|68. Defendants knew, or ~~recklessly disregarded~~|improperly failed to know,

that the financial results incorporated by reference in the 10-K were materially false and

misleading as the Company's gross margins and operating profits had been artificially

inflated by ~~defendants'~~|the Company's failure to properly account for marked down and

damaged merchandise in violation of GAAP, as described in paragraphs ~~33~~|107 through

~~42 above~~|124 below. As a consequence, reported earnings for the fourth quarter and year

end 2000 were artificially inflated.

~~78.~~|69. Additionally, defendants knew, or ~~recklessly disregarded~~|improperly failed

to know, that their comments regarding CVS's growth plans and business prospects were

materially false and misleading because they failed to disclose the fact that CVS intended to close approximately 200 underperforming stores and the fact that the Company was being adversely impacted by the ongoing pharmacist shortage, as described in 43|37 through 60|51 above.

79.|70. The 10-K contained purported cautionary statements regarding CVS's future operations, which were themselves materially false and misleading. Specifically, defendants represented|caused or allowed CVS to represent that its future results could be affected by, among other things, *"our|its ability to continue to secure suitable new store locations at favorable lease terms"* and *"our|its ability to attract, hire and retain suitable pharmacists and management personnel."* These statements were materially false and misleading in that defendants had already determined that approximately 200 stores would need to be closed because they were underperforming and could not be relocated to more desirable locations and defendants knew that CVS's operations were being adversely impacted by its inability to attract and retain adequate numbers of pharmacists to staff its stores.

80.|71. Also on March 19, 2001, while CVS was reaping the benefit of its purported "record" results for the fourth quarter and year end 2000, defendants issued a press release announcing that the Company had privately-placed $300 million of 5 5/8% notes due 2006 with an original issue price of $99.552 (the "Notes"). In this press release, defendants|CVS stated that, *"CVS is America's #1 pharmacy dispensing more retail prescriptions in more stores than any other chain. With annual revenues of more than $20 billion, CVS has created innovative approaches to serve the healthcare needs of all*

30

*of our customers through its more than 4,100 CVS/pharmacy stores . . . "* Subsequently,

CVS filed a registration statement with the SEC which permitted purchasers of the Notes

to exchange them for notes that would be freely tradeable in the market.

~~81.~~|72. On May 2, 2001, CVS issued a press release announcing its financial

results for the first quarter of 2001, the period ending March 31, 2001. The Company

reported "record" net earnings of $221.7 million, or $0.54 per share, for the first quarter,

up 15.9% from $~~191.3,~~|191.3 million, or $0.47 per share, during the same period the prior

year. Defendant Ryan commented on the results as follows:

> I am ~~very~~ pleased with our first quarter performance, which
> reflects solid same store sales growth and excellent expense
> control, resulting in improved operating margins . . .. We
> also continued to make good progress on inventory
> management, which will be a significant driver of our
> future returns.

The press release also commented on CVS's store growth during the quarter as follows:

> For the quarter CVS opened 14 new stores and relocated 24
> others. As of March 31, 2001, CVS operated 4,127 retail
> and specialty pharmacy stores in 31 states and the District
> of Columbia.

82.    ~~As defendants intended and anticipated,~~|73.  Defendants caused or

allowed all of the above-described representations were picked up and relied upon by

securities analysts in issuing highly favorable reports and recommendations, which

encouraged buying interest in CVS stock. For example, on May 3, 2001, Robinson-

Humphrey, after repeating CVS's reported results, reiterated its *"BUY rating on CVS due*

*to strong sector fundamentals and the company's recent move toward a slightly more*

*aggressive growth strategy."*

31

83.|74. On May 10, 2001, CVS held its annual meeting with securities analysts in New York City. At the conference, CVS management emphasized to analysts its internal operating initiatives to improve efficiency and drive sales, reviewed its strategies to attract and retain qualified pharmacists and discussed its plans for store growth. At the conference, CVS indicated that sales in May were "off to a good start."

84.|75. On May 11, 2001, CVS filed its report on Form 10-Q with the SEC for the first fiscal quarter of 2001. The 10-Q was signed by defendant Rickard. In the 10-Q, defendants|CVS repeated the financial results first announced in their May 2, 2001 press release. In addition, CVS represented that:

> In the opinion of management, the accompanying consolidated condensed financial statements include all adjustments (consisting only of normal recurring adjustments) which are necessary to present a fair statement of the Company's results of operations for the interim periods presented.

Defendants|CVS further commented on CVS's|its results and business operations as follows:

> Our pharmacy sales growth continued to benefit from our ability to attract and retain managed care customers and favorable industry trends.
>
> \*      \* \* \*      \*
>
> Sales also benefited|benefitted from our active relocation program which seeks to move our existing shopping center stores to larger, more convenient, freestanding locations. Historically, we have achieved significant improvements in customer count and net sales when we do this. . . . We believe that our relocation program offers a significant opportunity for future growth, as only 40% of our existing stores were freestanding as of March 31, 2001.

32

85. 76. Defendants knew, or ~~recklessly disregarded~~|improperly failed to know, that the financial results first announced in the May 2 press release and reported in the 10-Q were materially false and misleading as the Company's gross margins and operating profits had been artificially inflated by defendants' failure to properly account for marked down and damaged merchandise in violation of GAAP, as described in paragraphs ~~33~~|21 through ~~42~~|33 above.

86. |77. Additionally, defendants knew, or ~~recklessly disregarded~~|improperly failed to know, that their comments regarding CVS's growth plans and business prospects were materially false and misleading because they failed to disclose the fact that CVS intended to close approximately 200 underperforming stores and that the Company was being adversely impacted by the ongoing pharmacist shortage, as described in ~~43~~|37 through ~~60~~|51 above.

87. |78. In addition, the 10-Q contained purported "cautionary statements" which were, in themselves, materially misleading. Specifically, CVS represented that its future operations could be affected by, among other things, *"our ability to continue to secure suitable new store locations at favorable lease terms;"* and *"our ability to attract, hire and retain suitable pharmacists and management personnel."* These statements were materially false and misleading in that defendants had already determined that approximately 200 stores would need to be closed because they were underperforming and could not be relocated to more desirable locations and that CVS's operations were being adversely impacted by its inability to attract and retain adequate numbers of pharmacists to staff its stores.

33

88. ~~On May 14, 2001, Jim Smith, CVS's senior vice president of health services was quoted in an article published by Racher Press Inc. as follows: "By making the value it places on pharmacists abundantly clear, CVS Corp. is coping better with the nationwide pharmacist shortage than most retailers."~~

89. ~~Similarly, on May 11, 2001, J.P. Morgan issued an analyst report, based on information provided by CVS at its May 10 meeting with securities analysts, which stated the following: "CVS addressed its strategies to attract and retain quality pharmacists and technicians. CVS offers stock options to pharmacists, who can also participate in 401K and employee stock programs. The company discussed Excellence in Pharmacy Innovation and Care (EPIC), its program which focuses on workflow processes in the pharmacy, automation (for pill counting), as well as labor productivity, in terms of the cost benefits of shifting work from the pharmacist to the technician. 60% of the company's new pharmacy staff are hired away from competitors, while 40% from colleges."~~

~~90.~~|79. The statements identified in paragraphs ~~88 and 89~~|40 through 51 above, which were designed to create the |misleading impression that CVS was handling the pharmacist shortage better than its competitors and that the shortage was not having an adverse impact on the Company's operations ~~were materially false and misleading for the reasons set forth in paragraphs 49 through 60 above. Indeed, in communications with analysts, defendants' acknowledged that growth of pharmacy sales in April and May, 2001 was lower than the previous year. However, defendants falsely represented that this softening in sales was attributable to weak flu and allergy seasons. Contrary to these representations, as defendants were later forced to admit, the softening of sales was actually attributable to CVS's lack of adequate pharmacists to staff its stores.~~91.

~~Moreover, contrary to defendants' representations,~~|. CVS was not coping better

34

than most retailers with the pharmacist shortage *"by making the value it placed on pharmacists abundantly clear."* In fact, CVS was being collectively sued by its pharmacists based on its failure to pay overtime in violation of federal law. CVS's unfair treatment of its pharmacy personnel resulted in many pharmacists leaving the Company and negatively impacted the Company's ability to attract new pharmacists. As a result, defendants knew, or ~~recklessly disregarded~~|improperly failed to know, that the pharmacist shortage was having a materially negative impact on CVS's operations, resulting in increased wait time, reduced hours and temporary closings of stores on a regular basis, which in turn, reduced CVS's sales.

<u>The Truth Slowly Begins to Emerge</u>

~~92.~~|80. On June 27, 2001, CVS surprised the market by announcing that *"as a result of current economic and business trends, it now expects earnings per share for the second quarter and full year to be lower than previously anticipated."* Defendant Ryan commented on the announcement, stating in pertinent part as follows:

> "A slowing in our same store sales growth and increased gross margin pressure has led us to revise our expectations for the second quarter and full year," said Tom Ryan, Chairman, President and Chief Executive Officer. "The current economic environment has impacted front-store sales, particularly high-margin seasonal and general merchandise categories. While our pharmacy business remains healthy and vibrant in the vast majority of our markets, there are pockets of the country where we are experiencing a slower growth rate in pharmacy.

> |*     *     *

> "Clearly, we are disappointed with these developments, and we are taking the necessary actions to reaccelerate our growth," continued Mr. Ryan. "~~We~~|WE are focused on driving improvement through operational initiatives and tailored marketing programs. We expect that the trends we are experiencing are near ~~term~~|terms in nature, and that we

35

> are doing the right things to get our results back on a faster
> growth track."

93. 81. This announcement, however, only partially disclosed CVS's true

economic condition, as defendants continued to conceal the extent of the problems at the

Company. Thus, Defendant Ryan concluded the press release by stating:

> In spite of these developments, we are as excited as ever
> about the future of CVS. We operate in a vibrant industry
> and remain well-positioned as the market leader to take
> advantage of significant growth opportunities.

94. 82. Also on June 27, 2:, 2001, defendants CVS held a conference call with

investment analysts to discuss the announcement. During the call, defendant Defendant

Ryan stated:

> Our pharmacy comps began to slow in late April and
> continued through May but especially the last two weeks of
> May and into June . . . The facts are this, we have pockets
> of the country where we are experiencing slower growth
> rate in pharmacy. *Most of these problems relate to service
> issues, including waiting time, reduced pharmacy
> department hours, or closed pharmacy departments and out
> of stocks. Most if not all of these are directly related to the
> pharmacy shortage and I'll talk more about this later.*
>
> *              *  *  *              *
>
> Obviously, the shortage is an industry issue that is affecting
> all of us, all of our competitors. But *we have had a severe
> shortage in four of our major markets* and these markets,
> we have, we are a significant leader in these markets. ―
> Markets are Washington, Metro Washington, D.C.,
> Hartford, Connecticut, Detroit and Cleveland and obviously
> we have some other isolated areas . . . But as a result we
> have actually had the closed doors for reduced department
> hours leading to obvious service issues. We closed, reduced
> hours on closed pharmacy departments on Sunday. We've
> shortened hours on Saturday and to be quite honest, we
> could have lived with this and I think our customers would
> understand it to a point. Where we had the problem is

> where we've had to actually close some pharmacy
> departments during the weekdays. We didn't have
> pharmacists to cover the shifts.
>
> *       *  *  *       *
>
> We are still a growth company. Although our growth will
> be lighter than normal this year, clearly we are affected by
> the prolonged slow down in the economy. While we're not
> immune to down turns in the economy, we are certainly
> better positioned than most. I am confident that this is just a
> temporary set back due to those reasons I mentioned and
> that our trends will improve.

95.|83. Notwithstanding defendants' partial disclosure, the statements referenced above in paragraphs 92|80 through 94|82 were each materially false and misleading when made because they failed to disclose and/or misrepresented the following material facts:

(a)     that the Company had engaged in improper earnings management by delaying the writedown of damaged or unsaleable merchandise and that the Company's financial results had been artificially inflated as a result of this manipulation, as described above in paragraphs 32 through 42;

(b)     that the Company had determined that it would need to close approximately 200 stores that were underperforming and/or could not be relocated to more desirable locations, as described above in paragraphs 43 through 48; and(c)  that the Company had recognized that it had been unable to attract and retain adequate numbers of pharmacists and that this pharmacist shortage had been negatively impacting CV S|CVS's business since the beginning of the Class Period|relevant period, as described above in paragraphs 49 through 60.|40 through 51; and

37

|(c)    that the Company had determined that it would need to close

approximately 200 stores that were underperforming and/or could not be relocated to

more desirable locations, as described above in paragraphs 37 through 39.

96.|84. In response to ~~defendants'~~|the revisions of the Company's expected

earnings, the price of CVS common stock dropped sharply, falling from $44.10 per share

to $36.51 per share on extremely heavy trading volume.

97.|85. In commenting on defendants' announcements regarding the revision to

expected earnings and the belated disclosure of the impact of the pharmacist shortage on

CVS's operations, some analysts stated that it appeared that the Company had

intentionally withheld material information from the investing public. For example, an

analyst report issued by J.P. Morgan Securities Inc. stated:

> Information flow is a problem -|- We do not think that
> management has effectively handled the flow of
> information as recent events and concerns have developed.
> We believe that this has had a compounded effect on CVS'
> stock price. April and May pharmacy same store sales
> trends came in relatively soft at just about 14.0% (over
> difficult 18.0% plus prior year comparisons). *Management
> attributed soft trends in the pharmacy for these months to
> lower flu activity (April) and soft allergy trends (May) -|-
> explanations which seemed questionable.* Following a
> competitor downgrade on June 15, 2001, concerns about
> service levels in the pharmacy surfaced. Management has
> since acknowledged service problems in the pharmacy, but
> indicated that EPIC (Excellence in Pharmacy Innovation
> and Care), the company's pharmacy systems and work flow
> processes program, was operating well and not
> experiencing fundamental issues (although enhancements
> and upgrades have been required). Management has also
> since identified that the company has completed less file
> buys year-over-year;|, which has contributed to softer Rx
> same store sales. Last, CVS has revealed that recent soft
> pharmacy same store sales trends have been fairly isolated

38

to 6 markets, a couple of which are large markets for the company (probably either Boston, New York, Philadelphia or Atlanta). *Why this information has come from management after the fact is perplexing;* however, it has clearly weighed on the stock price, as we wonder whether there is more information that needs to surface.

~~98.~~|86. An analyst report dated June 27, 2001 issued by Prudential Securities

stated:

Although the shortage of registered pharmacists for the industry came as no surprise, we along with other investors didn't realize the gravity of the situation where CVS was concerned. Pharmacy same store sales at CVS have been softer than anticipated over the past couple months with May coming in at 16.1 % and April at 16.7%. Management indicated that this accelerated during the last two weeks of May and into June. The weakness originally was attributed to weaker flu and allergy seasons which was the case in the company's territories. When sales failed to rebound in late May and June it became apparent that the issue was a result of the severity of the pharmacist shortage. Due to the limited availability of licensed pharmacists, some stores had to decrease pharmacy hours during peak times which led to increased waiting periods and poorer customer service-a revelation which wasn't apparent to investors. As a result, some pharmacy customers switched their prescriptions over to competitors. Lost business in these four problem markets should negatively affect the top-line as well as gross margins.

~~99.~~|87. Although ~~defendants~~|CVS finally revealed that, contrary to their previous

representations, the pharmacist shortage was negatively impacting CVS's operations,

~~they~~|CVS, nevertheless, failed to disclose the full extent of the problems ~~that CVS~~|it was

experiencing. ~~Defendants'~~|CVS's failure to disclose material adverse information,

combined with ~~their~~ statements that CVS was still in a position to take advantage of

growth opportunities, prevented the market from discovering the full truth and allayed

analysts' fears. For example, on June 28, 2001, based on management's representations,

39

UBS Warburg issued an analyst report maintaining its "Buy" rating on CVS stock, stating that *"[w]hile we are disappointed with CVS'/s current sales performance, we believe that management is taking the necessary steps to address the pharmacist shortage problem and accelerate overall sales growth."*

~~100.~~|88.    On July 31, 2001, CVS issued a press release announcing its financial results for the second ~~Fiscal~~|fiscal quarter of 2001. Notwithstanding, CVS's June 27 press release lowering previously projected earnings expectations, ~~defendants reported that~~ the Company ~~had~~|reported increased earnings and sales for the quarter, without mentioning the negative impact of the pharmacist shortage on CVS's operations. Defendant Ryan commented on the results as follows:

> "We operate in a vibrant industry with excellent long-term fundamentals. Even in this economy we registered double digit sales growth and continued earnings growth.|, achieving record second quarter performance," stated Tom Ryan, Chairman, President and Chief Executive Officer.

Further, ~~defendants~~|the Company also commented on ~~the Company's~~ store growth, stating that *"[for/f]or the quarter, CVS opened 16 new stores and relocated 23 others,"* without mentioning the need to close approximately 200 underperforming stores.

~~101.~~|89.    On August 14, 2001, CVS filed its report on Form 10-Q with the SEC for the second fiscal quarter of 2001. The 10-Q was signed by defendant Rickard. In the 10-|-Q, ~~defendants~~|CVS reported net sales of $5.5 billion, a purported increase of 11.2% over the same period in the prior year. In addition, CVS represented that:

> In the opinion of management, the accompanying consolidated ~~condensed~~ financial statements include all adjustments (consisting only of normal recurring adjustments) which are necessary to present a fair statement

40

of the Company's results of operations for the interim
periods presented.

~~Defendants further commented on CVS's results and business operations as follows:~~

|*       *       *

Sales also ~~benefited~~|benefitted from our active relocation
program which seeks to move our existing shipping center
stores to larger, more convenient, freestanding locations.
Historically, we have achieved significant improvements in
customer count and net sales when we do this... . We
believe that our relocation program offers a significant
opportunity for future growth, as only 40% of our existing
stores were freestanding as of June 30, 2001.

~~Defendants also acknowledged that:~~

|*       *       *

Sales were negatively impacted by continuing pharmacy
operational problems combined with the weakening
economy. Our pharmacy operational problems primarily
resulted from the ongoing industry-wide pharmacist
shortage caused by a number of major pharmacy schools
transitioning their curriculum from five-year to six-year
programs. We believe the pharmacy operational issues,
which included reduced pharmacy hours, closed pharmacy
departments and increased customer wait times, combined
with reduced front store sales due to the weakening
economy, ultimately resulted in lower customer counts and
lost sales during the second quarter.

~~102.~~|90.    The statements referenced above in paragraphs ~~100~~|88 and ~~101~~|89

were each materially false and misleading when made because they failed to disclose

and/or misrepresented that the Company had engaged in improper earnings management

in violation of GAAP|. Moreover, although ~~defendants~~|the Company belatedly

acknowledged that the pharmacist shortage had negatively impacted its results for the

quarter, ~~they~~|it failed to disclose that the pharmacist shortage had been negatively

impacting CVS's business since the beginning of the ~~Class Period~~|relevant period.

Moreover, ~~defendants~~|the Company continued to conceal the fact that ~~the Company had~~

~~determined that it would need~~|it needed to close approximately 200 underperforming

stores, while emphasizing the number of stores CVS opened during the quarter.

### The Full Truth is Revealed

~~103.~~|91.        On October 30, 2001, the ~~last day of the Class Period,~~

~~defendants~~|Company once again shocked the market by issuing a press release

announcing that CVS's financial results for the third quarter of 2001 had fallen

substantially from the previous year. In this regard, ~~defendants~~|the Company reported that

net earnings were down 16.0% from the third quarter of 2000. In response to this

negative information, defendant Ryan commented:

> We are disappointed with our results for the third quarter
> and committed to taking the necessary actions to improve
> performance and restore healthy long-term growth. With
> that in mind, we have completed a thorough analysis of our
> business and are today announcing a series of actions to
> best position CVS for the future.
>
> *        *  *  *        *
>
> The Company's plan includes a series of sales generation
> and expense reduction initiatives, including:
>
> ---        Undertaking a store consolidation program, under
> which approximately 200 stores will be closed
> during the first quarter of 2002
>
> ---        Closing one of CVS'|s ten distribution facilities and
> one of ProCare's two mail order facilities.
>
> *        *  *  *        *
>
> In connection with certain of these actions, the Company
> expects to record a pre-tax restructuring and asset

42

impairment charge of approximately $350 million, ~~or~~|of
$0.56 per diluted share, in the fourth quarter of 2001.

~~104.~~|92.        The market reacted immediately to this additional surprising
announcement. On October 30, 2001, the price of CVS stock fell an additional $7.72 to
$23.90 per share, a one-day decrease of 24% and a decrease of 61% from the ~~Class~~
~~Period~~|relevant period high of $62.10 per share reached on March 3, 2001.

~~105.    As set forth above, throughout the Class Period, defendants issued~~
~~materially false and misleading statements regarding the Company which misled the~~
~~investing public. The market for CVS common stock was open, well-developed and~~
~~efficient at all relevant times. As a result of these materially false and misleading~~
~~statements and failures to disclose, CVS common stock traded at artificially inflated~~
~~prices during the Class Period. The artificial inflation continued until the time CVS fully~~
~~revealed the deteriorated nature of its business and these admissions were communicated~~
~~to, and/or digested by, the securities markets. Lead Plaintiffs and other members of the~~
~~Class purchased or otherwise acquired CVS common stock relying upon the integrity of~~
~~the market price of CVS common stock and market information relating to CVS, and~~
~~have been damaged thereby. At all relevant times, the material misrepresentations and~~
~~omissions particularized in this Complaint directly or proximately caused or were a~~
~~substantial contributing cause of the damages sustained by Lead Plaintiffs and other~~
~~members of the Class.~~

**~~Post Class Period Events~~**

~~106.~~|93.        On November 9, 2001, CVS filed its report on Form 10-Q with the
SEC for the third quarter of 2001. In the 10-Q, defendants stated:

43

> Sales were negatively impacted by operational problems
> combined with the weakening economy and increasingly
> competitive environment. We believe the operational
> issues, which included: a pharmacist shortage resulting in
> reduced pharmacy hours and closed pharmacy departments;
> out-of-stock merchandise and increased customer wait
> times; combined with the weakening economy and an
> increasingly competitive environments ultimately resulted
> in lower customer counts and lost sales during the third
> quarter. To address these issues, we intensified our
> pharmacist recruiting and retention efforts.

~~The 10-Q also reiterated defendants' plan to close approximately 200 stores and record a~~
~~restructuring charge of approximately $350 million.~~

~~107.~~|94.    On February 5, 2002, ~~defendants~~|the Company issued a press
release announcing ~~CVS's~~|its results for the fourth quarter of 2001 and fiscal year ended
December 31, 2001. As previously indicated, defendants announced that CVS would
record a $352.5 million restructuring charge and close 229 stores as well as a mail order
facility and a distribution center. As a result of the restructuring charge~~.~~|, CVS announced
that it had incurred a net loss for the fourth quarter of 2001 of $130 million.

|95.    As set forth above, during the relevant period, defendants issued or
allowed to be issued materially false and misleading statements regarding the Company
which misled the investing public. The market for CVS common stock was open, well-
developed and efficient at all relevant times. As a result of these materially false and
misleading statements and failures to disclose, CVS common stock traded at artificially
inflated prices during the relevant period. The artificial inflation continued until the time
CVS fully revealed the deteriorated nature of its business and these admissions were
communicated to, and/or digested by, the securities markets. Persons who purchased or

44

otherwise acquired CVS common stock relying upon the integrity of the market price of CVS common stock and market information relating to CVS, and were been damaged thereby and have brought numerous lawsuits, now consolidated into one suit, which has cost the Company millions of dollars to defend and which may cost the Company tens of millions more in settlement and for further litigation costs, all to the harm of the Company. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by the Company.

[The Company's Incentive Bonus Structure

|96.    Defendants Ryan and Rickard and other senior CVS executives were motivated to engage in the improper scheme alleged herein by their ability to obtain extraordinarily generous bonus compensation tied to meeting certain predetermined financial objectives. Specifically, the bonus structure was based on pre-established objectives for CVS' consolidated earnings before taxes ("EBIT") and return on net assets ("RONA").

|97.    In 2000, as result of the Company's reported financial numbers, defendant Ryan received a bonus of $1.6 million, which was *164% of his base salary* of $975,000.00 for the year. Further, in 2000, defendant Rickard received a bonus of $592,102, which was *more than 100% of his base salary* of $590,000 for the year. As alleged herein, the bonuses received by the defendants were based on financial numbers that were manipulated and were therefore false and misleading. But for defendants' conduct alleged herein, Ryan and Rickard would not have been able to receive the

45

substantial bonuses they received in 2000. As a result of the other defendants' failure to exercise properly their fiduciary duties, they caused or allowed these excessive bonuses, totaling many millions of dollars, to be improperly paid, thereby harming CVS.

|Insider Sales

|98.    Defendant Ryan was also motivated to artificially inflate the price of CVS common stock through his misrepresentations and omissions in order to engage in insider sales and realize substantial profits. During the relevant period, defendant Ryan sold CVS stock despite adverse information about CVS business which he knew but had not been disclosed to the public.

|99.    Specifically, on May 22 and 23, 2001, while the Company's common stock was artificially inflated as a result of defendants' false and misleading representations of the Company's financial performance, Defendant Ryan exercised his CVS stock options and sold a total of 95,040 shares of CVS common stock for total proceeds of approximately $3.54 million.

|100.    These stock sales by Defendant Ryan constituted 27% of the CVS stock he actually owned or acquired by exercise of stock options during the relevant period. Defendant Ryan sold 27% of the stock he owned or acquired because he knew the stock was artificially inflated and would decline sharply in price when the true facts, which defendants were concealing, became public.

|101.    Defendant Ryan's stock sales were also unusual in their timing. These stock sales occurred during the time period when CVS was supposedly enjoying a period of exceptional business success. As a result, if these exceptionally favorable present

46

conditions and future prospects actually existed, CVS stock should have been poised for continued advancement. Nevertheless, defendant Ryan unloaded 95,040 shares of CVS stock – 27% of his holdings – for $3.54 million in illegal trading proceeds during a time of supposedly exceptional business growth. Defendant Ryan did this because he knew CVS's statements about the current strong condition and success of CVS's business, as well as its strong future prospects, were false and misleading and were concealing the serious negative conditions in CVS business detailed herein. Indeed, defendant Ryan made the insider sales alleged above during the time when, as he later admitted, the Company was being negatively impacted by the pharmacist shortage, contrary to CVS's statements that they were well-suited to handle the shortage and it was not having any impact on the Company's operations.

|102. Moreover, during the relevant period defendants failed to prevent other Company insiders from selling shares of CVS common stock at artificially inflated prices. For example, on March 5, 2001, Douglas Sgarro CVS's Vice President, sold 42,407 shares of CVS common stock at between $60.00 and $60.50 per share for total proceeds of $2,546,926.00.

|103.   The insider selling by defendant Ryan, as well as the insider selling of other Company executives were a waste of CVS's assets.

|Private Placement of 5 5/8% Notes

|104.   On March 19, 2001, the Company announced in a press release that it had privately-placed $300 million of 5 5/8 notes due 2006 with an original issue price of $99.552 (the "2006 Notes"). The private placement closed on March 22, 2001. The

47

Company used the proceeds of the sale of the 2006 Notes to repay outstanding short-term debt.

|105.    At the time of the private placement, the 2006 Notes were not registered under the Securities Act of 1933 and could not be sold absent registration or an applicable exemption from registration requirements.

|106.    The sale of the $300 million worth of 2006 notes was successfully caused or allowed by defendants herein on more favorable terms than CVS would have received if the true financial picture of the Company had been revealed to the public. CVS was able to use the inflated financial numbers to attract buyers to the 2006 Notes since the public was feeling confident about the continued financial success of the Company. Lawsuits resulting from such fraudulent sale have harmed the Company.

|CVS's False and Misleading Financial Statements

|107.    At all relevant times during the relevant period, CVS represented that its financial statements were prepared in accordance with GAAP. GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. As set forth in Financial Accounting Standards Board ("FASB") Statement of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and useful information concerning an entity. Concepts Statement No. 1 provides, in pertinent part,

> |Financial statements are a central feature of financial reporting. They are the principal means of communicating accounting information to those outside an enterprise. . . . Financial reporting should provide information that is

48

> useful to present and potential investors and creditors and
> others in making rational investment, credit, and similar
> decisions.

108.    By signing Forms 10-K and 10-Q during the relevant period, defendants represented that CVS's financial statements during the relevant period were prepared in accordance with GAAP. Such representations were materially false and misleading because defendants knew, or improperly failed to know, that the Company issued financial statements that provided false and misleading information about the value of and its policy of accounting for inventories. These misrepresentations materially mislead investors about CVS's gross profits, gross margins and profitability during the relevant period.[1]

109.    Regulation S-X [17 C.F.R. § 210.4-01(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

110.    CVS's financial statements for the year ended December 31, 2000 were included in its Annual Report to Shareholders which was incorporated by reference in CVS's 2000 Form 10-K filed with SEC on or about March 19, 2001. Such financial statements disclosed that inventories are stated at "the lower of cost or market using the first in, first out method.

111.    GAAP, in Chapter 4 of Accounting Research Bulletin ("ARB") No. 43, provides:

---

[1] Gross profit is defined as the excess of sales over cost of goods sold and is referred to as gross margin when expressed as a percentage of sales.

49

|A major objective of accounting for inventories is the proper determination of income through the process of matching appropriate costs against revenues. . .

|The primary basis for accounting for inventories is cost. . . . A departure from the cost basis of pricing inventories *is required* when the utility of goods is longer as great as its cost. Where there is evidence that the utility of goods, in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss in the current period. This is generally accomplished by stating such goods at the lower level commonly designated as market. [First Emphasis Added.]

|112.    In addition, GAAP, as noted in Accounting Principles Board ("APB") Opinion No. 28, inventory losses from market declines should not be deferred and are costs which are associated with revenue that should be reported as part of the cost of goods sold.

|113.    Defendants caused or allowed CVS to violate GAAP by improperly accounting for inventory and the cost of goods sold. As noted above, CVS's gross margin rate had been in continual decline for some time due to the fact that lower margin pharmacy sales were becoming an increasingly larger percentage of CVS's total sales. This was especially true with respect to pharmacy sales paid for by third party insurance programs.

|114.    In order to mitigate the negative impact that the increase in pharmacy sales was having on gross margins, CVS improperly failed to account for its inventories in accordance with GAAP and its publicly disclosed policy of accounting for inventories at the lower of cost or market value. In so doing, CVS delayed recording a charge against its cost of goods sold resulting from an impairment in the value of its inventory, which

50

materially inflated its reported gross margins and earnings during the year ended December 31, 2000.

|115.   As noted above, on May 25, 2000, defendants caused or allowed CVS management to issue a memorandum to all CVS store managers, announcing that CVS would implement new procedures to account for in-store markdowns of damaged merchandise, store supplies, unsaleable merchandise and/or outdated merchandise. Pursuant to the new procedures, in-store markdowns and returns were to be tracked and recorded on a daily basis using an electronic RF device. According to the Company's internal policy manual the change in the markdown policy would allow for "more accurate and timely [markups and markdowns] on a daily basis" and would reduce the risk of having to record any unnecessarily large write-offs for damaged, unsaleable or outdated merchandise at any point in time.

|116.   In November 2000, however, CVS, in direct contravention of its newly implemented markdown and damage return policy, required all CVS store managers to stop store initiated markdowns until after January 1, 2001. Accordingly, from November 20, 2000 through at least the end of fiscal 2000, defendants caused or allowed 4,100 plus stores not to take markdowns or return damaged, unsaleable or outdated goods. This initiative caused one former CVS store manager to state that his store had *"trays and cases of unsaleable merchandise taking up space in the back of the store, in the back room."*

|117.   As a result of defendants' improper conduct, CVS knowingly suspended receipt of information from its stores necessary to allow it to properly account for

impaired merchandise inventory. In so doing, defendants caused or allowed CVS to delay the write down of tens of millions of dollars of inventory, thereby artificially inflating the Company's gross margins and operating results.

|118.    By delaying the write-off of discounted and/or unsaleable merchandise, defendants caused or allowed CVS to improve reported margins at a time when it was critical for them to do so. CVS's sales growth of 11% from 1999 to 2000 was almost entirely attributable to lower margin pharmacy sales.  Nonetheless, CVS's reported gross margins as a percentage of total revenue remained constant at approximately 26% in both years. Since CVS's sales growth in 2000 was almost entirely attributable to lower margin pharmacy sales, CVS's overall gross margin would be expected to decline unless defendants caused or allowed the Company to compensate for the increased pressure on margins in some other way. Defendants caused or allowed management to direct all stores managers to cease recording bone-fide markdowns until after fiscal 2000, thereby allowing CVS to artificially inflate reported gross margins in fiscal 2000.

|119.    Accordingly, the representations during the relevant period concerning CVS's gross profits, gross margins and earnings were materially false and misleading as they improperly failed to account for the impairment in the value of its inventories, which defendants knew, or recklessly ignored. This failure violated GAAP and was in direct contravention of CVS's publicly disclosed policy of accounting for inventories at the lower of cost or market value.

|120.   In addition to the violations of GAAP noted above, CVS's December 31, 2000 financial statements also violated, at least, the following additional provisions of GAAP:

(a)     The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶ 58-59);

(b)     The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶ 79);

(c)     The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶ 95, 97).

(d)     The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, ¶ 34);

(e)     concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider

responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶ 50); and

(f)    the concept that information about an enterprise gains greatly in usefulness if it can be compared with similar information ... about the same enterprise for some other period or some other point in time. (Concepts Statement No. 2, ¶ 111).

121.   In failing to file financial statements with the SEC which conformed to the requirements of GAAP, defendants caused or allowed CVS to disseminate CVS financial statements that were presumptively misleading and inaccurate. Accordingly, defendants materially misled the investing public during the relevant period, thereby inflating the price of CVS common stock, by allowing or causing CVS to publicly issue false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.

122.   In addition, Item 7 of Form 10-K, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), require the issuer to furnish information pursuant to Item 303 of Regulation S-K [17 C.F.R. 229.303]. In discussing results of operations, Item 303 of Regulation S-K requires the registrant to:

> Describe any known trends or uncertainties that have had
> or that the registrant reasonably expects will have a
> material favorable or unfavorable impact on net sales or
> revenues or income from continuing operations.

The instructions to paragraph 303(a) further state:

> The discussion and analysis shall focus specifically on
> material events and uncertainties known to management
> that would cause reported financial information not to be
> necessarily indicative of future operating results.

54

123.    The SEC, in its May 18, 1989 Interpretive Release No. 34-26831, has indicated that SEC registrants are required to employ the following two-step analysis in determining when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303 of Regulation S-K:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and is reasonably likely to have a material effect on the Registrant's results of operations.

124.    Nonetheless, CVS's Form 10-K and Form 10-Q issued during the relevant period, and signed by defendants, failed to disclose the information necessary for a proper understanding and evaluation of the Company's inventories and operating results.

### DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

125.    Plaintiff brings this action derivatively in the right and for the benefit of CVS to redress injuries suffered as a result of the breaches of fiduciary duty by the defendants.

126.    Plaintiff will adequately and fairly represent the interests of CVS and its shareholders in enforcing and prosecuting its rights.

127.    As a result of the facts set forth herein, plaintiff has not made any demand on the CVS Board of Directors to institute this action against the defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for at least the following reasons:

> A.    A majority of the members of the Board knowingly caused or allowed the Company to engage in the imprudent and illegal conduct described herein,

which could not have been an exercise of good faith business judgment;

B.  A majority of the members of the Board exhibited a sustained and systematic failure to fulfill their fiduciary duties and therefore face a substantial likelihood of being held liable for their breaches of fiduciary duties. Accordingly, the Board is legally incapable of independently and disinterestedly considering a demand to institute and vigorously prosecute this action.

C.  Defendants Ryan and Rickard are directly interested in the insider trading transactions challenged herein, from which they each received millions or hundreds of thousands of dollars in illicit personal financial benefits. Accordingly, defendants Ryan and Rickard are legally incapable of independently and disinterestedly considering a demand to institute and vigorously prosecute this action.

## COUNT I

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION

128.  Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

129.  At the time of each of the stock sales set forth herein, each defendant knew, but did not disclose publicly, that CVS had engaged in the imprudent and illegal conduct described herein. Each defendant made or allowed each of the aforementioned stock sales on the basis of this material non-public information.

130.  The information described in the preceding paragraph was proprietary, non-public information concerning CVS.

56

|131.    At the time of their stock sales, each defendant knew that when CVS's imprudent and illegal conduct was publicly disclosed, the price of the Company's common stock would dramatically decrease. The defendants' sales or allowance of sale of CVS common stock based on their knowledge of this material non-public information was a breach of their fiduciary duties of loyalty and good faith.

|132.    Since the use of the Company's proprietary information for their own gain or allowance of co-defendants' gain constitutes a breach of the defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits any defendants obtained or permitted thereby.

## |COUNT II

### AGAINST DEFENDANTS RYAN AND RICKARD
### FOR UNJUST ENRICHMENT

|133.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

|134.    As a result of their wrongdoing alleged herein, defendants Ryan and Rickard were unjustly enriched by their receipt of proceeds from their improper sales of CVS stock.

|135.    As a result of their wrongdoing alleged herein, defendants Ryan and Rickard were further unjustly enriched by their receipt of the cash bonuses alleged herein.

|136.    It would be unconscionable and contrary to fundamental principles of equity for Ryan and Rickard to retain the foregoing unjust benefits they received as a result of their wrongdoing. Accordingly, the Court should order Ryan and Rickard to disgorge their unjustly obtained benefits.

|COUNT III

AGAINST ALL DEFENDANTS
FOR BREACH OF FIDUCIARY DUTY OF GOOD FAITH

|137.   Plaintiff incorporates by reference all preceding and subsequent

paragraphs as if fully set forth herein.

|138.   As alleged herein, each defendant had a fiduciary duty to, *inter alia,*

exercise good faith in ensuring that the Company was operated in a diligent, honest and

prudent manner and complied with all applicable federal and state laws, rules, regulations

and requirements, and, when placed on notice of illegal or imprudent conduct committed

by the Company or its employees, exercise good faith in taking appropriate measures to

prevent and correct such conduct.

|139.   Each defendant breached his fiduciary duty of good faith by knowingly

causing or allowing the Company to engage in the imprudent and illegal conduct

described herein, and, when placed on notice of the wrongdoing, failing to make a good

faith effort to prevent or correct it.

|140.   As a direct and proximate result of defendants' foregoing breaches of

fiduciary duty, the Company has sustained damages, including, but not limited to, costs

and expenses in connection with internal and external investigations of and litigation

regarding the Company's imprudent and illegal conduct.

|Requests for Relief

|WHEREFORE, plaintiff demands judgment as follows:

|A.   Against all of the defendants and in favor of the
Company for the amount of damages sustained by
the Company as a result of the defendants' breaches
of fiduciary duties;

58

|B.    Imposition of a constructive trust in favor of the Company for the amount of profits each of the defendants received from their sales of CVS common stock alleged herein;

|C.    Entry of an Order compelling each of the defendants to disgorge to the Company the unjust benefits they received as a result of their wrongdoing;

|D.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

|E.    Granting such other and further relief as the Court deems just and proper.

## |JURY DEMAND

|Plaintiff demands a trial by jury.

Dated:    December 17, 2004                        Respectfully submitted,

                                                  PERKINS SMITH & COHEN LLP,


                                        By:    _____
                                                  Susan E. Stenger
                                                  BBO #555552
                                                  One Beacon Street, 30th Fl.
                                                  Boston, MA 02108-3106
                                                  Tel: 617-854-4000
                                                  Fax: 617-854-4040

                                                  **WECHSLER HARWOOD LLP**
                                                  Robert I. Harwood
                                                  Samuel K. Rosen
                                                  488 Madison Avenue
                                                  New York, NY 10022
                                                  Tel: 212-935-7400
                                                  Fax: 212-753-3630

## |VERIFICATION

STATE OF NEW YORK       )
                        : ss
COUNTY OF NEW YORK  )

|I, Richard Krantz, declare under penalty of perjury as follows:

|1.      I am the plaintiff in the above-captioned matter.

|2.      I have read the foregoing Derivative Complaint and hereby verify that the

contents thereof are true and correct to my own knowledge, except as to matters therein

stated to be alleged on information and belief, which matters I believe to be true.

|Dated: December 14, 2004


                                        /s/  Richard Krantz
                                _____
                                        Richard Krantz

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                :
In re: CVS CORPORATION SECURITIES      :  C.A. No. 01-11464 JLT
LITIGATION                                      :
                                                :
                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' MOTION TO REDESIGNATE THE DERIVATIVE ACTION AS A RELATED CASE AND TO CONSOLIDATE

Defendants CVS Corporation ("CVS"), Thomas M. Ryan and David B. Rickard

(collectively, "Defendants") respectfully move to redesignate Krantz v. Ryan, et. al., C.A.

No. 04-12650-REK (the "Derivative Action"), presently pending before Judge Keeton, as

a related case pursuant to D. Mass. R. 40.1(G)(5) and, pursuant to Fed. R. Civ. P. 42(a)

and D. Mass. R. 40.1(J) for an order consolidating Fescina v. CVS Corp., et. al., C.A. No.

04-12309-JLT (the "ERISA Action") and the Derivative Action with the instant action

(the "Securities Action"). Pursuant to D. Mass. R. 40.1 (G)(5), a contemporaneous

motion for redesignation of the Derivative Action has been filed with Judge Keeton.

For the convenience of the Court, a copy of the complaint filed in the Derivative

Action and a blackline comparison of that complaint against the operative complaint in

the Securities Action are attached as Exhibits A and B to the Affidavit of Michael S.

Gardener filed herewith.

Defendants have also filed herewith a memorandum of law in support of their

motion, which they incorporate as though fully set forth herein. As set forth in detail in

Defendants' memorandum of law, the ERISA Action, the Derivative Action and the

Securities Action involve numerous common questions of fact and law, and consolidation

is therefore necessary in order to, *inter alia*, preserve judicial resources and eliminate the risk of inconsistent judgments.

WHEREFORE, for all of the reasons stated above and in the accompanying memorandum of law, Defendants respectfully request that the Court grant this motion to consolidate the above-mentioned actions or, in the alternative, to redesignate the Derivative Action as a related case, and such other relief as is appropriate under the circumstances.

Dated: Boston, Massachusetts
February 11, 2005

Respectfully submitted,

Of Counsel:

Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

Michael S. Gardener, BBO #185040
Mintz, Levin, Cohn, Ferris, Glovsky
  and Popeo, P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000

Attorneys for Defendants

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by mail/~~~~ on 2 | 11 | 05

SO ORDERED:

_____
U.S.D.J.

2

# RULE 7.1A(2) CERTIFICATE

On January 27 and 28, 2005, I conferred with Deborah Clark-Weintraub, counsel for lead plaintiff in the Securities Action, concerning this Motion to Consolidate. Ms. Clark-Weintraub stated that she will determine her position after reviewing the Motion to Consolidate filed herewith. On January 27, 2005, I conferred with Deborah Gross, counsel for James Fescina, concerning this Motion to Consolidate. Ms. Gross stated that she will determine her position after reviewing the Motion to Consolidate filed herewith. On February 5, 2005, I conferred with Samuel Rosen, counsel for Richard Krantz, concerning this Motion to Consolidate. Mr. Rosen opposes the motion.

_____
Trisha Lawson
Attorney for Defendants

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by mail/hand on ___2 | 11 | cT___

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
In Re: CVS CORPORATION SECURITIES         :  C.A. No. 01-11464 JLT
LITIGATION                                :
                                          :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO REDESIGNATE THE DERIVATIVE ACTION AS A RELATED
## CASE AND TO CONSOLIDATE

Defendants CVS Corporation, Thomas M. Ryan and David B. Rickard

(collectively, "Defendants") respectfully submit this memorandum of law in support of

their motion pursuant to Fed. R. Civ. P. 42(a) and D. Mass. R. 40.1(J) for an order

consolidating Fescina v. CVS Corp., et. al., C.A. No. 04-12309-JLT (the "ERISA

Action") and Krantz v. Ryan, et. al., C.A. No. 04-12650-REK (the "Derivative Action")

with the instant case (the "Securities Action") and redesignating the Derivative Action as

a related case pursuant to D. Mass. R. 40.1(G)(5).

### BACKGROUND

Defendants' motion seeks consolidation of three closely related actions currently

pending in the District of Massachusetts: the Securities Action; the ERISA Action; and

the Derivative Action.

*The Securities Action*: On August 22, 2001, plaintiff Eleanor Turberg filed a class

action complaint in this District under the caption Turberg v. CVS Corp. et. al., C.A. No.

01-11464-JLT, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange

Act of 1934 and Rule 10b-5 promulgated thereunder. Between August and October

2001, additional complaints were filed in this Court. On February 6, 2002, this Court

consolidated the cases under the caption <u>In re CVS Corp. Securities Litig.</u>, C.A. No. 01-11464-JLT, and appointed lead counsel and lead plaintiff.[1]

On April 8, 2002, lead plaintiff filed a Consolidated and Amended Class Action Complaint (the "Securities Complaint" or "S.C.") that articulates three theories of fraud. First, it alleges that during the last six weeks of 2000, Defendants "delay[ed] the writedown of tens of millions of dollars of inventory, thereby artificially improving the Company's gross margin and inflating its reported operating results for the fourth quarter and year end 2000." (S.C. ¶ 41). Second, it alleges that Defendants' statements regarding CVS's "growth plans and business prospects were materially false and misleading because they failed to disclose . . . the fact that the Company was being adversely impacted by the ongoing pharmacist shortage." (S.C. ¶ 78; <u>see also</u> <u>id.</u> at ¶¶ 66, 86). Third, it alleges that Defendants' statements regarding CVS's "growth plans and business prospects were materially false and misleading because . . . they failed to disclose the fact that CVS intended to close approximately 200 underperforming stores." (S.C. ¶ 66; <u>see also</u> <u>id.</u> at ¶¶ 78, 86).

Defendants moved to dismiss the Securities Complaint on June 7, 2002. The Court denied Defendants' motion to dismiss on December 18, 2002, and accordingly Defendants filed an answer on January 24, 2003. Defendants filed a motion for summary judgment on January 14, 2005. Plaintiff's opposition to Defendants' motion for summary

---

[1] In addition to <u>Turberg</u>, the consolidated cases were: <u>Shapiro v. CVS Corp.</u>, C.A. No. 01-11490-JLT, <u>Taylor v. CVS Corp.</u>, C.A. No. 01-11507-JLT, <u>Shaev v. CVS Corp.</u>, C.A. No. 01-11579, <u>Knisley v. CVS Corp.</u>, C.A. No. 01-11613-JLT, <u>Fink v. CVS Corp.</u>, C.A. No. 01-11637-JLT, <u>Copley Foundation v. CVS Corp.</u>, C.A. No. 01-11662, <u>Potash v. CVS Corp.</u>, C.A. No. 01-11732-JLT, <u>Nomm v. CVS Corp.</u>, C.A. No. 01-11819-JLT.

judgment is due on February 14, 2005; Defendants' reply is due on February 28, 2005. A Pre-trial Conference is scheduled for March 23, 2005. A trial date has been tentatively set for May 9, 2005.

*The ERISA Action*:  On October 29, 2004, plaintiff James Fescina filed a class action complaint under the caption <u>Fescina v. CVS Corp., et. al</u>, C.A. No. 04-12309-JLT, alleging claims under the Employee Retirement Income Security Act (the "ERISA Complaint" or "E.C.").  Fescina designated his case as related to the Securities Action.

The named defendants in the ERISA Action are CVS, Thomas M. Ryan and other members of the CVS board of directors.  The ERISA Complaint alleges that the named defendants and others were fiduciaries of the CVS-sponsored 401(k) plan (the "Plan"), and that they breached their fiduciary duties to the Plan's participants and beneficiaries based upon the same alleged misconduct that forms the basis of the Securities Action.

Like the Securities Complaint, the ERISA Complaint alleges that (i) the defendants "delay[ed] the writedown of millions of dollars of inventory, thereby artificially improving the Company's gross margin and inflating its reported operating results for the fourth quarter and year end 2000" (E.C. ¶ 73); (ii) the defendants' statements "regarding CVS's growth plans and business prospects were materially false and misleading because they failed honestly and fully to disclose . . . the fact that the Company, overall, was being adversely impacted by the ongoing pharmacist shortage" (E.C. ¶ 102); and (iii) the defendants' statements "regarding CVS's growth plans and business prospects were materially false and misleading because they failed honestly and

fully to disclose the fact that CVS had already determined a requirement to close approximately 200 specifically identified non- and underperforming stores" (E.C. ¶ 102).

The defendants in the ERISA Action returned executed waiver of service forms to plaintiff's counsel on January 27, 2005.

*The Derivative Action*: On December 17, 2004, plaintiff Richard Krantz filed a shareholder derivative complaint under the caption <u>Krantz v. Ryan, et. al.</u>, C.A. No. 04-12650-REK (the "Derivative Complaint" or "D.C."). The named defendants in the Derivative Action are Thomas M. Ryan, David B. Rickard, other members of the CVS board of directors and, nominally, CVS.

The Derivative Complaint alleges that the defendants breached their fiduciary duties based upon the same conduct that forms the basis of the Securities Action and the ERISA Action. Specifically, it alleges that (i) the defendants "delay[ed] the writedown of tens of millions of dollars of inventory, thereby artificially improving the Company's gross margin and inflating its reported operating results for the fourth quarter and year end 2000" (D.C. ¶ 32); (ii) the defendants' statements regarding CVS's "growth plans and business prospects were materially false and misleading because . . . they failed to disclose . . . the fact that the Company was being adversely impacted by the ongoing pharmacist shortage" (D.C. ¶ 58); and (iii) the defendants' statements regarding CVS's "growth plans and business prospects were materially false and misleading because . . . they failed to disclose the fact that CVS intended to close approximately 200 underperforming stores" (<u>id.</u>).

4

Despite the fact that the Derivative Complaint repeats nearly verbatim the

allegations in the Securities Complaint for more than *thirty* pages (see Affidavit of

Michael S. Gardener, Ex. B ¶¶ 8-44), Krantz failed to designate the Derivative Action as

a related case pursuant to D. Mass. R. 40.1(G)(1).  As a result, the Derivative Action is

currently pending before Judge Keeton.  Pursuant to this motion and a contemporaneous

motion filed with Judge Keeton, Defendants seek to have the Derivative Action

designated as related to this action.

## **ARGUMENT**

Rule 42(a) of the Federal Rules of Civil Procedure provides that:

> When actions involving a common question of law or fact
> are pending before the court, it may order a joint hearing or
> trial of any or all the matters in issue in the actions; it may
> order all the actions consolidated; and it may make such
> orders concerning proceedings therein as may tend to avoid
> unnecessary costs or delay.

Fed. R. Civ. P. 42(a).

In determining whether to order consolidation, the Court must first determine

whether the proceedings involve a common party and common issues of fact or law.

Seguro de Servicio de Salud de Puerto Rico v. McAuto Sys. Group, Inc., 878 F.2d 5, 8

(1st Cir. 1989) (citations omitted).  Once this determination has been made, the Court

"has broad discretion in weighing the costs and benefits of consolidation to decide

whether that procedure is appropriate."  Id.  If this two-step analysis is resolved in favor

of consolidation, the Court should grant the motion to consolidate unless the party

opposing consolidation shows "demonstrable prejudice."  Id. (quotations and citations

omitted).

5

**A.    The Three Actions Have Common Parties and Common
        Questions of Fact and Law**

The Securities Action, the ERISA Action and the Derivative Action indisputably

have parties and questions of fact and law in common. All three actions are brought by

CVS shareholders and name as defendants CVS and Thomas M. Ryan.[2]  In addition, all

three actions are based upon the same alleged misconduct.

First, all three plaintiffs contend that, at the end of 2000, CVS improperly

suspended certain markdowns, which allegedly had the effect of inflating CVS's

earnings. (Compare S.C. ¶¶ 33-42; E.C. ¶¶ 63-73; D.C. ¶¶ 24-33). Indeed, all three

complaints use nearly identical language to describe the markdown issue:

> CVS knowingly cut off the flow of information from stores
> that would allow the Company to properly account for
> discounted and unsaleable merchandise, in violation of
> GAAP. . . By doing so, defendants were able to delay the
> writedown of millions of dollars of inventory, thereby
> artificially improving the Company's gross margin and
> inflating its reported operating results for the fourth quarter
> and year end 2000.

(S.C. ¶ 41; E.C. ¶ 73; D.C. ¶ 32).[3]

Second, all three plaintiffs assert that the defendants deceived investors by failing

to timely disclose the adverse effects on CVS of a nationwide pharmacist shortage.

(Compare S.C. ¶¶ 49-60; E.C. ¶¶ 82-95; D.C. ¶¶ 40-51).

---

[2] The Securities Action and the Derivative Action also both name David B. Rickard as a
defendant. Thomas P. Gerrity, Stanley P. Goldstein, Marian L. Heard, Terrence Murray, Sheli Z.
Rosenberg, and William H. Joyce are defendants in both the ERISA Action and the Derivative Action.

[3] The Derivative Complaint contains immaterial differences. For example, instead of stating that
CVS "knowingly cut off the flow of information," the complaint states that "defendants caused or allowed
CVS to cut off the flow of information."

Third, all three plaintiffs assert that the defendants deceived investors by failing to disclose prior to October 2001 an alleged plan to close 200 CVS stores. (Compare S.C. ¶¶ 43-48; E.C. ¶¶ 74-81; D.C. ¶¶ 34-39).

Finally, all three plaintiffs identify the same allegedly false and misleading statements. (Compare S.C. ¶¶ 61-91; E.C. ¶¶ 96-105; D.C. ¶¶ 52-79).

Consequently, these cases are especially well-suited for consolidation. See BD ex rel. Jean Doe v. DuBuono, 193 F.R.D. 117, 141 (S.D.N.Y. 2000) (noting that "it is well settled that even one substantial common question of law or fact is enough for commonality under Rule 42(a)"); see also In re Unumprovident Corp. Sec., Derivative & "ERISA" Litig., 280 F. Supp. 2d 1377, 1378-79 (J.P.M.L. 2003) (consolidating for pretrial purposes securities, ERISA, and derivative actions); In re Xcel Energy Inc., Sec., Derivative & "ERISA" Litig., 254 F. Supp. 2d 1368, 1369-70 (J.P.M.L. 2003) (same); In re Enron Corp. Sec., Derivative & "ERISA" Litig., 196 F. Supp. 2d 1375, 1376-77 (J.P.M.L. 2002) (same).

## B.    The Benefits of Consolidation Clearly Outweigh the Costs

The similarity of the complaints clearly establishes that without consolidation, the Court, witnesses, and the parties will face substantially identical proceedings in the event the cases proceed to trial. Consolidation will thus avoid duplicative trials and eliminate the risk of inconsistent judgments. See In re PRI Automation, Inc. Sec. Litig., 145 F. Supp. 2d 138, 140 (D. Mass. 2001) (ordering consolidation where "[i]nterests in fair and efficient adjudication on the merits without wasteful duplicative proceedings will be better served"); Rohm & Haas Co. v. Mobil Corp., 525 F. Supp. 1298, 1310 (D. Del.

1981) (ordering consolidation where "both cases will undoubtedly involve a large number of the same witnesses, and the same documentary evidence and exhibits, thus raising the specter of inefficient and wasteful duplication").

The advantages of trying a single case rather than three distinctly similar cases also outweigh any minor inconveniences to the individual parties. The Securities Action is farther along than the other two cases, but courts routinely consolidate cases at different stages of litigation. See, e.g., Tingley Sys. Inc. v. CSC Consulting, Inc., 152 F. Supp. 2d 95, 102-03 (D. Mass. 2001); Werner v. Saterlee, Stephens, Burke & Burke, 797 F. Supp. 1196, 1212 (S.D.N.Y. 1992); Lloyd v. Indus. Bio-Test Lab., Inc., 454 F. Supp. 807, 812 (S.D.N.Y. 1978).

Moreover, any delay in the Securities Action resulting from consolidation would not have to be very long. The factual theories underlying the three cases are nearly identical; therefore, only limited additional discovery should be required if the ERISA and Derivative Actions survive motions to dismiss. In the event the Court grants the instant motion, moreover, Defendants are prepared to produce promptly to the plaintiffs in the ERISA and Derivative Actions copies of all discovery produced by Defendants in the Securities Action, subject to the Confidentiality Stipulation and Protective Order entered on October 6, 2003.

Nor will any of the plaintiffs be otherwise prejudiced by consolidation. First, considering the extent to which the three cases overlap one another, confusion is unlikely to result. Internet Law Library, Inv. V. Southridge Capital Management, LLC, 208 F.R.D. 59, 61 (S.D.N.Y. 2002) (noting that "[e]ven in multi-party litigation, courts have

8

been quick to emphasize that the danger of confusion from consolidation is largely

overstated") (internal citations omitted).[4]  Second, while the plaintiffs in the Securities

and Derivative Actions have demanded a jury trial, and the Court will hear the ERISA

Action, "multiple defendant jury and non-jury cases are routinely – and fairly – tried

together without any actual prejudice to any party concerned." Golden Trade S.R.L. v.

Lee Apparel Co., 1997 U.S. Dist. LEXIS 8924 at *7-8 (S.D.N.Y. June 25, 1997); see also

Blake v. Farrell Lines, Inc., 417 F.2d 264, 266-67 (3d Cir. 1969) (consolidating cases,

although one case involved a jury trial and the other involved a non-jury trial); Cedars-

Sinai Med. Ctr. v. Revlon, Inc., 111 F.R.D. 24, 33-34 (D. Del. 1986) (same).

Consolidation is thus warranted under the First Circuit's decision in Seguro de Servicio

de Salud de Puerto Rico v. McAuto Sys. Group, Inc., 878 F.2d 5, 8 (1st Cir. 1989).

### C. The Derivative Action Should be Designated as a Related Case

Pursuant to D. Mass R. 40.1(G)(1), a civil case is related to one previously filed

> if some or all of the parties are the same and if one or more
> of the following similarities exist also:  the cases involve
> the same or similar claims or defenses; or the cases involve
> the same property, transaction or event; or the cases involve
> insurance coverage for the same property, transaction or
> event; or the cases involve substantially the same questions
> of fact and law.

As discussed above, the Derivative Action, the ERISA Action and the Securities

Action involve numerous common questions of fact and law.  All three actions are

brought by CVS shareholders and name as defendants CVS and Thomas M. Ryan.  In

addition, all three actions are based on the same alleged misconduct.  In fact, as noted

---

[4] Consolidation is not precluded, moreover, because the class periods vary slightly.  See In re
Olsten Corp. Sec. Litig., 3 F. Supp. 2d 286, 293 (E.D.N.Y. 1998).

9

above, the Derivative Complaint repeats nearly verbatim the allegations in the Securities

Complaint for more than *thirty* pages. (See Affidavit of Michael S. Gardener, Ex. B ¶¶ 8-

44). As a result, the Derivative Action should be designated a related case and

transferred to this Court for consolidation and disposition along with the Securities and

ERISA Actions. Bailey v. Dart Container Corp. of Mich., 980 F. Supp. 584, 590 n.11 (D.

Mass. 1997) (noting "[t]he related case rule enhances the administration of the court by

avoiding piecemeal litigation and minimizing the occurrence of inconsistent decisions").

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court

grant their motion to designate the Derivative Action as a related case and to consolidate

the above-mentioned actions.

Dated: Boston, Massachusetts
February 11, 2005

Respectfully submitted,

Of Counsel:

Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

Michael S. Gardener, BBO #185040
Mintz, Levin, Cohn, Ferris, Glovsky
   and Popeo, P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000

Attorneys for Defendants

10

I hereby certify that a true copy of the
above document was served upon the
attorney of record for each party by
mail/hand on _____ ＞ ⏐ ⏐ ⏐ ⸳ ⸢ _____